BERGER SINGERMAN, P.A.
Paul Steven Singerman FL Bar No. 378860
Jordi Guso FL Bar No. 863580
Brian G. Rich FL Bar No. 38229
200 South Biscayne Blvd., Suite 1000
Miami, Florida 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
E-mail: singerman@bergersingerman.com
        jguso@bergersingerman.com
        brich@bergersingerman.com

DAVID C. FARMER ATTORNEY AT LAW LLLC
David C. Farmer    3946
225 Queen Street, Suite 15A
Honolulu, HI 96813-4639
Telephone: (808) 222-3133
Facsimile: (808) 529-8642
E-Mail: farmerd001@hawaii.rr.com

Proposed Co-Counsel to the Debtors

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| In re: | ) | Case No. 08-_____ |
| | ) | (Chapter 11 Cases) |
| ALOHA AIRLINES, INC., | ) | (Jointly Administered) |
| a Delaware corporation, et al.,[1] | ) | (Hon. Robert J. Faris) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| This document relates to: | ) | |
| | ) | |
| ALL CASES | ) | |
| _____ | ) | |

---

[1] The last four digits of the taxpayer identification number for each of the debtors follows in parentheses: (a) Airgroup (9996); (b) Aloha (4888); and (c) Acquisition (8526).   The address for all Debtors is 500 Two Waterfront Plaza, 500 Ala Moana Boulevard, Honolulu, Hawaii.

901627-6

## DECLARATION OF JEFFREY R. KESSLER IN SUPPORT OF
## VARIOUS FIRST DAY APPLICATIONS AND MOTIONS

JEFFREY R. KESSLER declares, under penalty of perjury, that:

1.     I am the Senior Vice President of Finance, Chief Financial Officer and Treasurer of Aloha Airlines, Inc. ("Aloha") and Aloha Airgroup, Inc. ("Airgroup").   Airgroup and Aloha, together with Airgroup Acquisition Corp. ("Acquisition") are referred to herein, collectively, as the "Debtors" or the "Companies."

2.     I make the following statements in support of the various first day applications and motions filed in the Debtors' bankruptcy cases.   Except as otherwise indicated, all of the facts set forth in this declaration are based upon my personal knowledge and my review of relevant documents of the Debtors.   I am competent to testify to the matters herein set forth and if called upon to do so, I could and would testify to the facts set forth herein.

3.     Part I of this declaration describes my background and qualifications. Part II describes the Debtors' businesses.   Part III explains the circumstances surrounding the filing of the Debtors' Chapter 11 petitions.  Part IV sets forth the relevant facts in support of certain of the Debtors' first day applications and motions filed concurrently herewith and on the date hereof (the "Petition Date").

# I. BACKGROUND AND QUALIFICATIONS

4.     I am currently the Senior Vice President of Finance and Chief Financial Officer of Airgroup and Aloha.

5.     In my current position, I oversee the financial management activities of Airgroup and Aloha and a workforce of approximately 80. I joined Airgroup and Aloha on June 6, 2005 as Chief Financial Officer. I worked extensively with the Debtors during the Prior Cases (as such term is defined herein) and assisted in the successful confirmation of the Prior Plan (as such term is defined herein).

6.     I hold a Masters of Business Administration in Finance and a Bachelors in Business Administration in Accounting (*magna cum laude*) from Temple University. I am a Certified Turnaround Professional and a Certified Insolvency and Restructuring Advisor.

7.     Prior to joining Airgroup and Aloha, I was a partner with Tatum CFO Partners, LLP in the Atlanta, Georgia office's restructuring practice. I have over 24 years of financial operations experience focused primarily on troubled companies and bankruptcy cases. In the numerous matters I have worked on, I have, among other things, evaluated current operations and financial performance, developed and evaluated various scenarios, and developed and implemented restructuring plans. Over the last two decades, I have worked on diverse projects

involving the restructuring of distressed companies, mergers and acquisitions, and administering sale and wind-down activities.

8.    Prior to joining Tatum CFO Partners, LLP, I was Managing Director with Partners for Corporate Renewal, Inc., a boutique turnaround firm. As acting Chief Financial Officer of Associated Grocers, Inc., a severely troubled $1 billion food distribution cooperative located in Seattle, Washington, I was instrumental in the restructuring of over $250 million in debt obligations held by 20 independent creditors and negotiated over $93 million in new financing to effectuate the restructuring.

9.    Prior to joining Partners for Corporate Renewal, I was Senior Vice President of Finance and Corporate Development and Treasurer for Burnham Service Corporation, a struggling $200 million third-party logistics company based in Atlanta, Georgia.  In that capacity, I was responsible for various financial functions and directed the company's acquisition and divestiture of business segments.  I was responsible for the sale/leaseback and outsourcing of the company's transportation fleet, and was also responsible for supervising the management of a real estate portfolio of 260 operating locations through the United States and Canada.  I was one of three senior executives responsible for administering the final sale and wind-down of all operations of the business through a Chapter 11 filing.

10.    Prior to joining Burnham Service Corporation, I was a Senior Manager in the Philadelphia, Pennsylvania office of Coopers & Lybrand's Business Reorganization Services group where I worked with debtors, lenders, creditors' committees and trustees to evaluate, turnaround or liquidate various operations and business entities.

## II.    THE DEBTORS' BUSINESSES

### A.    Operations

11.    Acquisition is a Delaware corporation and is the parent and sole shareholder of Airgroup.

12.    Airgroup is a Hawaii corporation and is the parent and sole shareholder of Aloha.[2]

13.    Aloha is a Delaware corporation and is a certificated, diversified aviation services corporation based in Honolulu, Hawaii.  Aloha is one of the three Hawaii-based air transportation services companies engaged primarily in the transportation of passengers, air freight, and cargo.  Aloha also is the largest provider of contract aviation services, serving more than 20 domestic and international air carriers in Hawaii.   An organizational chart for the Debtors is attached hereto as **Exhibit "A."**

---

[2] Airgroup has one other active subsidiary, AG Airgroup Insurance, Inc. ("Airgroup Insurance"), a wholly-owned "captive" insurance company that provides workers' compensation insurance to Aloha. Airgroup has a number of other subsidiaries, all of which are inactive.

14.     Aloha currently offers more than 700 scheduled inter-island passenger flights a week between Honolulu and the neighbor island destinations of Kona, Lihue, Kahului, and Hilo.   Aloha also operates approximately 140 transpacific flights a week between Hawaii and Oakland, Orange County, Sacramento and San Diego, California, and Las Vegas and Reno, Nevada.

15.     Aloha has been ranked as one of the top 10 U.S. domestic airlines by the readers of Travel and Leisure magazine for ten years in a row.   In 2007 Aloha was recognized as being one of the top airlines in terms of service. Aloha was number one in the nation for on-time arrivals, fewest complaints and fewest misplaced bags for several months in 2006 and 2007.   Aloha consistently ranks in the top tier for these service categories.

16.     In addition to carrying nearly 4 million passengers a year, Aloha handles approximately 85 percent of Hawaii's non-mail inter-island cargo, and has been named the number one air cargo carrier in North America by Air Cargo World Magazine.  The carrier offers more than 25 all-cargo flights daily.

17.     The Aloha fleet currently consists of 27 airplanes, including 8 Boeing 737-700 aircraft, 1 Boeing 737-800 aircraft, 13 Boeing 737-200 aircraft[3] configured for passenger flights and 5 Boeing 737-200 aircraft configured for cargo.

---

[3] Two of these 737-200s are presently not actively flying.

18.     Aloha offers its customers a broad choice of destinations and travel opportunities through its marketing and code share agreements with United Airlines and Hawaii Island Air.  In addition, the AlohaPass frequent flyer program allows for Aloha's customers to earn AlohaPass miles through the purchase of various goods and services and the use of the Aloha AirAwards credit card.  The AlohaPass program offers award redemptions for AlohaPass miles for travel benefits ranging from a one way inter-island ticket to a round trip ticket from Honolulu to Paris through United Airlines.

19.     The Companies are among Hawaii's top employers with a workforce of approximately 3500 employees and an annual payroll of approximately $130 million.   Of the approximately 3,500 employees, approximately 3400 are based in Hawaii.  The Companies are the 10th largest employer in the State of Hawaii.

20.     From January 1, 2008, through January 31, 2008, the Debtors had a net loss of $11 million, on operating revenues of $35 million.  From January 1, 2007, through December 31, 2007, the Debtors had a net loss of $81 million, on operating revenues of $407 million.  For the fiscal year ended December 31, 2006, the Debtors had a net loss of $46 million on operating revenues of $416 million.  For the fiscal year ended December 31, 2005, the Debtors had a net loss of $41.2 million, on operating revenues of approximately $455 million.

**B.    Labor**

21.    As a certified air carrier engaged in interstate air transportation, Aloha is subject to the Railway Labor Act ("RLA"), the federal statute which governs labor-management relations in the airline and railroad industries. Pursuant to the RLA, Aloha has well established collective bargaining relationships with four international labor organizations which represent approximately 3300 of Aloha's approximately 3500 employees in five bargaining groups.  These organizations are:

a.    Air Line Pilots Association, International ("ALPA") which represents Aloha's pilots.

b.    Association of Flight Attendants ("AFA-CWA") which represents Aloha's flight attendants.

c.    International Association of Machinists and Aerospace Workers ("IAM") – District 142 ("IAM142") which represents Aloha's mechanics.

d.    IAM, District 141 ("IAM141") which represents Aloha's ground employees, passenger service employees, and clerks.

e.    Transport Workers Union of America ("TWU") which represents Aloha's dispatchers and crew schedulers.

**C.    Current Officers and Directors of Debtor**

22.    The current board and management team of the Debtors are compromised of highly capable and experienced professionals with substantial familiarity with the airline industry.

**(1) Officers and Directors of Aloha, Airgroup, Inc. and Acquisition.**

|  | **ALOHA AIRLINES, INC., a Delaware corporation** | **ALOHA AIRGROUP, INC., a Hawaii corporation** | **AIRGROUP ACQUISITION CORP., a Delaware corporation** |
|---|---|---|---|
|  |  |  |  |
| **Directors** | Steve Mortensen | Steve Mortensen | Steve Mortensen |
|  | Ira Tochner | Ira Tochner | Ira Tochner |
|  | Erika Paulson | Erika Paulson | Erika Paulson |
|  | Gordon Bethune | Gordon Bethune | Gordon Bethune |
|  | Richard D'Abo | Richard D'Abo | Richard D'Abo |
|  | David Banmiller | David Banmiller | David Banmiller |
|  | Eldon Ching | Eldon Ching | Eldon Ching |
|  | Richard K. M. Ing | Richard K. M. Ing | Richard K. M. Ing |
|  | Willie Gault | Willie Gault | Willie Gault |
|  | Frederic Brace | Frederic Brace | Frederic Brace |
| **Executive Committee:** | Steve Mortensen | Steve Mortensen | Steve Mortensen |
|  | Ira Tochner | Ira Tochner | Ira Tochner |
|  | David Banmiller | David Banmiller | David Banmiller |
|  |  |  |  |
|  |  |  |  |
| **Officers:** |  |  |  |
| Chairman of the Board | Gordon Bethune | Gordon Bethune | Gordon Bethune |
| Chief Executive Officer | David Banmiller | David Banmiller | David Banmiller |
| President | David Banmiller | David Banmiller | David Banmiller |

| | | | |
|---|---|---|---|
| Chief Financial Officer | Jeffrey R. Kessler | Jeffrey R. Kessler | |
| Controller | Jerrold J. Benjamin | Jerrold J. Benjamin | |
| Chief Information Officer | Mustansir Malik | Mustansir Malik | |
| Sr. VP – Finance | Jeffrey R. Kessler | Jeffrey R. Kessler | |
| Sr. VP – Chief Marketing Officer | C. Thomas Nulty | C. Thomas Nulty | |
| Sr. VP – Public Relations and Government Affairs | Stephanie C. Ackerman | Stephanie C. Ackerman | |
| Sr. VP – Human Resources | Albert J. Pattison | Albert J. Pattison | |
| Sr. VP Airline Operations | Michael P. Coffman | Michael P. Coffman | |
| VP – Finance | Jerrold J. Benjamin | Jerrold J. Benjamin | |
| VP – Planning and Revenue Management | Bruce B. Wetsel | | |
| VP – Flight Operations | Ralph Peter Clark | | |
| | | | |
| Secretary | Han Hsin Ching | Han Hsin Ching | Steve Mortensen |
| Assistant Secretary | Albert J. Pattison | Albert J. Pattison | |
| Treasurer | Jeffrey R. Kessler | Jeffrey R. Kessler | |

**D.    Assets and Business Segments**

**(1)    Scheduled Assets and Liabilities**

23.    As of January 31, 2008, Airgroup reported $1,712 in assets, and $51,000 in liabilities   Aloha reported $215,850,000 in assets, and $284,912,000 in liabilities.   Acquisition reported no assets (other than investments in Airgroup), and no liabilities.    The Debtors have aggregate accounts receivable of approximately $20 million which are related primarily to cargo and contract services customers.    The Debtors have combined accounts payable of approximately $30 million, which consists primarily of unsecured trade debt and accrued unsecured obligations.   The Debtors have in excess of 4,000 creditors, including, *inter alia,* employees, trade creditors, secured creditors, lessors and counterparties to contracts.

**(2)    Business Segments**

24.    The Debtors' business consists primarily of four areas: interisland passenger service, transpacific passenger service, cargo services and contract services.

a.    **Inter-island Passenger Service.**    Aloha currently offers more than 700 scheduled inter-island passenger flights per week between Honolulu and the neighbor island destinations of Kona, Lihue, Kahului, and Hilo.    For the year ending December 31, 2007, inter-island passenger service served approximately 3.2 million passengers.

b. **Transpacific Passenger Service.** Aloha also operates 120 transpacific flights per week between Hawaii and Oakland, Orange County, Sacramento and San Diego, California; and Las Vegas and Reno, Nevada. For the year ending December 31, 2007, Aloha served approximately 693,000 passengers.

c. **Cargo Services.** Aloha provides cargo services to a variety of customers, including Fedex, UPS and the United States Postal Service.

d. **Contract Services.** Aloha provides above and below wing services for other carriers in Hawaii.

E. <u>Facilities</u>

25. The administrative office for Airgroup and Aloha is located at 500 Ala Moana Boulevard, Waterfront Plaza Bldg. II, Suites 210, 220, 410 and 500, Honolulu, Hawaii. In the aggregate, the Debtors occupy 34,336 square feet of rentable space. The Waterfront address includes the executive offices, and offices for finance, information technology and sales. Human resources, employee benefits and staffing offices are maintained in 6,500 square feet at 2828 Pa'a Street, Suite 2055, Honolulu, Hawaii and 750 square feet at 355 Hukilike Street Unit 120, Kahului, Maui, Hawaii. Reservations offices are maintained at 4510 Salt Lake Boulevard, Honolulu, Hawaii, consisting of Units D-4, D-5 and D-7 for a total of 10,512 square feet. A baggage claims office is maintained in 1,210 square feet at Airport Industrial Park, 3375 Koapaka Street, Suite F238-31,

Honolulu, Hawaii. An office/warehouse is maintained at 17935 Skypark Circle, Suite CD, Irvine, California consisting of approximately 3,640 square feet. An office/warehouse is maintained at 1481 Doolittle Drive, San Leandro, California consisting of approximately 4,174 square feet.

26. Aloha maintains a sales office in Tokyo, Japan at Terasawa Building, 6th Floor, 2-12-9 Kyobashi, Chuo-ku, Tokyo 104-0031. A ticket sales office is maintained in Sears, Ala Moana Shopping Center, 1450 Ala Moana Boulevard, Honolulu, Hawaii. Aloha also maintains airport ticket counters in Nevada, California and Hawaii.

27. Aloha also leases space or has permits for space to directly support its passenger and cargo air transportation services at the following airports:

| LOCATION | (square feet) |
| --- | --- |
| Honolulu International Airport | 369,311 |
| Kahului Airport | 37,205 |
| Kona International Airport at Keahole | 28,682 |
| Hilo International Airport | 42,882 |
| Lihue Airport | 29,191 |
| Oakland International Airport | 2,759 |
| McCarran International Airport | 562 |
| Reno-Tahoe Airport Authority | 3,734 |
| John Wayne Airport | 4,037 |
| Sacramento County Airport System | 1,513 |
| San Diego International Airport | 2,592 |

## F.   Pre-Petition Secured Indebtedness[4]

### (1)   Revolving and Term Loans

**Aloha Airlines**                    **Principal Secured Debt**

| | | Approx. Principal Balance 3/19/08 |
|---|---|---|
| Term Loan | GMAC Commercial Finance - Term Loan | $ 8,750,000 |
| Revolver | GMAC Commercial Finance – Revolver Yucaipa Corporate Initiatives Fund I, LLC (junior participant) | $ 35,324,043 |
| Subordinated Notes | Yucaipa Corporate Initiatives Fund I, LP, as agent | $106,686,926 |
| | Yucaipa Corporate Initiatives Fund I, LP, as agent | $ 0 |
| | Aloha Hawaii Investors | $ 168,752 |
| | GMAC Commercial Finance | $ 1,264,432 |
| LC Obligations | GMAC Commercial Finance | $ 4,925,050 |
| Revolver | United Air Lines, Inc. | $ 5,174,323 |
| | | $162,293,526 |

28.   The Debtors' principal secured creditors are GMAC Commercial Finance ("GMAC") and Yucaipa Corporate Initiatives Fund I, LP, as agent for a group of lenders ("Yucaipa").   As of March 20, 2008, Aloha had outstanding secured debt to GMAC and Yucaipa in the principal amount of

---

[4] The Debtors are not by this reference acknowledging the validity, priority or extend of any creditors pre-bankruptcy security interests and liens.

approximately $156,950,451, consisting of: (a) term loan in the approximate principal amount of $8,750,000 made by GMAC (the "GMAC Term Loan"), (b) revolving loan in the approximate principal amount of $35,324,043 made by GMAC, with a junior participation by Yucaipa Corporate Initiatives Fund I, L.P. (the "GMAC Revolver"), (c) loans, subordinated to GMAC, in the approximate principal amount of $106,686,926 made by Yucaipa (the "Subordinated Debt"). The Debtors' obligations to GMAC also include reimbursement obligations under letters of credit issued for the benefit of the Debtors, for which there is approximately $4.9 million in outstanding letters of credit (the GMAC Term Loan, GMAC Revolver and Subordinated Debt collectively referred to as the "Pre-petition Loans"). The Pre-petition Loans are secured by substantially all of the Debtors' assets.

29.　On July 3, 2007, Aloha, as borrower, and United Airlines, Inc. ("United"), as lender, entered into a Revolving Loan Agreement (the "United Loan"). The United Loan provided for funds to be made available to Aloha based upon a formula set forth in the United Loan documents. Additionally, pursuant to the terms of the United Loan, Aloha agreed to use commercially reasonable efforts to grant United a first priority security interest in all cash, cash equivalents and other proceeds from ticket sales (i) on United Ticket Stock or (ii) by United or its agents for travel on Aloha in the possession and/or control of United from time to time. Since the execution of the United Loan, Aloha has utilized commercially

reasonable efforts to grant United the security interest intended. As of the Petition Date, there is approximately $5.2 million due and owing to United under the United Loan.

## III. PRIOR BANKRUPTCY FILINGS AND EVENTS LEADING TO CURRENT CHAPTER 11 FILINGS

### A. Prior Bankruptcy Filings

30. Airgroup and Aloha previously filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on December 30, 2004 in the United States Bankruptcy Court in and for the District of Hawaii (the "Court"). The cases were jointly administered under Case Number 04-03063 before the Honorable Robert J. Faris (the prior cases will be referred to herein collectively as "Aloha I"). On November 26, 2005, the Court entered an order (the "Confirmation Order") confirming the joint plan of reorganization proposed by Airgroup and Aloha and Yucaipa (the "Prior Plan"). The Effective Date (as such term was defined in the Prior Plan) occurred on February 17, 2006.

31. The financial crisis leading to the filing of Aloha I was a result of, *inter alia,* competition from mainland carriers, as well as increased costs related to the price of fuel and health benefits, as well as pension-related costs.

32. Aloha and Airgroup utilized the protections afforded by the Aloha I cases to, *inter alia,* modify their fleet of aircraft, favorably modify certain labor agreements, restructure their financial obligations and emerge with new

investors and a low-cost structure primed to achieve financial and operational success.

### B. Events Leading Up To The Present Chapter 11 Filings

33.    Immediately after the confirmation of the Prior Plan, go! entered the market-place and began providing services at below-market and below-cost fares. The entry of this competitor into the marketplace instigated a fierce price war among the three local carriers, which has had a significant negative impact on the Debtors' revenue and profitability. Additionally, fuel prices have soared to an all-time historical high, resulting in huge increased operating expenses to the Debtors.

34.    Despite these hurdles, since the Effective Date, Aloha has excelled from an operational standpoint, and is consistently at the top of the ratings for the three primary benchmarks for operational excellence: fewest customer complaints, on-time arrivals and fewest baggage handling complaints. Aloha's operational performance has met, or exceeded, the Debtors' post-Effective Date projections.

35.    On October 13, 2006, Aloha and Airlines commenced an action in the United States District Court for the District of Hawaii styled <u>Aloha Airlines, Inc. and Aloha Airgroup, Inc. v. Mesa Air Group, Inc.</u>, Case No. 07-00007 (the "Mesa Case"). The Mesa Case seeks damages against Mesa Air Group, Inc. for attempted monopolization using predatory pricing tactics, breach of the parties'

two confidentiality agreements, breach of the implied covenant of good faith and fair dealing and fraud. The Mesa Case is presently pending and the trial is scheduled to commence on October 8, 2008.

36.     As set forth in paragraph 20 above, for the period of January 1, 2007, through December 31, 2007, the Debtors had a net loss of $81 million, on operating revenues of $407 million. For the fiscal year ended December 31, 2006, the Debtors had a net loss of $46 million on operating revenues of $416 million. For the fiscal year ended December 31, 2005, the Debtors had a net loss of $41.2 million, on operating revenues of approximately $455 million. The recent competition and increased operating expenses has had a significant impact on the Debtors.

## IV.     FIRST DAY MOTIONS AND APPLICATIONS

37.     The Debtors are filing concurrently herewith various "first day" applications and motions. The relief requested in the applications and motions will enable the Debtors to efficiently re-enter Chapter 11 and minimize the disruption to their business and their customers resulting from doing so. Accordingly, the Debtors request that all of the "first day" applications and motions be granted in their entirety.

### A. Joint Administration

38. As explained above, Acquisition is the parent corporation and sole shareholder of Airgroup. In turn, Airgroup is the parent corporation and sole shareholder of Aloha. Together, the Debtors operate an aviation services business.

39. In light of the interrelationship between the Debtors, the Debtors believe that the joint administration of their cases is in the best interests of the Debtors' estates and creditors generally. I am told that joint administration of the cases will avoid unnecessary costs and delay by eliminating duplicative filings with the Court and duplicative notices to creditors thereby facilitating the efficient and economical administration of the Debtors' estates.

### B. Retention of Counsel and Other Professionals

40. The Debtors are filing applications seeking approval of the employment of: (i) Berger Singerman, P.A. ("Berger Singerman") and David C. Farmer Attorney At Law LLLC ("Farmer"), as general co-counsel; (ii) Char Sakamoto Ishii Lum & Ching ("CSIL&C") as special corporate counsel; (iii) Epiq Bankruptcy Solutions, LLC ("EPIQ") as notice and claims agent; and (iv) Imperial Capital, LLC as financial advisors. In addition, the Debtors anticipate filing additional applications to employ various other special counsel and other "ordinary course" professionals in these cases in the near future.

41. The Debtors seek approval to employ Berger Singerman as general co-counsel. Berger Singerman has had considerable experience in cases

involving reorganizations under the Bankruptcy Code, and is familiar with the Debtors and their business. Berger Singerman represented Airgroup and Aloha as special transactional counsel and subsequently as general co-counsel in the Aloha I Cases. Since the Effective Date, Berger Singerman has continued to represent the Debtors in a variety of matters, including matters related to the administration of the Prior Plan. Therefore, the Debtors believe it is in their best interests to employ Berger Singerman as their general co-counsel.

42. The Debtors seek approval to employ Farmer as general co-counsel. Farmer has had considerable experience in cases involving reorganizations under the Bankruptcy Code, and is familiar with the Debtors and their business. Farmer represented Airgroup and Aloha as general co-counsel in the Aloha I Cases. Farmer is well known to the Court and the local bar and enjoys a favorable reputation before this Court. Therefore, the Debtors believe it is in their best interests to employ Farmer as general co-counsel in these cases.

43. The Debtors wish to retain CSIL&C as special corporate counsel to the Debtors for general corporate matters, contracts, leases, employment, governmental and legislative issues arising from acts of regulatory agencies and the Congress of the United States of America, subpoena and garnishment matters, including, without limitation, representing the Debtors in negotiations with Aloha's aircraft and equipment lessors, employees, and such additional corporate and transactional matters as designated by the Debtors.

44.     CSIL&C has previously represented the Debtors as counsel with respect to corporate matters, including representing the Debtors as special corporate counsel in the Aloha I case.  CSIL&C has been counsel for Aloha for many years, has considerable corporate experience and is intimately familiar with the Debtors' business.  Therefore, the Debtors believe it is in their best interests to employ CSIL&C as special counsel in these cases.

45.     The Debtors wish to employ EPIQ as their notice and claims agent.  The Debtors believe that the retention of EPIQ would promote the economical and efficient administration of the Debtors' cases because utilizing EPIQ would allow the Debtors to avoid duplication of effort in claims administration and in providing notices to their creditors, as well as allow the Debtors to focus on their core business.  EPIQ f/k/a Bankruptcy Services, LLC acted as notice agent and claims agent in Aloha I.  Therefore, the Debtors believe that it is in their best interests to employ EPIQ as their notice agent and claims agent.

46.     For the foregoing reasons, the Debtors believe the employment of the referenced professionals is in the best interests of the estates, and request that the applications be approved.

## C.    Cash Collateral Motion

47.     The Debtors are filing an *Agreed Emergency Motion by Debtors Pursuant To 11 U.S.C. §§ 361, 362 And 363 And Fed. R. Bankr. P. 4001 And*

*9014, For An Interim And Final Order Authorizing The Use Of Cash Collateral And Granting Adequate Protection* (the "Cash Collateral Motion").

48.    In the Cash Collateral Motion, the Debtors seek an interim and final order authorizing the use of cash, including cash collateral in which GMAC and Yucaipa (GMAC and Yucaipa collectively referred to as the "Lenders") claim an interest and the granting of adequate protection.

49.    As of the Petition Date, the Debtors had approximately $3.8 million of unrestricted cash on hand (the "Cash On Hand").   The Cash On Hand is maintained at accounts with First Hawaiian Bank, Royal Bank of Canada, SMBC and Sumitomo Mitsui.

50.    An immediate and critical need exists for the Debtors to be permitted to use the Cash On Hand to continue to operate and in order to, *inter alia*, pay wages, other direct operating expenses, to preserve the value of their assets so as to avoid immediate and irreparable harm to their estates, as well as to afford the Debtors adequate time to negotiate and seek approval for additional cash collateral use, subject to and within the limits imposed by the mutually agreed upon Budget.  The Debtors and Lenders have agreed to use Cash Collateral for the purposes set forth above and in compliance with the budget attached as part of Exhibit A to the Cash Collateral Motion (the "Budget").

51.    The filing of the motion is not an admission by the Debtors that any of the Lenders hold valid liens on the Debtors' cash.  The Debtors reserve the

right to contest the validity, priority and extent of each Lenders' liens as well as the amount of each of the Lenders' claims.

52.     Based upon the amount of Cash on Hand, the Debtors' immediate need to use Cash Collateral and the Lenders' requirement of the protections afforded in the proposed form of stipulated order, the Debtors request a preliminary hearing on a emergency basis (the "Preliminary Hearing"). At the Preliminary Hearing, the Debtors will seek entry of an interim order, pending entry of a final order. In addition, the Debtors further seek a final hearing no less than fifteen (15) days from service of a notice of hearing on such Final Hearing.

### D.     Cash Management Motion

53.     I am aware of the operating guidelines for debtors-in-possession established by the Office of the United States Trustee to supervise the administration of Chapter 11 cases. I understand that these guidelines require Chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation, "debtor-in-possession," the bankruptcy case number, and the type of account. I understand that the guidelines also require debtors to close their books and records as of the petition date and to open new books and records. I understand that these requirements are designed to provide a clear line of

demarcation between pre-petition and post-petition transactions and operations and to prevent the inadvertent post-petition payment of pre-petition claims.

54.     The Debtors are filing the *Debtors' Emergency Motion For Order Authorizing (I) Continued Use of Existing Business Forms And Records; (II) Maintenance of Existing Corporate Bank Accounts And Cash Management System; And (III) Extension Of Time To Comply With 11 U.S.C. § 345 Investment Guidelines* (the "Cash Management Motion").  In the Cash Management Motion, the Debtors seek authority to (i) continue the use of existing business forms and records; (ii) maintain their existing corporate bank accounts and cash management system; and (iii) an extension of time to comply with 11 U.S.C. § 345 investment guidelines.

55.     The Debtors' operations require that the cash management systems continue during the pendency of the Chapter 11 cases.  If the Debtors were required to adopt a new cash management system, their operations would be severely disrupted, which would have an adverse impact on the Debtors' ability to reorganize. Further, the establishment of new cash accounts and a new collection and disbursement system would result in substantial additional costs to the Debtors' estates.  Accordingly, the maintenance of the existing cash management system is essential and in the best interests of all creditors and other parties in interest.

## The Debtors' Cash Management System

56.     The Debtors' cash management system is comprised of a network of approximately twenty-eight (28) cash accounts maintained throughout the United States, Canada, and Japan.  The primary components of the Debtors' existing cash management system are (i) a series of depository accounts maintained with First Hawaiian Bank ("FHB"), Bank of the West and other institutions (collectively, the "Depository Accounts"); (ii) a series of disbursement accounts maintained at FHB and other institutions that are funded from the Depository Accounts and used for the payment of funds to employees, vendors and others (collectively, the "Disbursement Accounts"); and (iii) seven (7) accounts maintained with FHB and Hawaii National Bank to handle restricted cash balances, i.e., trust funds.

57.     The Debtors' cash management system is centrally managed by the Debtors' financial personnel in Honolulu, Hawaii.  Through the utilization of the existing cash management system, the Debtors are able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of the various bank accounts required to effect the collection, disbursement, and movement of cash.  The movement of funds through the Debtors' cash management system is described below and is illustrated in the chart attached as Exhibit "B" attached to the Cash Management Motion.  On March 19, 2008, the Debtors closed Account No. 6301-820035-508, one of the disbursement accounts at JP Morgan Chase.

58.     The cash management systems used by the Debtors constitute ordinary, usual, and essential business practices.  These systems allow the Debtors to (a) control corporate funds centrally, (b) invest idle cash, (c) ensure availability of funds when necessary, and (d) reduce administrative expense.

**The Debtors' Bank Accounts**

59.     Aloha utilizes a network of local, national and foreign banks to efficiently collect, transfer and disburse funds generated on a daily basis from its mainland, inter-island and international operations.

60.     Aloha maintains fourteen (14) depository accounts around the world for local deposits.  The Depository Accounts exist for the collection of credit card proceeds, airline clearinghouse settlements, station deposits, agent settlements, and other methods used by customers for the remittance of amounts owing to Aloha.  A number of the Aloha's Depository Accounts maintained in foreign countries are used to pay general expenses in local currency.  The Depository Accounts are maintained at the following institutions: Bank of the West, First Hawaiian Bank, Royal Bank of Canada and SMBC (Japan).  Funds are transferred manually from the Depository Accounts on a regular basis to the various Disbursement Accounts.

61.     Aloha maintains seven (7) restricted cash accounts at FHB and Bank of Hawaii for the maintenance of restricted cash balances.

62.     Aloha maintains a total of seven (7) separate disbursement accounts in Hawaii, Florida, Japan and Canada for special purpose disbursements, including:

direct deposit payroll, paper check payroll, ACH settlements, and, passenger compensation payments (refunds, lost baggage, and deferred boarding payments). The Disbursement Accounts are funded by the Depository Accounts on an as-needed basis.

63.    With respect to those accounts which are located in Japan, Japanese law requires that authorized signatories for accounts located in Japan must be residents of Japan.  In connection with the continued maintenance of the Debtors' accounts in Japan, the Debtors also request that the signatories on those accounts (who are all residents of Japan) be authorized to continue as signatories on the accounts, in accordance with the laws of Japan.

64.    Airgroup maintains one (1) cash account at FHB that maintains a nominal balance and is funded on an as-needed basis from the Depository Accounts.

**Existing Business Forms and Records**

65.    The Debtors also seek a waiver of the requirement that they open a new set of books and records as of the Petition Date.  The Debtors respectfully submit that opening a new set of books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay.  With the use of computer technology, it is now easy to differentiate between pre- and post-petition transactions by date.  The Debtors, in the ordinary course of their businesses, use many pre-printed checks,

invoices, stationery, and other business forms. By virtue of the nature and scope of the businesses in which the Debtors are engaged and the numerous other parties with whom the Debtors deal, a substantial amount of time and expense would be required in order to print new checks and other business forms. Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations.

66. Because of the nature of the Debtors' cases, and the nature, extent, and complexity of the Debtors' operations, the Debtors seek a waiver of the requirements of the Office of the United States Trustee and Section 345 of the Bankruptcy Code.

67. Additionally, as explained above, the Debtors' bank accounts comprise an established cash management system that the Debtors need to maintain in order to ensure that collections and disbursements from the accounts are not disrupted.

68. The Debtors will note, in their respective records, the date and times the Chapter 11 petitions were filed, and the records will reflect each post-petition receipt and disbursement.

**The Debtors' Business Forms and Checks**

69. Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession as a result of the size and notoriety of these cases and the press coverage that will be generated by the filing of these

cases.  Additionally, each of the Debtors' vendor creditors will receive direct notice of the commencement of these cases.

70.  Changing correspondence and business forms would be expensive, unnecessary, and burdensome to the Debtors' estates and disruptive to the Debtors' business operations.  For these reasons, the Debtors request that they be authorized to use existing checks and business forms.

### E.  Customer Programs Motion

71.  The Debtors are filing the *Debtors' Emergency Motion For Order Authorizing Aloha Airlines, Inc. To Honor Pre-Petition Obligations To Customers And To Otherwise Continue Customer Programs* (the "Customer Programs Motion").

72.  In the Customer Programs Motion, the Debtors seek entry of an order authorizing the Debtors, in their sole discretion, to honor certain pre-petition obligations to customers and to otherwise continue customer programs and practices in the ordinary course of business.

73.  As noted in the Customer Program Motion, prior to filing petitions for relief under Chapter 11 of the Bankruptcy Code, the Debtors engaged in certain practices, in the ordinary course of their businesses, to develop and sustain positive customer relations (collectively, the "Customer Programs").  The Debtors intend to continue to provide the Customer Programs in the ordinary course of business.

74.     The Customer Programs generally consist of three separate categories: (a) Ticket Holder Claims; (b) Frequent Flier Programs; and (c) Barter Arrangements.  The following are general descriptions and examples of some (but not all) of the Customer Programs offered by Aloha.

**Ticket Holder Claims**

75.     The Debtors seek the authority for Aloha to honor tickets that were purchased pre-petition, but have not yet been used (collectively, the "Pre-petition Tickets"), by providing the agreed upon air transportation or other related services.

76.     Customer confidence and goodwill will be harmed severely if Aloha is prevented from honoring Pre-petition Tickets.  If Aloha could not honor Pre-petition Tickets, parties holding such tickets would have priority claims pursuant to 11 U.S.C. § 507(a)(7).  Further, to the extent holders of unhonored Pre-petition Tickets do not exceed $2,425.00, paying such claims will not be detrimental to Aloha's general unsecured creditors.  Such priority claims would have to be paid in full in any event before unsecured creditors could receive any distribution.

77.     Similarly, Aloha must be able to honor any and all pre-petition transportation orders, travel certificates, miscellaneous charge orders, coupons, vouchers, Universal Air Travel Plan credits, and other authorizations for travel and other services. These authorizations are, from time to time, issued by Aloha as: (i)

compensation for late, canceled, or over-booked flights, or (ii) part of Aloha's promotional programs.

78.    The Debtors also request authority for Aloha to issue refunds on tickets purchased prior to the petition date.   To remain competitive with other carriers and to retain the goodwill and confidence of their customers and travel agents, it is extremely important that Aloha continue to issue refunds with respect to those tickets originally sold as refundable (collectively, the "Refundable Tickets").[5]   For the year ending December 31, 2007, Aloha refunded 36,100 ticket coupons totaling approximately $6.9 million in sales to customers.   The average refund value of each coupon refunded was $184.89.   In addition, the Debtors also seek authority for Aloha to continue to exchange those tickets originally sold as non-refundable.

79.    The Debtors believe that maintaining the refundability of tickets purchased pre-petition will enhance the public's confidence in the continued reliability and operations of Aloha.   In that regard, the Debtors believe that any extra refunds occasioned by these Chapter 11 cases will be more than offset by the revenue from sales made because the ticket refund policy is in place. Moreover, most of the ticket refunds requested would be accorded priority under Bankruptcy Code § 507(a)(7).

---

[5] Not all pre-petition tickets issued by the Companies are refundable.  Moreover, some non-refundable tickets are exchangeable only upon the payment of a penalty.

80.    To the extent Aloha is unable to continue the Customer Programs, Aloha risks isolating certain constituencies of customers and possibly encouraging customers to select competing airlines, all to the detriment of the Debtors and their estates. For the foregoing reasons, the Debtors seek authority for Aloha to continue honoring its obligations related to the Customer Programs involving Pre-petition Ticket Sales and Refundable Tickets (collectively, the "Ticket Holder Claims").

## Frequent Flier Program: AlohaPass and Related Credit Card

81.    In May 1983, Aloha created a frequent flier program now known as "AlohaPass."   Frequent flier programs, like AlohaPass, have been adopted by most major air carriers and are considered the primary marketing tool for developing brand loyalty among travelers and for accumulating demographic data pertaining to business fliers. Frequent flier programs are essential to building and maintaining a loyal customer base, especially among business travelers, who pay higher fares than leisure travelers.

82.    In connection with its AlohaPass program, Aloha offers Aloha AirAwards credit cards ("Aloha AirAwards Cards") pursuant to an Agreement between First Hawaiian Bank and Aloha, ("Aloha AirAwards Agreement") dated March 1, 2004, and as amended from time to time.   Under the Aloha AirAwards Agreement, Aloha provides First Hawaiian Bank with access to Aloha's list of AlohaPass program members and allows the First Hawaiian Bank to make certain

limited use of Aloha's logos, trademarks, trade names, and service marks (collectively, the "Aloha's Marks"). First Hawaiian Bank, in turn, agrees to offer credit card products bearing Aloha's Marks. Holders of the Aloha AirAwards Cards are entitled to earn AlohaPass miles at set formulae based on the type of card that they hold (i.e., Classic or Gold). In addition, certain holders are entitled to additional benefits related to Aloha's products and services. Such benefits include, by way of example, bonus flight miles and travel accident insurance.

83. Honoring AlohaPass obligations does not involve any appreciable current cash expense of the Debtors' estates. Rather, the AlohaPass participants who redeem mileage credit receive only air transportation from Aloha on flights that would operate in any event, or other related services from certain other participants in AlohaPass. Aloha uses the incremental cost method to account for liabilities associated with AlohaPass. Estimated future travel awards are valued at the estimated average incremental cost of carrying one additional passenger.

84. For the year ending December 31, 2006, AlohaPass program participants redeemed 1,248,639,000 mileage credits for 89,700 awards. Of these awards, 86,700 were redeemed for free travel. For the year ending December 31, 2007, participants redeemed 1,239,978,600 mileage credits for 79,200 awards, of which 75,900 were redeemed for free travel.

85.     The Debtors seek authorization for Aloha to provide post-petition air transportation to travelers who attempt to redeem miles earned pre-petition in the AlohaPass program.   Aloha simply cannot compete successfully against other major airlines unless it is able to maintain the integrity of the AlohaPass program.   Failure to honor the obligations of AlohaPass will severely harm Aloha's competitive position and the Debtors' reorganization efforts. Likewise, the Aloha AirAwards Agreement generates significant revenues for Aloha and also promotes loyalty among a large group of Aloha's customers. The vast majority of the costs incurred by Aloha under the Aloha AirAwards Agreement will not be incurred until some point in the future, if at all, and the Debtors are confident that the revenues generated under the Aloha AirAwards Agreement far exceed the eventual cost of the redemption of AlohaPass miles earned by holders of the Aloha AirAwards Cards.   Aloha's continued participation under the Aloha AirAwards Agreement - including honoring any pre-petition obligations - is in the best interest of the Debtors, their estates, and their creditors.

86.     To the extent Aloha is unable to continue AlohaPass and continue its participation under the Aloha AirAwards Agreement, Aloha risks isolating a proven customer base.   For the foregoing reasons, the Debtors seek authority for Aloha to (i) continue honoring its obligations related to the Customer Programs involving AlohaPass, and (ii) continue its participation under the Aloha

AirAwards Agreement, including the honoring of pre-petition obligations thereunder.

**AlohaPass and Mileage Plus Alliance**

87.     The passengers who are enrolled in the AlohaPass program have the option of accruing miles in either the AlohaPass program or in United Airlines' Mileage Plus program ("Mileage Plus").

88.     In 2001, Aloha entered into a comprehensive marketing agreement with United Airlines.  This agreement was amended in early 2007.  As a result of this agreement, Aloha's passengers have the opportunity to redeem award travel on United Airlines' extensive route network.  At the same time, Mileage Plus members can redeem award travel on Aloha's route system.

89.     For the year ending December 2007, Mileage Plus award travel on Aloha amounted to a value approximating $3.0 million.  At the same time, AlohaPass award redemption on United Airlines totaled 160.0 million miles.  For the year ending December 31, 2007, AlohaPass award redemption on United Airlines totaled 201.6 million miles.

90.     The Debtors seek authorization for Aloha to continue to provide air transportation to travelers who attempt to redeem Mileage Plus award travel on Aloha and to continue to reimburse United Airlines for any AlohaPass award travel redeemed on United Airlines.  Aloha simply cannot compete successfully against Hawaiian Airlines, go!, and others, unless it is able to maintain its participation in

the Mileage Plus program. Failure to honor Mileage Plus award travel on Aloha will severely harm Aloha's competitive position and the Debtors' reorganization efforts. Likewise, Mileage Plus travel awards used on Aloha generates revenue and promotes loyalty among a select group of Aloha's customers. Continued participation in the Mileage Plus program - including honoring any pre-petition obligations - is in the best interest of the Debtors, their estates, and their creditors.

91. To the extent that Aloha is unable to continue to participate in Mileage Plus, Aloha risks isolating a proven customer base.

**Barter Arrangements**

92. Aloha maintains barter arrangements with a number of organizations that provide varied services and support Aloha's operations in return for Aloha providing air transportation. The range of services provided to Aloha includes exclusive sponsorship of corporate and sporting events, advertising, sales promotion, public relations, and other professional consulting services (collectively, the "Barter Arrangements").

93. The Debtors seek authority for Aloha to continue to honor these Barter Arrangements. The Barter Arrangements are an important component of Aloha's promotional strategy. Conversely, the Debtors believe that the amount of unredeemed air transportation obligations related to Barter Arrangements as of the petition date is not substantial. Therefore, honoring the Barter Agreements will enhance the value of the estates at little cost.

94.     For the foregoing reasons, the Debtors request authority for Aloha to honor its obligations related to the Customer Programs involving Barter Arrangements.

**F.     Employee Wages and Benefits Motion**

95.     The Debtors are filing the *Debtors' Emergency Motion for Authority to Pay Pre-Petition Wages and Other Employment Related Costs and Expenses and to Honor Vacation and Sick Leave Rights* (the "Employee Wages and Benefits Motion").

96.     In the Employee Wages and Benefits Motion, the Debtors seek an order authorizing them to: (a) pay to their respective continuing Employees, in the regular course of the Debtors' businesses and in the Debtors' business discretion, pre-petition employment and employment related expenses, including, without limitation, pre-petition wages, salaries, payroll taxes, other required contributions, health insurance, life, disability, and other insurance, the employers' contribution to any pension, profit-sharing, or retirement plans, and reimbursable Employee expenses (hereinafter collectively referred to as "Pre-Petition Employment Expenses"); and (b) honor, in the regular course of the Debtors' businesses and in the Debtors' business discretion, all pre-petition accrued vacation and sick leave rights of the Debtors' continuing Employees.

**(1)  Wages, Salaries and Fees**

97.    As of the Petition Date, Aloha and Airgroup employed an aggregate of approximately 3,550 Employees[6] who together provide a myriad of services to the Debtors throughout the country.  The Employees serve both national and international airlines that operate in the State of Hawaii as well as support the Aloha's inter-island and mainland operations.

98.    Approximately 1,992 of the Employees are full-time ("Full-Time Employees"), while the remaining 1,558 of the Employees are part-time ("Part- Time Employees").[7]   In addition, the Debtors utilize the services of a variety of independent contractors from time to time, all of whom are paid as vendors through the Debtors' normal accounts payable system and not through the normal payroll systems, as are discussed herein.  Approximately 81% of all Employees are hourly wage earners (the "Hourly Employees" or "Represented Employees") who are also covered by collective bargaining agreements ("CBAs"), while the remaining 19% are salaried personnel (the "Salaried Employees").

99.    The annual payroll for all of the Debtors' Employees is approximately $110.5 million.[8]

---

[6] Acquisition has no employees.

[7] "Part-Time Employees" are defined as those Employees who are normally scheduled to work less than 40 hours per week for an indefinite period.

[8]  All average monthly payroll amounts provided herein are based on historical data.

### (a)    Salaried Employees

100. The Salaried Employees consist of the Debtors' executive, management, and non-represented Employees. The Salaried Employees are generally paid semi-monthly, on the tenth (10th) and twenty-fifth (25th) of the month, ten (10) days in arrears.

101. The Salaried Employees collectively are paid approximately $1.850 million per month, and the Debtors' portion of the payroll taxes for these Salaried Employees is approximately $142,000 per month. The Debtors estimate that, as of Petition Date, accrued but unpaid payroll for the Salaried Employees will be approximately $1,105,000, and accrued but unpaid payroll taxes will be approximately $85,000.

### (b)    Hourly/Represented Employees

102. The Hourly Employees, excluding pilots and flight attendants, are generally paid on a semi-monthly basis on the tenth (10th) and twenty-fifth (25th) of the month, ten (10) days in arrears. The Hourly Employees, collectively, are paid approximately $3.463 million each month, and the Debtors' portion of payroll taxes for those Hourly Employees is approximately $265,000 per month. (These amounts exclude the Flight Employees, as defined below). The Debtors estimate that, as of the Petition Date, accrued but unpaid payroll for the Hourly Employees will be approximately $2.309 million, and accrued but unpaid payroll taxes will be approximately $177,000.

103. Aloha's pilots and flight attendants ("Flight Employees") are paid on a semi-monthly basis, with such payments being made on the fifteenth (15th) and on the last day of each month. Flight Employees are paid "currently," but payment for a given month is adjusted after the close of the month. The payment on the last day of each month is an "estimated" payment (based on 50% of projected earnings for the month) and is adjusted on the fifteenth (15th) day of the following month so that pay for the previous month equals actual earnings for that month.

104. Because Flight Employees were paid on March 14, 2008 in the ordinary course, the Debtors estimate that, as of the Petition Date, accrued but unpaid payroll for the Flight Employees will be approximately $570,000, and accrued but unpaid payroll taxes will be approximately $44,000.

### (c) Outside Directors

105. The Debtors also reimburse expenses to members of their boards of directors (the "Outside Directors"). Additionally, Outside Directors are provided free airline travel for the board member, the board member's spouse, and the board member's dependents. Further, the Chairman of the Board is paid a consulting fee.

**(d)** <u>**Comparison to Priority Amount**</u>

106.  The Debtors estimate that none of the Debtors' Employees is owed in excess of $10,950 per individual for pre-petition wages or salaries.[9] Thus, all of the Debtors' Employees have a priority claim with respect to all of their accrued but unpaid pre-petition wages or salaries pursuant to Section 507(a)(4) of the Bankruptcy Code.

107.  The Debtors seek authority to pay the outstanding amounts owed as of the Petition Date for accrued and unpaid wages, salaries, and fees, including amounts that the Debtors are required by law to withhold from Employee payroll checks in respect of federal, state, and local income taxes, garnishments, contributions, and Social Security and Medicare taxes.

**(2)** <u>**Other Benefits, Withholdings, and Reimbursements**</u>

108.  The Debtors offer their Employees other forms of compensation, including vacation time, paid holidays, paid sick leave, and other earned time off, and reimbursement of certain business expenses. These forms of compensation are

---

[9] These calculations do not include accrued but unpaid Sick Leave or Vacation Time (both as defined hereafter). Information regarding Sick Leave is not centrally collected by the Debtors, and therefore the Debtors are not easily able to calculate the amounts owed to individual Employees as of any given time. In addition, the Debtors have excluded Sick Leave from the calculations, because Employees are not normally entitled to compensation for accrued Sick Leave upon resignation or termination of employment. Therefore, the Debtors expect Sick Leave to be used by Employees solely in the ordinary course of business. Finally, the Debtors have excluded Vacation Time from the calculation, because the Debtors do not normally expect such amounts to be paid out except as Employees use their Vacation Time in the ordinary course of business. Therefore, the Debtors believe that including such amounts would overstate the pre-petition obligations that they will actually be required to pay to Employees upon entry of an order approving this Motion.

usual, customary, and necessary if the Debtors are to retain qualified employees to operate their businesses.

**(a)** **Vacation Time**

109. All regular Full-Time Employees and regular Part-Time Employees are eligible to accrue paid vacation. The length of service determines a Full-Time Employee's amount of paid vacation, while Part-Time Employees receive paid vacation on a pro-rated basis based on the average weekly number of hours normally worked ("Vacation Time"). Vacation Time ranges from five (5) days to seven (7) weeks, based on an Employee's years of service. Actual payment to Employees for Vacation Time is based on an Employee's years of service and the number of vacation days taken in succession. The Debtors permit the carryover of Vacation Time from one year to the next for certain Employees.

110. For the majority of Employees, Vacation Time is accrued based on hours worked. For Employees not subject to a CBA, Vacation Time is accrued daily. Part-Time Employees' Vacation Time is pro-rated based on the number of hours worked. Employees who retire, resign, or are terminated are, for the most part, entitled to receive a cash payment based on their accrued Vacation Time.

111. The Debtors maintain information related to accrued Vacation Time for most Aloha Employees. The Debtors estimate that, as of March 15, 2008, approximately $7,175,000 exists in accrued but unpaid Vacation Time for all Employees.

### (b)  Sick Leave and Personal Leave

112.  Employees accrue sick leave ("Sick Leave") on a monthly basis. Sick Leave generally accrues at a rate of one (1) day per month for regular Full-Time Employees, depending on their position.  Regular Part-Time Employees do not accrue Sick Leave.  Certain Employee groups are subject to a maximum amount of accrued Sick Leave.  Those caps vary between 900 hours to 1,200 hours of accrued Sick Leave.  Employees who resign or are terminated normally are not entitled to any compensation for their accrued and unused Sick Leave.

113.  In addition, Employees are entitled to personal leave in accordance with the Debtors' companies' policies ("Personal Leave").

114.  The Debtors seek authority to honor in the ordinary course of business all pre-petition accrued Vacation Time, Sick Leave and Personal Leave rights of the Debtors' continuing Employees.  The Employees will utilize any accrued Vacation Time and Sick Leave in the ordinary course of business.

### (c)  Union Dues

115.  In the ordinary course of business, the Debtors withhold approximately $140,000 monthly from paychecks of certain Employees for the payment of dues to unions of which those Employees are members of unions (the "Union Dues").  These withheld amounts then are remitted to the respective unions on a monthly or semi-monthly basis, normally in arrears.

116.  The Debtors believe that funds withheld to pay Union Dues, to the extent that they remain in the Debtors' possession, constitute monies held in trust and, therefore, are not property of the Debtors' bankruptcy estates.  The Debtors believe, therefore, that their practice of directing such funds to the appropriate parties is in the ordinary course of business.  The Debtors, however, seek the approval of this Court for the continuation of such practices out of an abundance of caution.

### (d)  Expense Reimbursement

117.  Employees are entitled to reimbursement of certain limited categories of expenses incurred in the ordinary course of business.  The Debtors routinely reimburse Employees for certain expenses incurred within the scope of their employment, including expenses for travel, lodging, professional seminars and conventions, ground transportation, meals, supplies, and miscellaneous business expenses.   Additionally, a limited number of the Debtors' employees are reimbursed, as part of their salary, for certain housing and car expenses (collectively, "Business Expenses").

118.  In addition, the Debtors reimburse their pilots and flight attendants, pursuant to the terms of their respective CBAs, for certain expenses incurred while traveling within the scope of their employment, including expenses for lodging, transportation, and telecommunications, as well as a *per diem* based primarily on hours worked (collectively, the "Travel Expenses").  Most Travel

Expenses, excluding any *per diem*, are paid directly by the Debtors based upon negotiated arrangements with the outside vendors. All other expenses are reimbursed directly to the Employees in arrears.

119. The Debtors provide certain Employees with relocation expenses in order to attract desirable candidates to accept positions with the Debtors (the "Relocation Expenses")[10] (and, together with the Business Expenses and the Travel Expenses, the "Reimbursable Expenses"). In addition to the reimbursing individual Employees for their actual out-of-pocket expenditures, the Debtors also directly pay certain relocation-related vendors, including shipping companies, realtors, and a relocation agent. The Debtors seek authority to continue making payments related to Relocation Expenses in the ordinary course in an abundance of caution to ensure the ability to attract prospective employees.

120. Certain Employees have not yet been reimbursed for Reimbursable Expenses previously incurred. The majority of the Reimbursable Expenses have been incurred through the use of Employees' personal credit card accounts. The Employees submit receipts for reimbursement that are processed through the normal expense report and accounts payable process. It is difficult for the Debtors to estimate the amount of Reimbursable Expenses outstanding as of the Petition Date, because not all Employees have submitted expense reports as of

---

[10] There are no Relocation Expenses pending as of the Petition Date. The Debtors seek authorization to continue the practice of paying Relocation Expenses on a post-petition basis.

the Petition Date. It is critical that the Debtors be authorized to reimburse all such expenses as and when reports are submitted. The Debtors, therefore, seek authority to pay all pre-petition Business Expenses, Travel Expenses, and Relocation Expenses in the ordinary course of business, including those incurred prior to the Petition Date. The Debtors estimate that there is approximately $20,000 in accrued, unpaid pre-petition Reimbursable Expenses.

### (3) Employee Benefit Plans

#### (a) Medical Plans

121. The Debtors provide a number of Employee medical benefits pursuant to several medical plans (collectively, the "Medical Plans") through multiple health care providers. For instance, the Debtors have available medical, prescription drug, employee assistance programs, and flexible spending accounts provided by various major medical and health maintenance organization plans. In general, all Employees are eligible for the benefits described herein immediately upon being hired, unless otherwise noted.

122. Employees are offered a choice between a traditional "fee-for-service" indemnity plan (the "Indemnity Plan") or a health maintenance organization ("HMO"). The Indemnity Plan is administered by Hawaii Medical Service Association ("HMSA"). Aloha Airlines Employees choosing to enroll in an HMO are serviced by Kaiser Permanente Medical Care ("Kaiser").

123. The Medical Plans are funded primarily through contributions by the Debtors. The cost of the Medical Plans is borne primarily by the Debtors, but Employees contribute to the Medical Plans through payroll deductions. The Debtors deduct funds from Employee paychecks prior to plan payments in order to collect Employee contributions. Payment and funding of the Aloha Medical Plans is handled on a cash plan basis; monthly pre-payments for the HMSA plan are $504,679 and are paid at the beginning of each month (with an additional payment for actual utilization by the end of the month). For the Kaiser plan, payments are made for the previous month's claim by the middle of each month. The total cost for the Kaiser plan is approximately $183,000 per month. In addition, the Debtors pay certain of their plan administrators, primarily HMSA, nominal fees for administrative services related to the Aloha Medical Plans.

124. The Debtors request authority to make all payments, claims, and remittances related to the Aloha Medical Plans in the ordinary course of business.

**(b)** **Dental Plans**

125. In addition to the Aloha Medical Plan, the Debtors also offers their Full-Time Employees and certain retirees dental benefits pursuant to a dental plan (the "Dental Plan") administered by Hawaii Dental Service ("HDS"). Aloha pays $136,100 per month on the fifth day of each month for that month's premium.

126. The Debtors deduct funds from participating Employee paychecks prior to plan payments. The Debtors pay approximately 10% per month

to HDS for its administration services related to the Dental Plan, but do not have to pay any other fees for the Dental Plan. The Debtors seek authority to continue to make any such payments, claims, and remittance in the ordinary course.

### (c) Life Insurance

127. The Debtors offer life insurance to certain Employees pursuant to group policies issued by The Hartford Financial Services Group, Inc. ("Hartford"). Aloha Airlines maintains three (3) plans for different classifications of Aloha Airlines Employees, including pilots, flight attendants, and Employees employed as mechanics, or in clerical or related positions and covered by a CBA (the "Life Insurance Plans").

128. Aloha maintains a plan (the "Other Employee Life Insurance Plan") for most active Aloha Employees who are not covered under any of the other Life Insurance Plans (the "Other Aloha Employees"). For most Other Aloha Employees covered under the Other Aloha Employee Life Insurance Plan, Aloha provides coverage for Full-Time Employees.

129. Further, Aloha has certain other Life Insurance Plans in place for additional, narrowly defined groups of Aloha Employees. Specifically, the Debtors have a split-dollar Life Insurance Plan for approximately 4 executive Employees. The cost of such plan is approximately $9,000 per quarter, which will be fully reimbursed upon termination of employment or the payout of the policy. For 6 executives, Debtors have a Carve-Out Life Insurance Plan. The cost of this

carve-out plan is approximately $17,563.92 per quarter, plus an additional $2,223.17 per month. Finally, Aloha also pays the approximate amount of $1,808 per month for a life insurance plan for one of the members of its board of directors.

130. As part of the Aloha Life Insurance Plans, the Debtor offers accidental death and dismemberment ("AD&D") insurance to certain Aloha Employees. The AD&D coverage provided differs by the Aloha Employee group in the same manner as under the Aloha pilots and active Aloha flight attendants, the Debtors provide AD&D insurance coverage in an amount equal to the basic coverage provided under the Aloha Pilot Life Insurance Plan and Aloha Flight Attendant Life Insurance Plan, respectively. There are no mandatory Employee contributions for pilots and flight attendants.

131. The Debtors remit approximately $26,000 per month to Hartford pursuant to the Aloha Airlines Life Insurance Plans. The Debtors seek authority to continue making such payments and remittances in the ordinary course of business.

**(d)**     <u>**Supplemental A&D Insurance**</u>

132. Aloha also provides active Full-Time Employees and Part-Time Employees the option of selecting supplemental AD&D insurance coverage through a voluntary group accident plan (the "Aloha Supplemental AD&D Insurance Plan") provided by Hartford or American International Group, Inc. ("AIG").

133. Amounts to pay for coverage under the Aloha Supplemental AD&D Insurance Plan are withheld from Employee paychecks and transmitted by the Debtors to Hartford or AIG. Aloha believes that such withheld funds, to the extent that they remain in Aloha's possession, constitute monies held in trust and, therefore, are not property of the Debtors' bankruptcy estates. Thus, the Debtors believe that their practice of directing such funds to the appropriate parties is in the ordinary course of business.

### (e)    Disability Insurance

134. Depending on the type of employment, the Debtors offer a variety of long-term disability plans to eligible Aloha Employees (the "Aloha Long-Term Disability Plans").

135. For Aloha flight attendants, the Aloha fully funds a Long-Term Disability Plan (the "Aloha FA LTD Plan"). Flight attendants are eligible to receive disbursements under the Aloha FA LTD Plan after 182 days.

136. In addition, certain Aloha Employees, primarily non-represented managerial and executive Employees, are eligible for long-term disability coverage (the "Aloha Management LTD Plan"). The Aloha Management LTD Plan is fully funded by the Debtors and is insured by UNUM Life Insurance Company of America ("UNUM").

137. The Debtors also furnish a long-term disability coverage program (through UNUM) for Aloha's IAM Employees. Eligible IAM Employees

receive a benefit of 60% of their pre-disability compensation up to a monthly maximum of $2,000. IAM Employees are eligible to receive disbursements under the LTD Plan after ninety (90) days of disability.

138. The Debtors' average monthly payment with respect to the Aloha Long-Term Disability Plans is $7,200. The Debtors seek authority to pay all amounts related to the Aloha Long-Term Disability Plans in the ordinary course of business.

### (4)   <u>Savings and Retirement Plans</u>

139. The Debtors offer certain Employees savings and retirement plans through which they can accumulate savings for the future.

### (a)   <u>401(k) Plans</u>

140. The Debtors offer certain 401(k) plans (the "401(k) Plans") with varying terms and an additional qualified retirement plan (the "Money Purchase Plan") for certain Employees. For Aloha Employees, there are two 401(k) Plans, eligibility for which is determined by the Employee's position. The first 401(k) Plan covers Aloha pilots and flight attendants (the "Aloha Pilots/Flight Attendants 401(k)"). Under the Aloha Pilots/Flight Attendants 401(k), a participating pilot or flight attendant can elect to contribute up to 55% of his or her pre-tax compensation for investment in the 401(k) Plan. Aloha provides no annual contribution based solely on the employment status (a "Base Contribution"), nor does it provide any contribution to match Employee contributions (a "Matching

Contribution"). The second 401(k) Plan covers all other Aloha Employees. Under the second 401(k) Plan, the Debtors contribute 3% of the gross salary of non-represented Employees participating in this 401(k) Plan.

141. The Debtors seek authority to pay all amounts related to the 401(k) Plans that arose prior to the Petition Date, as they become due, in the ordinary course of the Debtors' business.

### (b) Defined Contribution Plans and Defined Benefit Plans

142. Aloha also provides certain of its Employees with a defined contribution plan (the "Defined Contribution Plan"). Aloha pilots and flight attendants participate in a Defined Contribution Plan. Aloha fully funds this plan. Flight attendants receive 10.25% of earnings and pilots receive 18% of earnings. All Aloha Employees subject to the immediately preceding Base Contribution scale are additionally entitled to certain profit sharing benefits. All contributions vest after five (5) years for flight attendants and after one (1) year for pilots.

143. In addition, the Debtors provide their TWU Employees with a defined benefit retirement plan (the "Defined Benefit Plan"). The Defined Benefit Plan is funded by the Debtors based upon certain actuarial calculations and pursuant to multiple CBAs and otherwise.

144. Further, the Debtors contribute approximately $81,000 per month toward a non-Debtor benefit plan for the benefit of IAM Employees.

145. Subject to the Debtors' rights to seek relief under Bankruptcy Code §§ 1113 and 1114 and otherwise, the Debtors respectfully request authority to make any payments due with respect to the Defined Contribution Plans and the Defined Benefit Plans, should the Debtors owe any amounts during these cases, and should the Debtors determine to do so, in their discretion.

**(c)     Non-Qualified Plans**

146. In addition, the Debtors also provide certain of their Employees with several non-qualified benefit programs pursuant to plan documents, including, without limitation, separation plans, stock incentive plans, and supplemental executive and pilot retirement plans (collectively, the "Non-Qualified Plans"). Benefits paid pursuant to the Non-Qualified Plans are paid from the Debtors' general assets, except as described below, and checks for Non-Qualified Plan benefits are issued through the payroll system or by Bank of Hawaii Trust Company.

147. Under the Non-Qualified Plans, the Debtors have an obligation of approximately $3,500 (actual disbursements) per month.

148. Subject to the Debtors' rights to seek relief under Bankruptcy Code §§ 1113 and 1114 and otherwise, the Debtors respectfully request authority to pay, in their business discretion, all amounts related to the Non-Qualified Plans that arose prior to the Petition Date, that become due, in the ordinary course of the

Debtors' businesses, if the Debtors determine that it is in the estates' best interest to make such payment.

**(5)** **Workers' Compensation Insurance**

149. The Debtors provide workers' compensation benefits to all Employees. These benefits are covered primarily under the Debtors' workers' compensation insurance programs, insured primarily by Airgroup Insurance, a "captive" insurance company wholly-owned by Aloha Airgroup, and administered by Marsh Management. The Debtors' workers' compensation insurance policies have a per occurrence deductible of $500,000. Failure to maintain this insurance in the various states in which the Debtors conduct business could result in the institution of administrative or legal proceedings against the Debtors. The monthly premium for the workers' compensation insurance is $385,585.

150. The Debtors seek authority to pay an workers' compensation premium that remained accrued and unpaid as of the Petition Date and continue paying and/or contesting in good faith, as appropriate in the Debtors' business judgment, all amounts related to workers' compensation claims that arose prior to the Petition Date, including, without limitation, any payments to insurers required as a result of such claims, as they become due in the ordinary course of the Debtors' business.

**(6) Other Benefits**

151.  In addition to the benefits described herein, the Debtors offer certain other benefit programs to various groups of Employees, including, without limitation, substance abuse and other counseling services and discounted Employee and retiree travel.[11]  The Debtors believe that these programs are important to maintaining Employee morale and assisting in the retention of the Debtors' workforce.  The cost of such programs for the Debtors each month is negligible.  The Debtors believe that failing to honor such programs would have an adverse affect on the Debtors' Employees.  The Debtors request authority to continue such programs in their sole discretion and make payments pursuant to such programs in the ordinary course of business.

**(7) Social Security, Income Taxes, and Other Withholding**

152.  The Debtors routinely withhold from Employee paychecks amounts that the Debtors are required to transmit to third parties.  Examples of such withholding include Social Security, FICA, federal and state income taxes, garnishments, health care payments, union dues, retirement fund withholding and charitable donations.  The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute monies held in trust and, therefore, are not property of the Debtors' bankruptcy estates.  The Debtors request

---

[11] The Debtors also provide such travel benefits to current and former non-employee members of the Debtors' board of directors and their immediate families.  The Debtors seek to continue to provide such benefits.

that their practice of directing such funds to the appropriate parties in the ordinary course of business be specifically authorized and approved by the Court.

**(8)  Administration of Employee Benefit Plans**

153.  As is customary in the case of most large companies, the Debtors utilize the services of several professionals and consultants in the ordinary course of their businesses in order to facilitate the administration of (and to main the books and records in respect of) Employee benefit plans and programs.  For instance, the Debtors utilize the services of Hawaii Medical Services Association ("HMSA") for, among other things, processing and determining all claims related to Aloha's Medical Plans.  HMSA also handles the administration of all COBRA-related issues.  The Debtors pay HMSA approximately $1,125 per month as a service fee.  In addition, Watson Wyatt Worldwide ("WWW") provides benefits services for all of the Debtors' Defined Benefit Plans and Defined Contribution and 401(k) Plans, for which the Debtors pay WWW approximately $1,000 per month, which amount is paid directly from the Defined Benefit Plans.  The Debtors pay certain other third parties for their administrative services related to other benefit programs, such as the Aloha Airlines Dental Plans.

154.  These administrative services ensure that the Debtors' multiple benefit plans and programs are operated in the most cost-efficient manner.  The Debtors request that they be authorized to continue to pay the various costs

incident to maintaining or paying third parties to maintain and provide recordkeeping relating to the various Employee benefit programs.

### (9) Direction to Banks

155. Finally, the Debtors seek an order authorizing and directing all banks to receive, process, honor, and pay any and all checks drawn on the Debtors' payroll and general disbursement accounts related to Pre-petition Employment Expenses, whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

156. The Debtors' Employees would suffer hardship if they were to lose (or suffer a delay in receiving) their anticipated pay and benefits.

157. The Debtors have paid their Employment Expenses on a current basis. Some Employment Expenses for the period immediately before the filing of the petitions, however, have not been paid, primarily because the petitions were filed after the Employees' entitlements had accrued but before payment was due.

158. The Debtors have determined that, in order to ensure that the Employees remain with the Debtors, and in order to maintain Employee morale and productivity and continuous service to their customers, it is necessary to pay, in the ordinary course of the Debtors' businesses, the Pre-petition Employment Expenses that are owed to or payable for the benefit of the Debtors' current Employees as set forth in the Employee Wage and Benefits Motion. Payment of these amounts, unless the Debtors' union contracts and other employment

contracts and arrangements are restructured, modified, or rejected (either by agreement or pursuant to Bankruptcy Code § 1113), will encourage the Employees to continue to work for the Debtors, thereby avoiding potential disruption in the Debtors' businesses and its service to customers, promoting the prospects for a successful reorganization, and, ultimately, enhancing potential recoveries for the creditors.

159. The Debtors propose to pay the Pre-petition Employment Expenses that accrued prior to the Debtors' filing of the bankruptcy petitions.

### G. Landing Fees Motion

160. The Debtors are filing the *Debtors' Emergency Motion For Authority To Pay Secured Domestic Airport Landing Fees And Other Similar Bonded Or Secured Obligations* (the "Landing Fees Motion").

161. In the Landing Fees Motion, the Debtors seek authorization to pay secured domestic airport landing fees and other similar bonded or secured obligations as determined by Debtors in their sole discretion.

162. Aloha pays approximately $5.8 million annually in landing fees to various airport authorities. The landing fees are secured by letters of credit or cash deposits.

163. Airlines typically pay fees to the airport authorities of the airports at which they land. In many cases, the obligation to pay landing fees is secured by a cash deposit, a surety bond or a standby letter of credit. The surety

bonds are often secured by a letter of credit and the letters of credit are often secured by cash deposits. Similarly, certain obligations to the United States Customs authorities are bonded or secured by letters of credit. Therefore, the secured airport authorities and U.S. Customs authorities will ultimately be paid notwithstanding Debtors' bankruptcy, and one claim (of the airport authority or U.S. Customs) simply will be exchanged for another claim (of the letter of credit issuer or bonding company). Debtors seek authority to pay secured pre-petition fees owed to airport authorities and U.S. Customs authorities. A failure to pay these fees at the outset of the cases could be harmful to the Debtors' operations and will result in the estates' needlessly incurring additional costs as parties exercise their rights under surety bonds and letters of credit, charge fees to the Debtors and, in some instances, instigate litigation in this Court to enforce their rights.

### H. Fuel Services Motion

164. The Debtors are filing the *Debtors' Emergency Motion For Order Authorizing (A) Application Of Pre-Petition Payments For Post-Petition Fuel And Related Services; And (B) Aloha Airlines, Inc. To Continue To Honor Obligations Under Fuel Supply Management Agreement* (the "Fuel Services Motion").

165. In the Fuel Services Motion, the Debtors seek authorization for Aloha to honor its obligations under the Fuel Supply Management Agreement ("Fuel Agreement") between Aloha and Epic Aviation, LLC, d/b/a Valley Oil

Company ("Valley Oil") and, in an abundance of caution, to pay any outstanding pre-petition obligations, if any, outstanding pursuant to any other party providing fuel-related services.

166. The Debtors request that the Court authorize Valley Oil to apply any pre-payments made by Aloha as of the Petition Date or credits due to Aloha to fuel services provided post-petition, in accordance with the Fuel Agreement. Without this relief, Aloha's fuel supply could be interrupted, and its operations could be harmed. Accordingly, the Debtors request that, to the extent required, the automatic stay of Bankruptcy Code § 362 be modified to allow for the payments received by Valley Oil or credits due to Aloha pre-petition to be applied to fuel services occurring post-petition.

167. The Debtors request that this Court authorize Aloha, in its business discretion, to continue honoring, performing, and exercising its rights and obligations (whether pre-petition or post-petition) under the Fuel Agreement in the ordinary course of business; provided, however, that doing so shall not give rise to administrative claims solely as a result of the entry of an order providing such authorization.

168. In addition, the Debtors request that the Court authorize Aloha, in Aloha's business discretion, to pay any pre-petition obligations outstanding under the Fuel Agreement, if any, to other fuel suppliers besides Valley Oil. If

payments are not made to these other fuel suppliers and service providers, Aloha's fuel supply could be disrupted, thereby stranding Aloha's aircraft and passengers.

169.  It is essential that Aloha continue to have available fuel at its disposal at any given time, because a shortage or elimination of fuel to its aircraft would be disastrous to its operations.  Therefore, it is critical that Aloha be granted the relief requested herein.

### I.      Executory Credit Card Agreements

170.  The Debtors are filing the *Debtors' Emergency Motion For Order Authorizing Aloha Airlines, Inc. To Honor Obligations Related To Executory Credit Card Agreements In The Ordinary Course Of Business* (the "Credit Card Agreement Motion").

171.  In the Credit Card Agreement Motion, the Debtors seek an order authorizing Aloha, in its business discretion, to continue honoring, performing, and exercising its rights and obligations (whether pre-petition or post-petition) under certain executory credit card agreements in the ordinary course of business.

172.  Pursuant to certain agreements, Aloha's customers may purchase airline tickets using credit cards issued by MasterCard, VISA, American Express, Discover, Diners Club, and JCB (the "Credit Card Agreements").  Pursuant to each of the Credit Card Agreements, Aloha receives payments for tickets purchased for travel on Aloha, less a discount rate representing a processing fee.  These discount rates vary depending on the Credit Card Agreement, the type

of charge, and the manner of processing. Each of the Credit Card Agreements is described below.

### (1) First Hawaiian Bank

173. Aloha accepts MasterCard, VISA, and JCB credit cards pursuant to the Amended and Restated Merchant Bank Card Participation Agreement, as extended pursuant to the Extension of Merchant Bank Card Participation Agreement, effective as of January 1, 2005, and the Amendments of Amended and Restated Merchant Bank Card Participation Agreement 1 through 30 (extending the agreement through March 31, 2008) between First Hawaiian Bank and Aloha (collectively, the "FHB Credit Card Agreement").

174. Under the FHB Credit Card Agreement, Aloha agrees to honor all charges on all valid MasterCard, VISA, and JCB credit cards for purchases of goods or services from Aloha. Although the FHB Credit Card Agreement covers Diner's transactions, Aloha does not settle these charges through FHB, rather it settles directly with Diner's for these transactions.

175. The FHB Credit Card Agreement provides that Aloha shall establish and maintain a settlement account with First Hawaiian Bank (the "FHB Settlement Account"), for purposes of debiting or crediting Aloha for credit card activity.

176. Aloha is obligated to submit to First Hawaiian Bank the electronic or paper records evidencing all charge card purchases that have been

made under the FHB Credit Card Agreement. First Hawaiian Bank then credits the FHB Settlement Account with the amount of such charge purchases. On the last business day of each month, First Hawaiian Bank assesses a discount charge based on the monthly total of charge purchases, which is deducted from the FHB Settlement Account.

177. To secure the performance of all of Aloha's obligations to First Hawaiian Bank under the FHB Credit Card Agreement, Aloha has granted to First Hawaiian Bank a security interest in an investment account at First Hawaiian Bank, as set forth in that certain Pledge and Security Agreement and that certain Investment Account Control Agreement, both dated January 23, 2003.

178. It is necessary for Aloha to continue honoring its obligations to First Hawaiian Bank under the FHB Credit Card Agreement. Approximately 67% of Aloha's tickets are purchased with credit cards covered by the FHB Credit Card Agreement.

**(2)** **American Express**

179. Aloha also accepts American Express credit cards, as set forth in the Terms and Conditions for Worldwide Acceptance of the American Express Card by Airlines, dated January 1, 2004 as amended by the Addendum to Airline Card Service Agreement Between American Express Travel Related Services Company, Inc., and Aloha Airlines, Inc., Debtor and Debtor-in-Possession dated

April 1, 2005 (the "American Express Agreement"), between Aloha and American Express Travel Related Services Company, Inc.

180. Under the American Express Agreement, Aloha accepts American Express credit cards for purchase of airline tickets and other travel related services. Aloha then submits all charges to American Express.

181. American Express pays Aloha for all charges submitted in accordance with the American Express Agreement, less the discount rate for processing by American Express.

182. It is necessary for Aloha to continue honoring its obligations to American Express under the American Express Agreement. Approximately 20% of Aloha's tickets are purchased with American Express credit cards.

**(3) <u>Discover Card</u>**

183. Aloha accepts Discover credit cards pursuant to the Merchant Services Airline Agreement, dated March 2, 1992, between Discover Card Services, Inc. and Aloha, as amended by the First Amendment, dated September 11, 1995, between Novus Services, Inc. ("Novus") and Aloha (collectively, the "Discover Card Agreement").[12]

---

[12] On August 1, 1995, Discover Card Services, Inc., the original party to the Merchant Services Airline Agreement, merged with a corporate affiliate to form Novus Services, Inc. as the surviving company.

184.  Under the Discover Card Agreement, Aloha accepts Discover credit cards for purchase of airline tickets and other travel related services.  Aloha then submits all charges to Novus.

185.  Novus pays Aloha for all charges submitted in accordance with the Discover Card Agreement, less the discount rate for processing by Novus.

186.  It is necessary for Aloha to continue honoring its obligations to Novus under the Discover Card Agreement.  Approximately 1.5% of Aloha's tickets are purchased with Discover credit cards.

**(4)  Diners Club**

187.  Aloha accepts Diners Club credit cards for certain Canadian credit card transactions pursuant to the Diners' Club International Establishment Application and Agreement (undated), between Citibank Canada ("Citibank") and Aloha, as amended by the Payment Method Amendment (undated) (collectively, the "Diners Club Agreement").

188.  Under the Diners Club Agreement, Diners Card cardholders may use their cards to purchase Aloha tickets and related services.

189.  Aloha is obligated to sell, and Citibank is obligated to purchase, all valid charges that have been made within a certain period of time under the Diners Club Agreement (the "Valid Charges").  Citibank pays Aloha for all Valid Charges, less a certain discount rate, submitted in accordance with the Diners Club

Agreement. All payments made in Canadian dollars owed to Aloha are credited to Aloha's account at the Royal Bank of Canada.[13]

190. It is necessary for Aloha to continue honoring its obligations to Citibank under the Diners Club Agreement. Less than 2% of Aloha's tickets are purchased with Diners Club cards covered by the Diners Club Agreement.

191. The Debtors believe that honoring and continuing to perform Aloha's obligations (whether incurred before or after the Petition Date) under the Credit Card Agreements is necessary to ensure a smooth and orderly business operations in Chapter 11 and minimize the disruption to the Debtors' business. The ability to use the Credit Card Agreements and to perform Aloha's obligations under the Credit Card Agreements is essential to the ability of Aloha to generate revenue.

### J.     Outside Mechanics, Repairmen and Shippers Motion

192. The Debtors are filing the *Debtors' Emergency Motion for Order Authorizing the Payment of Certain Pre-Petition Claims of, and Honoring Certain Contracts With, Outside Mechanics, Repairmen and Shippers* (the "Outside Mechanics, Repairmen, and Shippers Motion").

193. In the Outside Mechanics, Repairmen and Shippers Motion, the Debtors seek an order authorizing, but not directing, Aloha (a) to pay, in its discretion and in the ordinary course of business, as and when due, certain pre-

---

[13] As noted above, U.S. Dollar payments settle at an account with FHB.

petition claims of the Outside Maintenance Providers and Shippers (each as defined below); and (b) to continue honoring, performing, and exercising its rights and obligations (whether arising pre-petition or post-petition) under the Maintenance Contracts (as defined below) in the ordinary course of business; provided, however, that honoring, performing, or exercising of such rights and obligations shall not give rise to administrative claims solely as a result of the entry of an order providing such authorization and shall not be deemed an assumption of any contract.

## Outside Maintenance Providers and Shippers

194. Aloha is required to perform significant maintenance and overhaul work to maintain its fleet of aircraft properly and safely and in accordance with the regulations of the Federal Aviation Administration. See, e.g., 14 C.F.R. §§ 125.241 to 125.251 (setting forth regular and extensive maintenance requirements for certain types of aircraft). Although Aloha performs a large part of its aircraft maintenance and repair work with its own personnel, Aloha also relies on outside mechanics and repairmen (the "Outside Maintenance Providers") to perform a material part of the necessary aircraft, engine, and other equipment maintenance and repair work.

195. Most of the Outside Maintenance Providers perform maintenance and repair work (a) pursuant to ongoing maintenance and service contracts (e.g., engine repair contracts) (the "Maintenance Contracts"), or (b) on a

credit basis and subsequently deliver invoices to Aloha. Some of the Outside Maintenance Providers provide "on-call" maintenance and repair services at various destinations, which enable Aloha to avoid maintaining complete repair facilities and employee mechanics at every destination city. As part of their maintenance and repair work, the Outside Maintenance Providers also supply and/or sell certain aircraft component parts, most of which are replacement parts.

196. Generally speaking, Aloha has developed strong long-standing relationships with their Outside Maintenance Providers over the course of several years that has allowed Aloha to negotiate very favorable pricing and trade credit terms. The Debtors fear that Aloha's failure to honor its pre-petition obligations to the Outside Maintenance Providers would jeopardize these relationships. Because the universe of qualified Outside Maintenance Providers is very limited, the Debtors believe that it would be extremely difficult to replace the majority of these providers with new providers on economically viable terms. Additionally, many of the Outside Maintenance Providers are currently in possession of aircraft, engines, and other equipment that are vital to Aloha's operations and may assert possessory liens and refuse to redeliver these to Aloha until they are paid prepetition amounts.

197. An integral part of Aloha's maintenance and repair operations is the use of domestic and foreign commercial common carriers, movers, shippers, freight forwarders and consolidators, delivery services, customs brokers, shipping

auditing services, and certain other third-party services providers (collectively, the "Shippers") to ship, transport, store, move through customs, and deliver goods through established national and international distribution networks (payments for which services, including any related taxes and custom duties, are collectively referred to herein as ("Shipping Charges").

198. Aloha relies extensively on the Shippers to transport parts to and from their Outside Maintenance Providers. The services provided by the Shippers, therefore, are critical to the day-to-day operations of Aloha. At any given time, there are numerous shipments en route to or from the Outside Maintenance Providers and, therefore, certain Shippers are currently in possession of engines and other equipment that is vital to Aloha's operations and may refuse to deliver or release these items to Aloha until they are paid pre-petition amounts.

199. Therefore, authorizing, but not directing, Aloha to make payment of pre-petition claims to the Outside Maintenance Providers and Shippers and to honor the Maintenance Contracts will enable Aloha to continue its operations without the serious disruptions that would result if the Outside Maintenance Providers or Shippers refuse to redeliver aircraft, engines, and other equipment in their possession, or refuse to service Aloha's aircraft on an ongoing basis.

200. Aloha has reviewed actual disbursements made during the period from January 1 through December 31, 2007 and for the first two months of

2008 for or related to Outside Maintenance Providers and Shippers. The average monthly payments in aggregate for or related to Outside Maintenance Providers and Shippers during this period were approximately $2.9 million and $235,000, respectively, per month.  Although it is difficult to estimate with precision the obligations outstanding at any given moment, based upon the average monthly amounts for these periods period of, Aloha estimates that the amounts of outstanding prepetition obligations owed to the Outside Maintenance Providers and Shippers are approximately $1.7 million and $160,000 respectively, as of the Petition Date.  Authorizing Aloha to make such payments and honor such Maintenance Contracts will be without prejudice to the Debtors and will not preclude the Debtors from pursuing any claims under the Bankruptcy Code or applicable non-bankruptcy law that they may have against the Outside Maintenance Providers or Shippers, including, without limitation, claims for failure to deliver, provide service to, or supply additional parts for Aloha's aircraft and components.

### K.     Tax Motion

201.  The Debtors are filing the *Debtors' Emergency Motion for Order Authorizing Aloha Airlines, Inc. to Pay Pre-Petition Sales, Use, Trust Fund, Transportation, Property, and Other Taxes and Similar Obligations* (the "Tax Motion").

202.  In the Tax Motion, the Debtors seek an order authorizing, but not directing, Aloha to pay pre-petition sales, use, trust fund, transportation, property, and other taxes and similar obligations, as detailed herein, in the ordinary course of Aloha's business.  In addition, the Debtors request that (i) to the extent Aloha has paid certain taxes which should not have been paid, the Court authorize the Debtors to seek a refund of such taxes, and (ii) to the extent that Aloha disputes any such pre-petition tax, the Court authorize Aloha to set aside, in a segregated account, funds to pay the subject tax until a final determination is made as to whether Aloha is obligated to pay the subject tax.

203.  In connection with the operation of its business, Aloha: (a) incurs use, liquor, fuel, franchise, property, and excise taxes, collects sales, fuel, and transportation taxes from its customers, and collects or incurs payroll and employment-related taxes in favor of various taxing authorities; (b) is responsible for the collection of (i) an excise tax on the amount paid for domestic air transportation, (ii) another excise tax on each domestic segment, international departure, and international arrival, pursuant to Section 4261 of the Internal Revenue Code, charged to Aloha's passengers, which, if not paid, may become a liability of Aloha, and (iii) an excise tax on the sale of frequent flyer miles, and property transported by air (collectively, the "Taxes"); (c) is charged fees, licenses, and other similar charges and assessments by various licensing authorities, and collects customs, immigration, security, and inspection fees from its customers

(collectively, the "Fees"), and (d) collects fees on passenger tickets charged by airports for general passenger facilities at such airports (the "Passenger Facility Charges" or "PFCs"). The Taxes, Fees, and PFCs are paid to various taxing, licensing, and airport authorities (collectively, the "Authorities") on a periodic basis (whether monthly, quarterly, or yearly) that is established for each particular Tax, Transportation Tax, Fee or PFC.

204. As of the filing of the Petition Date, the Debtors estimate that Aloha has incurred and collected approximately $1,800,000 of pre-petition Taxes that are owed (but have not yet been paid) to the Authorities. In addition, as of the petition date, the Debtors estimate that they owe to the Authorities, on a pre-petition basis, approximately $600,000 in Fees, and approximately $300,000 in PFCs. The Debtors believe they are current on Taxes (although additional amounts may become due in March 2008).

205. If the Taxes, Fees and PFCs are not paid immediately, the Debtors believe that some, if not all, of the Authorities may, pursuant to Bankruptcy Code § 362(b)(9), cause Aloha to be audited and subjected to various administrative proceedings. Such audits and administrative proceedings and the accompanying disruption in business activities would materially and adversely affect the Debtors' reorganization prospects and unnecessarily divert the Debtors' attention away from these cases. Moreover, while reserving the right to argue to the contrary in particular cases, the Debtors believe that Aloha generally does not

have any legal or equitable interest under Bankruptcy Code § 541(a)(1) in funds held by it and due in respect of Taxes, Fees and PFCs.

### L.    Operating Agreements Motion

206.    The Debtors are filing the *Debtors' Emergency Motion for Order Authorizing Aloha Airlines, Inc. To Honor Obligations Related To Interline Agreements, Clearinghouse Agreements, ARC Agreements, Alliance Agreements, Computer Reservation Systems Agreements, Travel Agency Agreements, Cargo Agreements, Joint Aloha Pass Agreements, UATP Agreement, ATPCO Agreement, And Various Other Operating Agreements In The Ordinary Course Of Business* (the "Operating Agreements Motion").

207.    In the Operating Agreements Motion, the Debtors seek entry of an order authorizing the Debtors, in their business discretion, to continue honoring, performing, and exercising their rights and obligations (whether pre-petition or post-petition) under certain agreements with respect to the Debtors' operations (the "Operating Agreements"), including Interline Agreements, Clearinghouse Agreements, ARC Agreements, Alliance Agreements, Computer Reservation Systems Agreements, Travel Agency Agreements, Cargo Agreements, Joint Aloha Pass Agreements, and other Operating Agreements in the ordinary course of Aloha's business.

208.    Aloha is a party to, or beneficiary of, each of the Operating Agreements, as shall be explained in further detail below.  These agreements

constitute an essential part of the airline business and are vital to Aloha's ability to conduct business in the airline industry.

**Interline and Clearinghouse Agreements**

209.  The airline business is an interdependent industry based upon a network of agreements that govern virtually all aspects of air travel and airline operations.  Without such agreements for coordination between airlines and airline services, efficient service by the airline industry to the traveling public would be virtually impossible.  Among other things, these agreements facilitate cooperation among airlines with respect to such critical activities as making reservations and transferring passengers, packages, baggage, and mail between airlines.

210. All major air carriers participate in some form of interline agreement with other air carriers because of the tremendous operating efficiencies obtained through their usage.  Pursuant to interline agreements, airlines agree to accept each other's tickets for transportation over the other carrier's system.  These agreements enable carriers and travel agents to issue a single ticket having flight coupons for travel on more than one airline.  Interline agreements provide customers with the comfort of knowing that, if they miss a flight or if the flight they intended to take is late or canceled, they can use their ticket with another carrier for a substitute flight.

211.  Interline agreements also facilitate the purchase of tickets via travel agents.  Interline agreements allow travel agents and airlines to write tickets

with itineraries that involve more than one carrier.  If an interline agreement is not in place, a traveler buying a ticket directly from a carrier will be issued a ticket only for those segments of the itinerary that involve that carrier, even though the desired itinerary might necessitate the use of a second carrier.  Similarly, if the traveler seeks to buy a ticket from a travel agent and no interline agreement is in place, the travel agent will be required to write two tickets, thus making it significantly less convenient for the travel agent to book flights on a carrier not part of the interline system.

212.  Interline agreements are also the mechanism by which passengers' luggage is transferred from one airline to another.  For example, if there were no interline agreement in place, Aloha's passengers connecting to a United Airlines flight in Oakland, California, would have to retrieve their luggage at the Aloha terminal in Oakland, bring it to United Airline's Oakland terminal, and check it in at that terminal.  This would be an inefficient, time-consuming, and unacceptable process for passengers.  Interline agreements permit the airlines to accomplish the transfer of luggage without unduly burdening passengers.

213.  Airlines also agree to provide ground handling, special maintenance, and skycap services for each other pursuant to interline agreements.  The reciprocal exchange of such services is efficient, because airlines do not have to provide ground handling and special maintenance personnel and facilities at each airport to which the carrier flies.  Similarly, airlines agree to provide cargo

services for each other pursuant to interline agreements. These arrangements obviate extraneous cargo handling and the need to have separate personnel and facilities devoted to cargo at each airport that the carrier services.

214. All payments related to interline agreements are basically reconciled through clearinghouses: Airlines Clearing House, Inc. ("ACH") and International Air Transport Association Clearinghouse ("ICH" and, together with ACH, the "Clearinghouses"). The ACH serves as a settlement bank for domestic carriers, and the ICH serves as a settlement bank for international carriers. ACH and ICH, in turn, are parties to an inter-clearance agreement, pursuant to which settlements are made between members of ACH and ICH. The Debtors' businesses rely on their participation in and compliance with the ACH and ICH clearinghouse agreements (together the "Clearinghouse Agreements").

215. Interline agreements take two principal forms: bilateral and multilateral. Under bilateral agreements, two carriers typically contract directly for interline and other services and provide for regular periodic settlement of their accounts, either directly or through a clearinghouse. Each party under the bilateral agreements is authorized, among other things, to issue tickets for transportation of passengers and baggage over the lines of the other party (the "Interline Tickets"). The bilateral agreements are normally in effect for one calendar month at a time unless affirmatively renewed for an additional calendar month or longer periods as may be mutually agreed upon pursuant to written notifications exchanged by the

parties. Ordinarily, bilateral agreements are renewed as a matter of course, especially for an established carrier such as Aloha.

216. The primary agreements linking Aloha to the interline network are its agreements with the International Air Transport Association (the "IATA") and the Air Transport Association of America (the "ATA"), including the Clearinghouse Agreements. Aloha also has entered into numerous interline agreements with carriers on an individual basis (collectively, the "Interline Agreements").

217. The Clearinghouses aggregate invoices from other carriers to Aloha and from Aloha to other carriers and calculate a net balance. Invoices must be submitted to the Clearinghouses on a weekly basis. Once the net balance is calculated, the Clearinghouses notify Aloha of the result. For any given week, Aloha may be required to make a net payment to the Clearinghouses, or it may be entitled to receive a net payment from the Clearinghouses. Settlement with ACH occurs on a weekly basis on the dates set forth in a clearance & settlement calendar issued by ACH. ICH notifies Aloha of the net payable or receivable amount for two to five business days after the clearing date. Settlement with ICH occurs approximately seven calendar days following invoicing. Settlements are subject to audit, rejection, and rebilling by the carriers.

218. In addition to the foregoing, Aloha also has interline relationships with a small number of carriers that do not settle accounts through

either of the Clearinghouses.  These airlines are directly billed by Aloha each month.  The Debtors also request authority for Aloha to continue such direct interline billings.

219.  In 2007, Aloha received net settlement interline payments of approximately $8.4 million from ACH, and received net settlement interline payments from ICH of approximately $7.5 million.

220.  The Interline Agreements and Clearinghouse Agreements are critical to Aloha's business operations and to the preservation of value of the Debtors' assets.  Aloha's inability to preserve such agreements would make it impossible to serve ticketed passengers on other carriers where the trip was comprised of one or more segments not flown by Aloha.  Similarly, other carriers would be unable to ticket passengers on a segment flown only by Aloha.  It is essential to Aloha's operations that it is assured of uninterrupted participation under the Interline and Clearinghouse Agreements.

221.  Aloha settles with the Clearinghouses on a monthly basis and is not in default under any of the Interline or Clearinghouse Agreements.

## ARC Agreements and BSP Agreements

222.  Aloha is party to three agreements with the Airline Reporting Corporation ("ARC").  The first is the Carrier Services Agreement ("CSA"), as amended by a letter agreement dated January 9, 1987, which is an agreement between the ARC and a participating carrier.  The second is the Agent Reporting

Agreement ("ARA" and, together with the CSA, the "ARC Agreements"), which is an agreement between ARC, the parties to the CSA, and travel agents. The third is a lease between Aloha and ARC regarding travel agency data.

223. ARC is, essentially, a clearinghouse. It remits monies owed from travel agencies to carriers, which amounts are offset for any refund claims the travel agencies are owed. In addition, ARC remits to travel agencies refund claims that they are owed and processes credit card transactions on behalf of the carriers.

224. The majority of travel agents located in the United States are members of ARC. The ARC Agreements are the mechanism through which travel agents and airlines settle accounts for tickets sold, accepted for exchange, or refunded by travel agents. Under the ARC Agreements, all participating agents' obligations to and claims against the carriers are netted against one another, and the net amounts due to the airlines are paid in lump sums.

225. Aloha settles with ARC on a weekly basis and is not in default under either the CSA or the ARA. If Aloha is not allowed to honor the ARC Agreements, ARC could suspend offsets of pre-petition travel agency refund claims that have not been processed before the petition date. The Debtors request that the Court modify the automatic stay to permit ARC to follow its normal procedures for settling accounts.

226. Permitting these offsets will generate substantial additional travel agency remittances to the Debtors. As evidenced in the first Continental

Airlines and the Eastern Air Lines bankruptcies, travel agents - even those who, on the Petition Date, are not owed any refunds - do not remit the full amount of their receipts from post-petition sales. They do this because they wish, by self-help remedies, to establish a reserve against the possibility that they will subsequently be asked by their customers to make refunds of pre-petition tickets. Reinstating the normal pre-petition procedures with respect to travel agent refunds will greatly reduce any incentive the travel agents may have to resort to self-help remedies.

227. Aloha is not a creditor of travel agents through ARC or the ARC Agreements. Aloha has consistently been owed more money through ARC or the ARC Agreements than it has owed with respect to ticket refunds and other payments.

228. Aloha is also a party to certain Bank Settlement Plans ("BSP"). The BSPs, like the ARC, are, essentially, clearinghouses. They remit to carriers monies owed from travel agencies, which amounts are offset for any refund claims the travel agency is owed. In addition, the BSPs remit to travel agencies refund claims they are owed and processes credit card transactions on behalf of the carriers.

229. In order to continue to process sales through travel agents, which are critical to the preservation of the value of Aloha's business, the Debtors request that Aloha be granted authority to honor the obligations under the ARC Agreements and the BSPs.

## Alliance Agreements

230. Prior to the filing of Aloha I, Aloha entered into several comprehensive marketing agreements (the "Alliance Agreements") with United Air Lines, Inc. ("United") and also one with Island Air for inter-island travel. These agreements were either amended or superseded by the 2007 agreements pursuant to which United provided additional liquidity to Aloha. The Alliance Agreements provide numerous benefits to Aloha and its customers, including, among others, significantly easier access to destinations served solely by United pursuant to the code share arrangement, streamlined ticketing, baggage handling, and check-in procedures between the two airlines, and the ability for customers of Aloha and United to earn frequent flyer miles on flights of either carrier.

231. The Alliance Agreements constitute an ongoing portion of Aloha's marketing program and represent a significant consumer benefit for passengers who are traveling between the US Mainland and Hawaii. These agreements facilitate the interline agreements discussed earlier between United and Aloha and enhance Aloha's ability to improve its inter-island market share by offering more attractive marketing programs than its competitors. Therefore, the Debtors respectfully request that Aloha be granted authority to honor the Alliance Agreements and its pre-petition obligations thereunder.

## Computer Reservation Systems Agreements

232. In the course of its business, Aloha uses multiple computer reservations systems ("CRSs"). A CRS is a computer system that operates through terminals located in travel agencies and stores and provides information about available passenger air transportation. A CRS enables travel agents to accept and record bookings of those services from remote locations. In addition to storing information, CRSs also allow travel agents to make and confirm reservations, print and issue tickets automatically, and perform the travel agency's internal accounting tasks. Also, CRSs are used extensively by online travel agencies, such as Travelocity, Expedia, and Orbitz, to gather travel and flight information and are, therefore, a key component to maintaining Aloha's competitive position in the online travel market. Carriers, including Aloha, have agreements, pursuant to which their flight schedules, fare information, and seat availability are included in the databases of the CRSs (collectively, the "CRS Agreements"). Aloha is a party to CRS Agreements covering many major CRSs, including Abacus, Amadeus Global Travel Distribution, Galileo, INFINI, Sabre, and Worldspan.

233. If an airline does not use CRSs, then, in order to book travel on that airline, travel agents must independently look up or have specific knowledge of the flight, contact the airline, write the ticket manually, and complete the related accounting unassisted. The amount of effort involved in completing such a reservation makes it unlikely that travel agents would use unlisted airlines. As a

result, the continued use of CRSs is essential to Aloha's business operations. Therefore, the Debtors respectfully request authority for Aloha to honor its pre-petition obligations under the CRS Agreements.

**Travel Agency Agreements**

234. Consistent with most other airlines, Aloha sells a significant portion of its tickets through travel agents. From January 2007 to December 2007, approximately 31% of all Aloha's bookings were made through travel agents. Aloha provides incentives to certain travel agents primarily through a commission-based system, whereby travel agents can receive a payment for each ticket sold based on a percentage of the ticket price up to a pre-set maximum amount.

235. Aloha has agreements with various persons and entities known as general sales agents ("GSAs"), under which Aloha has agreed to provide special incentives to the GSAs for sales in a certain geographic region (the "GSA Agreements"). The purpose of the GSA Agreements is to allow Aloha to sell tickets in foreign locations that are not normally serviced by Aloha. The GSAs normally sell tickets on Aloha flights to both travel agents and customers located within their geographic location, and the services of the GSAs allow Aloha to realize ticket sales through the issuance of multi-carrier itineraries. Thus, the GSA Agreements are critical to Aloha's international marketing efforts.

236. In addition, Aloha is also a party to various commission agreements with travel agents (the "Commission Agreements"). Pursuant to the Commission Agreements, Aloha provides incentives to travel agents through a commission-based system, whereby a travel agent receives a payment for each ticket sold. (Hereinafter, the GSA Agreements and Commission Agreements are collectively referred to as the "Travel Agency Agreements.")

237. Honoring pre-petition obligations related to the Travel Agency Agreements is essential to Aloha's continued conduct of business with travel agents.

238. As noted above, Aloha's relationships with travel agencies are crucial to maintaining the viability of its operations going forward. For these reasons, Aloha respectfully request authority to continue the Travel Agency Agreements and to honor its pre-petition obligations thereunder.

**Cargo Agency Agreements**

239. Aloha has agreements with certain cargo sales agents, similar to its agreements with travel agents, to sell Aloha's cargo services. These agents are normally entitled to a commission or similar compensation on account of their service.

240. In order to continue Aloha's cargo business, it is essential that it be permitted to maintain its ongoing relationships with the cargo agents.

**Joint AlohaPass Agreements and Mileage Plus Agreements**

241. Aloha is also a party to and beneficiaries of certain joint agreements related to its frequent flyer program, AlohaPass, the frequent flyer program of United Airlines (The Mileage Plus Program), and the loyalty programs of other travel-related and non-travel-related vendors (collectively the "AlohaPass Agreements").

242. The continuation of the AlohaPass Agreements is important to the passenger transportation component of Aloha's business operations and thus critical to Aloha's continued operations. The Debtors respectfully request authority for Aloha to honor its pre-petition obligations under the Aloha PassAgreements.

**UATP Agreement**

243. The Universal Air Travel Plan ("UATP") is a corporate charge card system for purchase of air and rail transportation for passengers and related services. It includes an aggregation of standard contracts among airlines that permit individuals to pay for tickets purchased from a travel agent or airline using the credit of the airline issuing a UATP card to the purchaser. Pursuant to the Amended and Restated UATP Participation Agreement, dated May 24, 2000 (the "UATP Agreement"), the Debtors are an authorized issuer for the UATP card.

244. UATP cards are issued to corporate employees who may purchase air transportation on Aloha or any other airline who is a ticket issuer or contractor under the UATP Agreement (collectively, the "Signatory Airlines").

Each Signatory Airline is responsible for administering their UATP program, including subscriber account approval, card issuance, billing, servicing, and collection of payments.

245.   Information on tickets purchased at travel agencies using UATP cards is processed through the Air Travel Card Acquiring Network ("ATCAN"). ATCAN electronically gathers sales using the UATP card and consolidates the information for reporting to the respective card-issuing carriers.

246.   Aloha collects monies for all transportation charges made on the UATP cards that Aloha accepts.  The accounts of all Signatory Airlines are settled by netting out charge purchases made on their respective UATP cards.  Net UATP sales for the year ending December 31, 2007 were approximately $800,000. Nearly all UATP charges are originated by travel agents.  Aloha's ability to accept the UATP card is dependent upon CRS, Interline, ACH, ICH, IATA and ATA agreements.

247.   Because Aloha needs to continue providing tickets for customers using UATP cards, the Debtors respectfully request that the Court grant Aloha the authority to honor its pre-petition obligations under the UATP Agreement.

**ATPCO Agreements**

248.   Airline Tariff Publishing Company ("ATPCO") facilitates the publication of airline tariff filings that are communicated by ATPCO to ticket

vendors. Under multiple agreements with ATPCO (the "ATPCO Agreements"), Aloha relies on ATPCO to publish and update vendor databases on pricing issues. This process is crucial to Aloha's marketing and ticket sale efforts and the Debtors therefore request authority for Aloha to honor its pre-petition obligations to the ATPCO.

249. It is critical that the Debtors maintain public confidence while proceeding with their reorganization efforts. Aloha must take immediate steps to preserve its loyal customer base and essential relationships with various business entities with which Aloha is a party to the Operating Agreements.

## M. Utilities Motion

250. The Debtors are filing the *Debtors' Emergency Motion For Order Under 11 U.S.C. §§ 105(A) And 366(c) (I) Prohibiting Utilities From Altering Or Discontinuing Services On Account Of Pre-Petition Invoices And (II) Establishing Procedures To Determine Requests For Additional Assurance Of Payment* (the "Utilities Motion").

251. In the Utilities Motion, the Debtors seek the entry of an order (i) prohibiting the Utility Companies (as defined below) from altering, refusing or discontinuing service on account of pre-petition invoices, and (ii) deeming the Utility Deposit Account (as defined below) to provide the Utility Companies with adequate assurance of payment, but establishing procedures for Utility Companies to request additional adequate assurance of payment.

252.  In the normal conduct of their business operations, the Debtors have relationships with multiple utility companies and other providers (each a "Utility Company" and, collectively, the "Utility Companies") for the provision of electric, phone, sewer and other services (the "Utility Services").    The Utility Companies service the Debtors' corporate offices and other office locations. Uninterrupted utility services are essential to ongoing operations.

253. Should the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted.    If such disruption occurred, the impact on the Debtors' business operations and revenue would be extremely harmful and would jeopardize the Debtors' reorganization efforts.    It is, therefore, critical that Utility Services continue uninterrupted.

254.  Although the Debtors anticipate that the cash flow from their ongoing business operations will be sufficient to allow them to satisfy all administrative expenses on a current and ongoing basis, including post-petition utility bills, the Debtors will establish the Utility Deposit Account to provide the Utility Companies with adequate assurance of payment for future services.  The Debtors recognize, however, that certain Utility Companies may not be satisfied that the Deposit Amount and Utility Deposit Account provides them with adequate assurance of payment.  The Procedures provide a fair, reasonable, and orderly

mechanism for the Utility Companies to seek additional adequate assurance, while temporarily maintaining the status quo for the benefit of all stakeholders.

255.   To provide adequate assurance of payment for future services to the Utility Companies, the Debtors propose to deposit a sum equal to or greater than 50 percent (50%) of the Debtors' estimated cost of their monthly utility consumption (the "Deposit Amount"), into a segregated bank account designated for these deposits  (the "Utility Deposit Account").

256.   If a Utility Company is not satisfied that the establishment of the Utility Deposit Account and the deposit of the Deposit Amount provides them with adequate assurance of future payment, the Debtors propose the following procedures (the "Procedures").   The Debtors submit that these Procedures are fair and reasonable under the circumstances.

### N.   Extension of Time to File Schedules

257.   The Debtors are filing the *Debtors' Motion for Extension of Time to File Schedules and Statement of Financial Affairs* (the "Extension Motion").

258.   In the Extension Motion, the Debtors seek entry of an order extending the time within which the Debtors must file their schedules and statements of affairs (collectively the "Schedules") from fifteen (15) days to thirty (30) days after the Petition Date.

259.   Based upon the size, nature and complexity of Aloha's operations, the Debtors need additional time to properly analyze and compile the

information required to be included in the Schedules. In addition, certain pre-petition invoices have not yet been received and/or entered into the Debtors' financial systems, so the Debtors have not had sufficient opportunity to gather the necessary information to prepare and file their respective Schedules. As indicated in the Debtors' combined creditor matrix, the Debtors have thousands of creditors, customers, and employees, and numerous executory contracts relating to the operation of the Debtors' business.

## V.    CONCLUSION

260. In order to minimize any loss of value and disruption to the Debtors' business, the Debtors intend to engage in business as usual following the commencement of their Chapter 11 cases, with as little interruption to Aloha's operations as possible. I believe that if this Court grants the relief requested in each of the first day motions and applications the Debtors have filed, the prospect for achieving this objective, to the maximum benefit of creditors and the Debtors' estates, will be greatly enhanced.

261.  This concludes my declaration.

## 28 U.S.C § 1746 Declaration

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 20th day of March, 2008.

JEFFREY R. KESSLER

# EXHIBIT "A"

# Organizational Chart



[14] The ownership of Airgroup Acquisition Corp. is as follows:

| Shareholder | Security Series | # of Shares | % effective ownership |
|---|---|---|---|
| Yucaipa Corporate Initiatives Fund, I, L.P. | A | 43,250 | 67.557% |
| GMAC Commercial Finance LLC | A | 750 | 1.171% |
| Aloha Aviation Investment Group, LLC | B | 16,820 | 26.273% |
| Aloha Hawaii Investors | B | 2,200 | 3.436% |
| David Banmiller | C | 1,000 | 1.562% |
| United Air Lines | D | 3,369 (holds warrants for 3,369 more Series D) | N/A (Series D is non-voting) |