# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>ALOHA AIRLINES, INC., a<br>Delaware corporation, <u>et al.</u>,<br><br>              Debtor. | Case No.: 08-00337<br>Chapter 7<br><br>Jointly Administered<br>Honorable Lloyd King |
| This document relates to:<br><br>ALL CASES | Related Dkt. No. 1347 |

## MEMORANDUM OPINION REGARDING TRUSTEE'S RENEWED MOTION CONCERNING SALE OF DEBTOR'S INTELLECTUAL PROPERTY

## I. INTRODUCTION

This is a liquidating bankruptcy under chapter 7 of the Bankruptcy Code.[1] On March 20, 2008, the debtors[2] filed their voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code. Shortly thereafter, on April 29, 2008, the case was converted to chapter 7. Prior to filing for bankruptcy, the debtors operated an airline company based in the state of Hawaii, Aloha Airlines, which provided passenger and air cargo services, as well as local assistance to other

---

[1] Three related cases are being jointly administered under the name and number of this case (docket no. 44). The other related cases are, Aloha Airgroup, Inc., case no. 08-00338, and Airgroup Acquisition Corp., case no. 08-00339. For convenience, the singular word, 'case' will be used throughout.

[2] Aloha Airlines, Inc., Aloha Airgroup, Inc., and Airgroup Acquisition Corp. (collectively, "Aloha").

airlines with operations in Hawaii.

On April 28, 2009, the court heard a renewed motion (the "Renewed Motion") by the trustee in bankruptcy (the "Trustee") for an order approving competitive bidding and sales procedures for the sale of Aloha's intellectual property (the "IP"). The IP includes the "Aloha Airlines" name, aircraft painting specifications, Aloha's frequent flyer programs, web sites, and numerous related trademarks and service marks (docket no. 1347-1, pp.23-32). Ownership of the IP will enable any airline company to fly as Aloha Airlines.

A renewed motion was necessary because the court disallowed the results of a prior auction sale, due to the exclusion of a newspaper reporter from the auction (docket no. 1328). The prior auction was not "public" as required by Fed. R. Bankr. P. 6004(f)(1).

Most motions for approval of sales procedures are routine and uncontested. The Renewed Motion, however, is seriously contested because the entity identified as the probable purchaser is contractually bound to license the IP to another airline company, which is alleged to have contributed to the failure of Aloha's businesses. Among those opposing the Renewed Motion are the unions representing Aloha's former employees and former owners of Aloha.

The Renewed Motion was heard on April 28, 2009. Appearing in support of the motion were Chuck C. Choi, Wagner Choi & Verbrugge, for Dane S. Field, the Trustee and Robert A. Klyman, Latham & Watkins, for prospective purchasers, Yucaipa Corporate Initiatives Fund I, L.P. and Yucaipa Corporate Initiatives Fund

I, LLC. (collectively, "Yucaipa")  Appearing in opposition to the motion were

Rebecca L. Covert, Takahashi Vasconcellos & Covert,  for the International

Association of Machinists and Aerospace Workers Local Lodge 1245

("Machinists Union"); Kurt K. Leong, Ogawa, Lau, Nakamura & Jew, and,

telephonically, Jeffrey A. Bartos, Guerrieri, Edmond, Clayman & Bartos, for the

Association of Flight Attendants-CWA, AFL-CIO ("Flight Attendants Union");

and Tina L. Colman, Alston, Hunt, Floyd & Ing, for the Ing Family Partnership,

former owners of Aloha.[3]

## FACTS

Some of the facts discussed below are found in documents filed in this

bankruptcy court and the United States District Court for the District of Hawaii, of

which this bankruptcy court is a unit.  (28 U.S.C. § 151).  The sources of facts

from documents not part of the record in the Aloha bankruptcy case are: Aloha

Airlines, Inc., et al. v. Mesa Air Group, Inc., United States District Court for the

District of Hawaii, Case No. CV 07-00007 DAE/BMK ("Aloha v. Mesa"), and

Hawaiian Airlines, Inc., v. Mesa Air Group, Inc., United States Bankruptcy Court

for the District of Hawaii, Adversary Proceeding No. 06-90026 ("Hawaiian v.

Mesa").  There has been no hearing concerning the use of such documents.

Federal Rule of Evidence 201(e) permits any party to request a hearing, even after

---

[3] There has also been informal opposition: (1) The signatures of approximately 260 former employees are included in docket no. 1298, Objections by Former Employees of Aloha Airlines to Trustee's Proposed Sale of Intellectual Property; and (2) The declaration of Randolph J. Kauhane, full-time representative of Machinists Union Lodge 1245, states that the Union has received objecting petitions, with over 4,000 signatures (docket no. 1296-3).

judicial notice has been taken.

The inter-island airline business in Hawaii has, for many years, been intensely competitive. The two oldest and largest companies, Hawaiian Airlines ("Hawaiian") and Aloha have each been in bankruptcy twice. After two chapter 11 cases in this court, No. 93-01072 and No.03-00817, Hawaiian is still in business, providing air transportation inter-island in Hawaii, as well as service to the U.S. mainland, and other destinations. Aloha continued in business after its first chapter 11 case, No. 04-03063. As part of that reorganization of Aloha, Yucaipa became the owner of a controlling interest Aloha's corporate stock.[4]

The current Aloha bankruptcy case, in which this Renewed Motion by the Trustee is pending, is Aloha's second bankruptcy. It was filed as a voluntary Chapter 11 reorganization on March 20, 2008. Shortly thereafter, on March 31, 2008, Aloha abruptly terminated passenger operations. Aloha's air cargo business continued and was soon sold separately, as a going business. Aloha's chapter 11 case was converted to a liquidating bankruptcy on April 29, 2008, and Dane S. Field was appointed to serve as trustee by the Office of the United States Trustee.

Aloha started its airline operations in 1946. At the time of the filing of Aloha's second bankruptcy petition, it had approximately 3,500 employees. The sudden termination of passenger operations cost most of these employees their jobs, essentially without warning. Many had decades of service with Aloha. Some

---

[4] Debtor Aloha Airlines, Inc., is 100% owned by debtor Aloha Airgroup, Inc. Debtor Aloha Airgroup, Inc., is 100% owned by debtor Airgroup Acquisition Corp. Yucaipa is the 67.557% effective owner of Airgroup Acquisition Corp. List of Equity Security Holders in Airgroup Acquisition Corp. (No. 08-00339, docket. no. 3).

families were especially hard hit, as both spouses worked for Aloha. Wages were not the only loss, as most employees had job related health insurance.

At the first hearing in this case, on March 21, 2008, Aloha attributed its problems to the predatory behavior of Mesa Air Group, Inc. ("Mesa") and to greatly increased fuel costs.

Mesa started inter-island passenger air service in June, 2006, through its go! subsidiary ("go!"). Before entering the Hawaii market, Mesa obtained valuable information from both Hawaiian and Aloha, subject to confidentiality agreements. That information was useful to Mesa in making its decision concerning entering the Hawaii market. Mesa and Hawaiian entered into a confidentiality agreement in March, 2004. Mesa and Aloha entered into confidentiality agreements in January, 2005, and January, 2006.

Hawaiian filed the complaint in Hawaiian v. Mesa on February 13, 2006, seeking damages, the return of confidential materials and an injunction preventing Mesa from entering into the Hawaii air market.[5] During the course of that litigation, Mesa falsely claimed that it had not misused confidential information obtained from Hawaiian. The court found that:

> From the inception of this case, Mesa attempted to create the impression that it has scrupulously obeyed the letter and spirit of the confidentiality agreement. Mesa went so far as to attach to its initial pleading a declaration from its chief financial officer . . . , in which [he] described in great detail the painstaking care which he claimed he had taken to preserve any confidential information which Mesa got

---

[5] The presiding bankruptcy judge in both the Hawaiian Chapter 11 case, no. 03-00817, and the Hawaiian v. Mesa adversary proceeding was Hon. Robert J. Faris, not the undersigned.

from [Hawaiian]. Mesa's story began to unravel when a sharp-eyed attorney with [Hawaiian's counsel] read a document that Mesa produced in discovery and thought that it seemed familiar. Further checking revealed that, when Mesa prepared an offering memorandum seeking financing for its new Hawaii operations, it copied verbatim large portions of the information memorandum that Hawaiian had given to Mesa under the protection of the confidentiality agreement.

Hawaiian v. Mesa, docket no. 563, p. 9-10.

The Hawaiian litigation against Mesa revealed more dishonesty by Mesa, this time concerning Aloha. This court stated, in a footnote:

At least at one time, Mesa hoped to drive [Aloha] out of business. [Mesa's executive vice-president and chief financial officer] stated in a declaration that '[a]t no time did Mesa base its business plan or decision to enter the Hawaii inter-island market on [Aloha] or [Hawaiian] exiting this market'. In his deposition, he said that Mesa had not even done any analysis to determine what would happen to Mesa's business if [Aloha] were to cease operations. Both statements are false. One week before Mesa announced that it planned to enter the inter-island market, [he] wrote, in an email to [a Mesa consultant], 'I agree that if we assume [Aloha] stays in the market and in business forever, this project makes no sense. We definitely don't want to wait for them to die, rather we should be the ones who give them the last push. . . . Clearly if we can get [Aloha] out of the market without anyone else stepping in this is a homerun.' Similarly, Hawaiian has proven that, contrary to sworn testimony, the Mesa consultant prepared a set of projections based on the assumption that [Aloha] would reduce its flights and go out of business.

Hawaiian v. Mesa, docket no. 120, pp. 25-6, n.5.

There was still more Mesa misconduct before this court in the Hawaiian adversary proceeding against Mesa. Destruction of electronic evidence by use of a

disk scrubber is described in detail in the Hawaiian v. Mesa, Findings of Fact and Conclusions of Law on Motion for Sanctions. (Hawaiian v. Mesa, docket no. 451). The day after that lawsuit was filed, an attorney advised Mesa's top executives to "preserve any and all documents that may be related to the matters set forth in the Complaint including emails, electronic documents, notes, models etc." Id. at p. 5, ¶ 9.b.i..

Despite the warning from counsel, the executive vice-president and chief financial officer of Mesa used DiskScrubber2 or a similar program to render unrecoverable any deleted files on two computers and changed the system clocks of the computers in an attempt to conceal the fact of the deletions. Id. at p. 4-5, ¶ 8. The court found that "Mr. Murnane's destruction of evidence was intentional, deliberate, willful, and in bad faith." Id. at p. 5, ¶ 9. Mesa facilitated this misconduct by failing to take reasonable steps that would have prevented or mitigated the consequences of the destruction of evidence. Id. at p. 11, ¶ 13.

After trial of Hawaiian's adversary proceeding against Mesa in this bankruptcy court, Hawaiian was given judgment against Mesa in the amount of $80,000,000. (Hawaiian v. Mesa, docket no. 453. entered October 30, 2007). Later, Hawaiian was awarded an additional $3,929,532.21, for attorneys' fees and costs (Hawaiian v. Mesa, docket no. 563). Mesa filed a notice of appeal and posted an appeal bond. While the appeal was pending before the United States District Court for the District of Hawaii, the litigation was settled by the payment of $52,500,000 to Hawaiian (Hawaiian v. Mesa, docket no. 591).

On January 9, 2007, while the Hawaiian litigation with Mesa was pending, Aloha filed a lawsuit against Mesa in the United States District Court for the District of Hawaii, <u>Aloha Airlines, Inc., et al. v Mesa Air Group, et al.</u>, CV07-00007 DAE LEK. ("Aloha v. Mesa"). The complaint accuses Mesa of "improper predatory pricing and unfair competition designed to drive [Aloha] out of business and Mesa's improper retention and use of Aloha's valuable trade secrets and proprietary information to compete unfairly against Aloha in violation of various agreements." (Aloha v. Mesa, docket no. 1, p. 1, ¶ 4.)

Aloha filed its petition for reorganization in this bankruptcy case on March 20, 2008, over a year after filing its complaint in Aloha v. Mesa. After Aloha's chapter 11 reorganization case was converted to a liquidating bankruptcy under chapter 7, the Trustee elected to sell the lawsuit, rather than have the bankruptcy estate continue the litigation. The purchaser of the lawsuit was Yucaipa, which made a credit bid of $10,000,000, against its total secured claim of close to $100,000,000. On June 27, 2008, an order was entered in this bankruptcy case authorizing the sale. (docket no. 840).

Aloha's former counsel, in Aloha v. Mesa, Latham & Watkins, continued to represent the plaintiff's position after it was purchased by Yucaipa. Latham & Watkins now represents Yucaipa in its efforts to complete its purchase of the Aloha IP and the license of the Aloha identity to Mesa.

On November 28, 2008, Yucaipa and Mesa entered into a settlement and release agreement ("Settlement Agreement"). The full terms of the Settlement

Agreement are not part of the record in this matter, but Yucaipa has filed in this bankruptcy case a partial disclosure entitled, 'Notice of Filing Terms of Settlement Agreement between Yucaipa and Mesa Airlines,' indicating that it contained the 'economic and licensing terms' of the settlement. (docket no. 1260). The disclosed portion of the settlement appears to be divided into two parts, a release given by Yucaipa to Mesa of all claims related to the lawsuit and a license to Mesa of the Aloha IP.[6]

Under the disclosed terms of the Settlement Agreement, consideration for Mesa's release is stated to be a cash payment of $2 million and the issuance to Yucaipa of 2,692,800 shares of Mesa Air Group. As consideration for the 10 year IP license, Mesa promises to pay to Yucaipa a minimum of $600,000 per year for the term of the lease. That amount can be increased, depending upon Mesa's profitability.[7] To give Yucaipa some assurance of payment from the licensing fees, it is also to receive a back-up secured promissory note in the amount of $5 million.

Yucaipa and Mesa entered into the Settlement Agreement on Friday, November 28, 2008, just days before the December 2, 2009, auction of the Aloha IP and the December 3, 2009 court hearing to approve and confirm the results of the auction. The Trustee was not a party to the Aloha v. Mesa settlement or

---

[6] "Under the Settlement Agreement [between Yucaipa and Mesa], upon the consummation of Yucaipa's acquisition of Aloha's rights, title and interest in the 'Aloha' name and the 'Aloha Airlines' name (the 'Assets'), Yucaipa will enter into an agreement with Mesa (the 'Licensing Agreement') whereby Yucaipa will license the Assets to Mesa for 10 years (the 'Term')." (Docket. no. 1260, p. 2.)

[7] Also, for the 10 year term of the license agreement, "Mesa will issue 6 space available free round trip passes per year to each Aloha employee, as of the date of Aloha's bankruptcy filing. . . ." (Docket no. 1260, p.2.)

negotiations leading to the Settlement Agreement. Upon public disclosure, the terms of the Settlement Agreement, especially the proposed license of the Aloha name, received local media attention.

Previously, on November 19, 2008, the court had entered an unopposed order approving bid procedures similar to those now proposed by the Trustee in this Renewed Motion. (docket no. 1232). The Aloha IP is part of the collateral for Yucaipa's secured claim, and the order approving bid procedures allowed Yucaipa to credit bid, up to the amount of the secured claim. The unpaid amount of the Yucaipa secured claim is estimated to be in the range of $85 million to $90 million. The Trustee and Yucaipa agreed to a sale price to Yucaipa of $500,000, plus $50,000 in cash to the estate. An auction sale would be held, only if there was a qualifying overbid. Hawaiian made a qualifying overbid of $575,000, cash, so an auction sale was necessary.

The auction was held on Tuesday, December 2, 2008, at the offices of the Trustee's counsel. The bidding started with Hawaiian's bid of $575,000. Yucaipa made an increased bid of $750,000. There were no further bids. The Trustee closed the auction and declared Yucaipa to be the high bidder.

The next day, Wednesday, December 3, 2008, the court heard the motion to confirm the auction sale of Aloha's IP. By that date, there was public awareness of the preceding Friday's Yucaipa - Mesa settlement and the proposed license of Aloha's IP to Mesa. Because of this very recent development, the court continued the auction confirmation hearing to March 3, 2009.

On December 3, 2008, a few hours after the first auction confirmation hearing, the court received correspondence from a Honolulu Advertiser reporter, stating that he had been denied permission to attend the auction. After this fact was confirmed, the auction sale was declared invalid, because it was not a public auction sale, as required by Fed. R. Bankr. P. 6004(f)(1) (docket nos. 1328, 1329).[8] Because the auction sale was declared invalid, the court did not consider objections to the sale to Yucaipa and the accompanying IP license to Mesa.

Since objections to the proposed Yucaipa - Mesa license had been filed, but not considered, the court ordered those objections to be heard at the same time as the Trustee's motion to conduct another auction (docket no. 1343).

On March 24, 2009, the Trustee filed the Renewed Motion, seeking approval of the Asset Purchase Agreement between the Trustee and Yucaipa and, in the event of a qualified overbid, an auction sale (docket no. 1347).

The Renewed Motion was heard on April 28, 2009. The Machinists' Union, the Flight Attendants' Union, and the Ing Family Trust continue to oppose a sale to Yucaipa, which would include a license to Mesa. All argue that the successful effort of Mesa to drive Aloha out of business means that a license, which would allow Mesa to operate as Aloha, is not in good faith. The Machinists Union also argues that the Trustee is incapable of selling Aloha's IP to anyone, because a sale

---

[8] At the hearing to determine whether or not the Trustee's December 2, 2008, auction sale to Yucaipa should be set aside, counsel for the Machinists Union stated that Randolph J. Kauhane, the union's full-time representative, was also denied access to the auction (docket no.1328). Counsel for the Trustee and Yucaipa were present at the hearing and did not dispute the allegation.

of Aloha's name and goodwill must be accompanied by a sale of tangible assets. The Flight Attendants' Union argues that any license to Mesa must include terms more favorable to Aloha's former employees than six "space available" round-trip interisland tickets per year for the term of the license. Hawaiian, did not object to the Renewed Motion.

The Trustee's Renewed Motion was argued and submitted on April 28, 2009.

## II. ISSUE

Can the past misconduct of a prospective purchaser of property of a bankruptcy estate disqualify that entity from acquiring property of a bankruptcy estate?

## III. DISCUSSION

A. Standing of the Parties Objecting to the Trustee's Renewed Motion

Yucaipa challenges the standing of the former employees' unions and former owners of Aloha to object to the terms of sale of the Aloha IP.

The answer to this objection starts with the fact that the former employees are parties in interest in the Aloha bankruptcy case. Two adversary proceedings have been filed in this court, alleging that the sudden, mass termination of the jobs of Aloha employees was done in violation of the Worker Adjustment and Retraining Notification Act, 28 U.S.C. §§ 2101- 2109 (the "WARN Act").

The Flight Attendants' Union is plaintiff in adversary proceeding no. 08-90038, the Association of Flight Attendants-CWA, AFL-CIO, filed July 7, 2008. The other WARN Act adversary proceeding is Stoker, et al., v. Aloha Airlines, Inc.,

et al., adv. pro. no. 08-00018, filed April 8, 2008 ("Stoker v. Aloha"). Stoker was filed as a class action on behalf of all terminated employees, but no class has yet been certified.

The WARN Act lawsuits give to all former employees claims against the Aloha bankruptcy estate. Under the Bankruptcy Code, a 'claim' is a right to payment, even if unliquidated, contingent, or disputed. 11 U.S.C. § 101(5). As holders of claims, they are 'creditors' in the bankruptcy case. 11 U.S.C. § 101(10). All creditors are entitled to notice of the proposed sale of property of the estate. (Fed. R. Bankr. P. 2002(a)(2)). Creditors of an estate should be allowed to be heard concerning the sale of the estate's assets. No contrary authority has been provided. Former employees, through their unions, The Flight Attendants' Union and the Machinists Union, have standing to object to the proposed sale.

In addition to the standing of the unions, this court, as a court of equity, has both the power and the duty, sua sponte, to examine the facts surrounding this proposed sale of Aloha's IP. 11 U.S.C. § 105(a); In re Davenport, 175 B.R. 355, 361 (Bankr. E.D. Cal. 1994); In re Hale, 980 F. 2d 1176, 1179 (8th Cir. 1992).

The objecting unions have standing to object to the proposed terms of sale of the Aloha IP. The court has the independent ability to review the propriety of the proposed terms of the Trustee's Renewed Motion. Therefore, Yucaipa's argument that the Trustee's Renewed Motion must be granted due to the objectors' lack of standing fails. This determination makes it unnecessary to rule upon the standing of the objecting former owners of Aloha, the Ing Family Partnership.

B. Mesa as a Co-Purchaser with Yucaipa

The Trustee's Renewed Motion seeks approval of proposed procedures for the sale of Aloha's IP. The Trustee's proposed procedures allow Yucaipa to credit bid, and Yucaipa has an estimated $85 to $90 million available for such a bid. No qualified bidders have suggested offering as much as $1 million for the IP, so Yucaipa cannot be outbid. If Yucaipa wants the IP, it will be the successful bidder. There are no remaining assets of substantial value on which Yucaipa could use the remainder of its secured claim for a credit bid.

Because Yucaipa is the probable purchaser under the procedures proposed by the Trustee's Renewed Motion and because the connection between Yucaipa and Mesa has become a matter of some controversy, the court has decided to face the issue of Mesa's license from Yucaipa before, rather than after, the proposed sale has been completed by the Trustee and presented to the court for approval.

For purposes of this discussion, it is assumed that there are two proposed purchasers[9] of the Aloha IP, Yucaipa and Mesa. The agreement between the Trustee and Yucaipa for purchase of the Aloha IP attached to the Trustee's Renewed Motion (docket no. 1347-1) is between the Trustee and Yucaipa and contains no mention of Mesa. However, Yucaipa's Notice of Filing Terms of Settlement Agreement Between Yucaipa and Mesa Airlines (docket no. 1260, p. 2), states that, should Yucaipa be the successful purchaser, it is obligated to give a 10

---

[9] Under the Bankruptcy Code, "The term 'purchaser' means transferee of a voluntary transfer, and included immediate or mediate transferee of such a transferee." 11 U.S.C. § 101(43).

year license of the IP to Mesa.

The record does not disclose whether or not Mesa has any renewal rights after the 10 year term, but a 10 year license is a very substantial interest in what the Trustee is offering for sale. If the Trustee's Renewed Motion is granted, Mesa, through its go! subsidiary, will be able to become 'Aloha Airlines' for at least 10 years. Under the agreement between the Trustee and Yucaipa, whereby Yucaipa purchased the Aloha v. Mesa lawsuit, the bankruptcy estate will receive 5% of Yucaipa's net recovery from Mesa, so the estate should get a portion of any licensing fees paid by Mesa for Aloha's IP. Mesa is both giving and receiving value in connection with the Trustee's proposed sale of Aloha's IP (docket no. 840-1, Art. 4.2B).

"Decisional law tells us that the first requirement of a 'good faith' purchaser is that there be an identifiable purchaser." In re Thomas, 287 B.R. 782, 785 (Bankr. 9th Cir. 2002). The Trustee's Renewed Motion misidentifies only Yucaipa as the prospective purchaser. Actually, there are two would-be purchasers, Yucaipa and Mesa. The fact that such a substantial portion of what is to be sold by the Trustee will go to Mesa cannot be ignored. Mesa is a co-purchaser with Yucaipa.

C. Statutory 'Good Faith' 11 U.S.C. § 363(m)

The only statutory use of the term 'good faith' concerning sales of property of a bankruptcy estate is in 11 U.S.C. § 363(m). If an order authorizing a sale is reversed on appeal, that section provides a safe harbor to 'an entity that purchased

15

or leased such property in good faith'. Interest in protecting the integrity and finality of bankruptcy court sales favors the protection of 'good faith' purchasers.

The term 'good faith' is not defined in the Bankruptcy Code, but case law has decided that it means purchasing for value, in good faith and without notice of adverse claims. In re Gucci, 126 F.3d 380, 394 (2nd Cir. 1997). The Trustee's Renewed Motion does not concern a sale that has occurred or an appeal from an order authorizing a sale. Therefore, in discussing the consequences of misconduct by a prospective purchaser, it is best to leave the statutory term 'good faith' to the confines of § 363(m). While there may be some conceptual overlap, use of the term 'good faith' at this time is not required.

D. The Bankruptcy Court as a Court of Equity

In discussing purchasers' attempts to escape the terms of a bankruptcy sale, a bankruptcy court stated, "This court, as it has been so frequently reminded, sits as a court of equity and examines the facts before it with such principles in mind, for its equitable power extends to more than the typical dispute and pervades bankruptcy administration." In re M & M Transportation Company, 13 B.R. 861, 867, (Bankr. S.D.N.Y. 1981)(citations omitted). In that case, there was no misconduct, and it was the court approved purchasers who were trying to nullify their purchase of motor carrier operating rights. After the sale and before full payment to the trustee, deregulation of the trucking industry greatly devalued the rights. The purchasers sought equitable relief from their obligations to pay the trustee. The court granted the trustee's motions for summary judgment requiring payment for the rights. In M

& M, legal rights prevailed over equitable claims because, "[m]indful of all this, the court can only reaffirm the observation that the legal process and the equity process do not necessarily lead to the same result". Id. at 868.

In cases where equitable arguments prevail, over a legal position, there is usually some form of misconduct by the party relying on the legal position. The most well known bankruptcy case in this regard is Pepper v. Litton, 305 U.S. 295 (1939).

In that case, an insider had a claim for back salary, supported by a state court judgment. Id. The Court found that there was a scheme by the insider to defeat a debt owing to a legitimate creditor and reversed the court of appeals ruling upholding the insider's claim. Id.

"No matter how technically legal each step in that scheme may have been, once its basic nature was uncovered, it was the duty of the bankruptcy court in the exercise of its equity jurisdiction to undo it. Otherwise . . . equity would be perverted as an instrument for approving what it was designed to thwart." Id. at 312.

There are, of course, limits on the use of equitable powers in bankruptcy. In Norwest Bank Worthington v. Ahlers, 485 U.S. 197 (1988), the court disapproved the use of equitable powers to nullify the absolute priority rule of reorganizations under Chapter 11. The court observed that, "Whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code". Id. at 206. Therefore, a bankruptcy court cannot deny to a

creditor rights specifically accorded by the Code.

Yucaipa is not being denied any rights specifically given to it by the Bankruptcy Code. The closest Code provision appears to be 11 U.S.C. § 363(k), which allows lien holders to make credit bids, "unless the court for cause orders otherwise. . . ." Yucaipa's sponsorship of Mesa's acquisition of a substantial interest in the Aloha IP constitutes 'cause' to deny Yucaipa the ability to credit bid, as proposed in the Trustee's Renewed Motion. Standing alone, with no connections to Mesa and appropriate assurance that no interest in the Aloha IP would ever pass to Mesa, there is no apparent cause to deny to Yucaipa the ability to credit bid. However, since the Trustee's Renewed Motion and the attached Asset Purchase Agreement do not identify Mesa as a co-purchaser or even mention the license of the IP which Yucaipa is obligated to give to Mesa, cause exists to deny the credit bid, and neither subdivision (k) or any other provision of § 363 gives to Yucaipa any rights which are immune to a bankruptcy court's equitable powers.

In re Grodel Manufacturing, Inc.,33 B.R. 693 (Bankr. D. Conn. 1983), discusses court approval or disapproval of a prospective purchaser, on terms favorable to the bankruptcy estate, before a sale has taken place. In disapproving a potential sale to a former trustee, the court observed, "Notwithstanding any financial merits of a proposed sale to a former trustee and without taking into account proof of any wrongdoing by a former trustee, such a sale carries with it such a graphic appearance of impropriety that the prudent course for courts to

18

follow is to prohibit the transaction or invalidate its occurrence." Id. at 696.

Given the prior conduct of co-purchaser Mesa, this court, as a court of equity must prohibit the sale proposed by the Trustee's Renewed Motion.

E. Adequacy of the Record as to Mesa Misconduct

The concerning Mesa's behavior require court of equity to refuse to approve the sale of the IP to Mesa through Yucaipa.

The record demonstrates that Mesa entered the Hawaii inter-island air market with the intention of forcing Aloha out of business. It was aided in this effort by information obtained through confidential agreements with both Hawaiian and Aloha. The information obtained from Hawaiian was misused by Mesa to support its plan to enter the Hawaii air market. In the Hawaiian v. Mesa adversary proceeding in this court, Mesa relied upon sworn misstatements, which were intended to cover the truth concerning its dishonesty and destruction of records.

Mesa succeeded in inflicting great harm, not only upon the Aloha corporate entities, but also upon thousands of Aloha employees and their families. Now, through Yucaipa, Mesa seeks to perfect its wrongdoing by becoming Aloha.

While no cases have been found with comparable facts, it is difficult to imagine a court overlooking what Mesa has done and putting its stamp of approval on Mesa's subsidiary, go!, becoming Aloha.

It does not help Mesa's cause that it attempts to sneak into Aloha's identity under the cover of Yucaipa's proposed credit bid. A loss to Yucaipa of the licensing fees from Mesa will accompany a refusal to allow Yucaipa to bid for

itself and for Mesa, but Yucaipa must have known that some parties would find its dealings with Mesa to be highly objectionable. The bankruptcy estate, which is entitled to 5% of Yucaipa's net recovery from the Aloha v. Mesa litigation, will lose that share of the licensing fees. However, the financial merits are not a sufficient reason for a court to allow an improper sale of property of a bankruptcy estate. In re Grodel Manufacturing, Inc., 33 B.R. at 696.

In the context of a challenge to the good faith of a purchaser, the 9th Circuit BAP has suggested the possibility of an evidentiary hearing to review the conduct of the purchaser. In re Thomas, 287 B.R. 782. Usually, an evidentiary hearing is the best way to get a full picture of a party's actions. However, this is not the usual case. Mesa has destroyed records and attempted to cover up the destruction. After the district court settlement between Yucaipa and Mesa, it would be surprising to find much of anything still in existence related to Mesa's entry into the Hawaii air market. As a further complication, Mesa's past dishonesty in this court will surround any hearing in which its veracity is at issue with an atmosphere of disbelief. In other words, an evidentiary hearing would serve no purpose.

F. Remaining Arguments

Because the Trustee's Renewed Motion is to be denied for the reasons explained above, the court need not consider the two remaining arguments raised by the objectors.

G. <u>Conclusion</u>

The Trustee's Renewed Motion for sale of the Aloha IP is presented as a proposed sale to Yucaipa, on a credit bid that cannot be defeated. However, because of the Settlement Agreement between Yucaipa and Mesa, Yucaipa is bound to license the Aloha IP to Mesa for at least 10 years. The full Settlement Agreement is not part of the record, so Mesa's rights, if any, upon expiration of the 10 year term are unknown.

The fact that Mesa is to receive a very substantial interest in the Aloha IP makes Mesa a co-purchaser with Yucaipa, for purposes of evaluating the proposed bid procedures. It is therefore necessary to consider the prior conduct of both Yucaipa and Mesa. There has been no suggestion of affirmative misconduct by Yucaipa. When Yucaipa purchased Aloha during its first bankruptcy case, it appears to have made an unfortunate investment, but that is not misconduct.

Mesa, on the other hand, entered the Hawaii inter-island air market with the intention of forcing Aloha out of business and with the advantage of confidential information obtained from both Hawaiian and Aloha. Mesa attempted to conceal its misbehavior by document destruction and false statements, made under oath.

Unions representing former employees who hold claims against the estate have objected to allowing Mesa to perfect its misconduct by letting Mesa's subsidiary, go!, become Aloha Airlines.

This court has an independent power and duty to examine the propriety of a proposed sale of property of a bankruptcy estate, and it cannot allow its authority to be misused in a way that would reward Mesa for its misconduct.

The Trustee's Renewed Motion will be denied.

Dated: Honolulu, Hawaii, _____May 14, 2009_____.

Lloyd King
U.S. Bankruptcy Judge