WAGNER CHOI & VERBRUGGE
Attorneys at Law

JAMES A. WAGNER
CHUCK C. CHOI
745 Fort Street, Suite 1900
Honolulu, Hawaii 96813
Telephone: (808) 533-1877
Facsimile: (808) 566-6900
Email: jwagner@hibklaw.com

Counsel to Chapter 7 Trustee

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>ALOHA AIRLINES, INC., a Delaware corporation, et al.,[1]<br><br>Debtors<br><br>―――――――――――――――<br>This Document relates to: All Cases | Case No. 08-00337<br>(Chapter 7 Cases)<br>(Jointly Administered)<br><br>Date: December 16, 2010<br>Time: 10:30 a.m.<br>Judge: Hon. Lloyd King |

### TRUSTEE'S MOTION FOR AN ORDER APPROVING THE SALE OF THE ESTATE'S REMAINING ASSETS INCLUDING INTELLECTUAL PROPERTY ASSETS TO YUCAIPA; EXHIBIT "A"

Dane S. Field, as Chapter 7 Trustee (the "Trustee") for Aloha Airlines, Inc.

("Aloha"), Aloha Airgroup, Inc. ("Airgroup") and Airgroup Acquisition Corp.

("Acquisition" and collectively with Aloha and Airgroup, the "Debtors"), through

---

[1] The last four digits of the taxpayer identification number for each of the debtors follows in parentheses: (a) Airgroup (9996); (b) Aloha (4888); and (c) Acquisition (8526).

his undersigned counsel, hereby files this above-captioned motion (the "Sale Motion") pursuant to 11 U.S.C. §§ 105(a) and 363, Federal Rule of Bankruptcy Procedure 6004 and LBR 6004-1, and respectfully represents as follows:

In support of this motion (the "Motion"), the Trustee respectfully represents as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### The Chapter 11 Cases

3.     On March 20, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the instant cases. The Debtors operated and managed their businesses, as debtors-in-possession, pursuant to Bankruptcy Code §§ 1107 and 1108 until the cases were converted to chapter 7.

4.     As of the Petition Date, Aloha provided commercial air passenger service based in Hawaii. The Debtors also provided cargo transportation services (the "Air Cargo Business") and aviation contract services (the "Contract Services Business") to various other airlines.

5.     As of the Petition Date, virtually all of the Debtors' assets were encumbered by liens in favor of GMAC Commercial Finance, LLC ("GMAC") and Yucaipa Corporate Initiatives Fund I, L.P. and Yucaipa Corporate Initiatives Fund I, LLC (each separately or together, or its respective designee, collectively, "Yucaipa"), securing amounts in excess of the value of the Debtors' assets. Yucaipa holds certain secured claims pursuant to (i) its Junior Participation in that certain Loan and Security Agreement dated as of February 17, 2006, as amended, (the "Loan and Security Agreement") among one or more of the Debtors and GMAC and (ii) that certain Note Purchase Agreement, dated August 16, 2006, as amended, and related Subordinated Notes in the amount of $111,618,803 as of March 20, 2008, subordinate only to the secured claims of GMAC. As a result, the Debtors' estates had no unencumbered assets or funds as of the Petition Date.

6.     Shortly after filing for bankruptcy protection, the Debtors curtailed their operations substantially. Effective March 31, 2008, the Debtors terminated their trans-pacific and inter-island passenger services.

7.     The Debtors also advanced a process for the sale of certain of their assets, including the assets that comprise the Air Cargo Business. The Debtors obtained an initial offer for the Air Cargo Business from Saltchuk Resources, Inc. which was used to advance an auction sale (the "Chapter 11 Auction") pursuant to

court-approved bidding procedures. The Chapter 11 Auction of the Air Cargo Business was not successful, however.

### The Chapter 7 Cases and Liquidation of Assets

8. Given the results of the Chapter 11 Auction, the Debtors did not have enough liquidity to operate their businesses. Accordingly, on April 28, 2008, the Debtors elected to convert these cases to cases under chapter 7 of the Bankruptcy Code.

9. On April 29, 2008, the Court entered an *Order Converting the Chapter 11 Cases of the Debtors to Cases Under Chapter 7.* On April 30, 2008, the Office of the United States Trustee filed its *Notice of Appointment of Trustee*, appointing the Trustee.

10. On May 1, 2008, the Court conducted various hearings in these cases. At the conclusion of the hearings, the Court, among other things, authorized the Trustee to continue to operate the remaining business of the Debtors, and ordered the Trustee to consummate the sale of the Contract Services Business to Pacific Air Cargo, LLC. The Trustee consummated the sale of the Contract Services Business on May 2, 2008.

11. On May 2, 2008, the Court entered its *Order Authorizing (I) Trustee to Operate Air Cargo Business Pursuant to 11 U.S.C. § 721, (II) Advance of Funds for Trustee's Administration of Estates and for Benefit of Unsecured Creditors,*

and (III) *Postpetition Advances to Maintain Business Operations of Air Cargo Business Through Sale Closing* (the "721 Order"). The 721 Order provides, among other things, for a carve-out of 5.0% of the net sale proceeds (the "Administration Fund") from the disposition of the collateral of GMAC and Yucaipa to pay the Trustee and his professionals.

12. On May 2, 2008, the Trustee filed his *Motion for Entry of Order (A) Approving Sale of Debtors' Air Cargo Assets and (B) Approving Assumption and Assignment of Executory Contracts to Saltchuk Resources, Inc.* (the "Cargo Sale Motion"), and his *Motion to Reject Collective Bargaining Agreements Pursuant to 11 U.S.C. § 365(a)* (the "Rejection Motion").

13. On May 12, 2008, the Court granted the Cargo Sale Motion and the Rejection Motion. The Trustee consummated the closing of the sale of the Air Cargo Business on May 14, 2008, and most of the net proceeds of sale were wired to GMAC

14. On June 6, 2008, the Court approved the Trustee's *Motion for Entry of Order Authorizing Trustee to (A) Sell Personal Property Free and Clear of Liens and Encumbrances Via Public Auction or Private Sale; (B) Pay Auctioneers' Commissions and Expenses Without Further Court Order* ("Personal Property Sale Motion"), seeking authority to sell, via public or private sale, substantially all of the Debtors' remaining personal property, including ground equipment, passenger

service equipment, surface transport equipment (vehicles), office furniture and equipment, including computers and printers, various machinery and fixtures (including aircraft engines, food service equipment, ramp and storage equipment), airframes and expendable aircraft parts inventory (all collectively, the "Personal Property").

15.     On June 3, 2008, the Trustee filed his *Emergency Motion for Order Authorizing Sale of Debtors' Interests in the Mesa Litigation* (the "Mesa Lawsuit Sale Motion"), seeking authority to sell the Debtors' interest in the "Mesa Litigation" to Yucaipa pursuant to a credit bid (from its portion of the Loan and Security Agreement) of $10 million. On June 27, 2008, the Court entered an Order and Findings of Fact and Conclusions of Law granting the Mesa Lawsuit Sale Motion.

16.     During August of 2008, Starman Bros., the Trustee's aviation auctioneer, auctioned substantially all of the Personal Property through: (a) an internet auction of certain aviation property (including aircraft, engines, rotable parts and the right to purchase certain Boeing landing gear upon completion), and (b) two separate live auctions of other property (such as Ground Support Equipment, tooling and catering equipment, and expendable parts) in Oakland and Honolulu.

17.     The proceeds of these sales, less the cost of sale and the 5% contribution to the Administrative Fund, were turned over to GMAC and Yucaipa as the various sales closed.

18.     Yucaipa succeeded to the rights of GMAC under the Loan Agreement on March 24, 2009. Yucaipa holds a valid, perfected, and duly enforceable first priority lien on the Assets to be sold.

The Assets

The Assets covered by the Asset Purchase Agreement, attached hereto as Exhibit "A" ("APA"), include:

A.     Remaining Personal Property. All of the Estate's remaining personal property is being sold to Yucaipa, pursuant to the APA, excluding certain items identified in paragraph 3.5 of the APA. All of the items being sold to Yucaipa pursuant to the APA are covered by Yucaipa's security agreements and constitute Yucaipa's remaining collateral in the possession of the Estate.

B.     The Intellectual Property. The Intellectual Property is described in section 3.1 of the APA. The Intellectual Property generally consists of all of the Debtors' remaining intellectual property, including patents, trademarks, copyrights, and web domains, and associated good will, provided, however, the Intellectual Property excludes certain intellectual property (relating solely to the Air Cargo Business) which the Trustee sold to the buyer of the

Air Cargo Business. Additionally, certain of the Debtor's trademarks have expired during the course of these proceedings.

19. As set forth more fully in the Agreement, Yucaipa has agreed to purchase the Debtors' interest in the Assets for (a) a credit bid under section 363(k) of the Bankruptcy Code in the amount of $1,428,571.43 (the "Credit Bid"), plus (b) $71,428.57 in cash (the "Cash Component"), for a total purchase price of $1,500,000 (the "Purchase Price"), subject to overbid. Yucaipa intends to use its portion of the Loan and Security Agreement to fund the Credit Bid. The Cash Component will be deposited into the Administration Fund, and represents an amount equal to five percent of the Credit Bid. To the extent Yucaipa increases the Credit Bid, Yucaipa will also commensurately increase the Cash Component (e.g., a Credit Bid of $1 million will result in an increase in the Cash Component to $50,000, for a total Yucaipa Bid Price of $1,050,000). Yucaipa has agreed that it will not assert claims against the Administrative Fund.

The Initial Sale Motion, Auction and Court Ruling

20. On October 7, 2008, the Trustee filed his initial *Motion for Entry of Orders: (a) Approving Competitive Bidding and Sales Procedures for Sale of Debtors' Intellectual Property to Yucaipa or Other Highest and Best Bidder; (B) Approving Form and Manner of Notices; (c) Scheduling Dates to Conduct Auction*

*and Hearing to Consider Final Approval of Sale; and (D) Granting Related Relief*
(the "Initial Sale Motion"), seeking to sell the Intellectual Property to Yucaipa.

21.    After a series of hearings regarding the initial proposed sale of the IP Assets to Yucaipa on May 14, 2009, the Court entered its Memorandum Opinion, finding, *inter alia*, that due to a settlement between Yucaipa and Mesa Air Group, Inc. ("Mesa"), Yucaipa was obligated to sell the IP Assets to Mesa once they were acquired from the Debtor, Mesa was the defacto purchaser.   The Court further found that Mesa acted with bad faith regarding the Debtor and on said basis denied the Trustee's Motion.

22.    Following that ruling, Yucaipa terminated its agreement to sell the IP Assets to Mesa.   Paragraph 3.4 of the APA specifically prohibits Yucaipa from selling the IP Assets to Mesa or any of its affiliates.   This provision is intended to cure the defect in the prior effort to sell the IP Assets to Yucaipa.

## RELIEF REQUESTED

23.    By this Motion, the Trustee seeks entry of an order (a) approving the sale of the Assets (the "Sale") pursuant to the proposed Agreement substantially in the form attached hereto; and (b) granting related relief.

Sale of Procedures

24.    The sale is subject to qualified overbid at the hearing to approve the Sale.  To qualify to overbid at the hearing, any prospective bidder shall be required

to make a non-refundable deposit with the Trustee at the time of any such overbid in the form of a cashier's check, payable to the Trustee in an amount equal to not less than 10% of the overbid amount ("Qualified Bidder Deposit").

25. Any qualified overbid would be considered by the Court at the hearing on this Motion, and would be subject to further bidding by Yucaipa on a credit bid basis, and by other qualified bidders, if any. The Qualified Bidder Deposit would be subject to forfeit by the overbid bidder, as liquidated damages, in the event the overbidder was the successful bidder and thereafter did not close. Closing shall occur not more than 10 business days after the entry of a final order approving the Sale.

26. All of the terms of the APA including, but not limited to, the restrictions contained in paragraph 3.4 of the APA, would apply to any overbid purchaser.

## AUTHORITY FOR RELIEF REQUESTED

27. Section 363(b) of the Bankruptcy Code provides in pertinent part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). In general, a debtor or trustee may use property of the estate outside of the ordinary course of its business where the use of such property represents an exercise of the debtor's sound business judgment. *See, e.g.,* In re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th

Cir. 1991)); *see also* <u>Stephens Indus., Inc. v. McClung</u>, 789 F.2d 386, 390 (6th Cir. 1986) (citing <u>Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>. 722 F.2d 1063, 1070 (2d Cir. 1983)); <u>In re Abbotts Dairies of Pa., Inc.</u>, 788 F.2d 143,145-47 (3d Cir. 1986) (implicitly adopting the articulated business judgment test of <u>Lionel Corp.</u>).

28. Section 363(k) of the Bankruptcy Code, allows Yucaipa to credit bid its allowed secured claim for the Intellectual Property.

29. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See, e.g.*, <u>In re Food Barn Stores, Inc.</u>, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate."). To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See Id.* (such procedures "encourage biding and maximize the value of the debtor's assets").

**WHEREFORE**, the Trustee respectfully requests the entry of an Order:

a. Approving the sale of the Assets to Yucaipa or to a prevailing overbid purchaser;

b. Authorizing the Trustee to take such other and further actions as may be necessary or appropriate to effectuate the terms of the APA; and

c. Granting any other and further relief that this Court deems just and proper.

DATED: Honolulu, Hawaii, November 18, 2010.

Respectfully submitted,

/s/  James A. Wagner
James A. Wagner
Chuck C. Choi
Counsel for Dane S. Field,
Chapter 7 Trustee

ASSET PURCHASE AGREEMENT


by and between


YUCAIPA CORPORATE INITIATIVES FUND I, L.P. and
YUCAIPA CORPORATE INITIATIVES FUND I, LLC


("Buyer")


and


DANE SCOTT FIELD, AS CHAPTER 7 TRUSTEE
FOR ALOHA AIRLINES, INC.,
ALOHA AIR GROUP, INC., and
AIRGROUP ACQUISITION CORP.


("Seller")


DATED: December [   ], 2010


**EXHIBIT  A**

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "**Agreement**") is made and entered into as of the [   ] day of December, 2010, by and among YUCAIPA CORPORATE INITIATIVES FUND I, L.P. and YUCAIPA CORPORATE INITIATIVES FUND I, LLC (each separately or together, or its respective designee, collectively, "**Buyer**" in its capacity as the Buyer under this Agreement, and collectively "Yucaipa" for all other purposes), and DANE S. FIELD, AS CHAPTER 7 TRUSTEE (the "**Trustee**" **or** "**Seller**") for Aloha Airlines, Inc., a Delaware corporation, Bk. No. 08-00337, Aloha Air Group, Inc. a Hawaii corporation, Bk. No. 08-00338, and AirGroup Acquisition, Inc., a Delaware Corporation, Bk. No. 08-00339, and any other bankruptcy cases involving affiliates or subsidiaries of the foregoing debtors (collectively, the "**Debtors**"), (collectively, the "**Bankruptcy Case**") jointly administered, in the United States Bankruptcy Court in the District of Hawaii (the "**Bankruptcy Court**").

## PRELIMINARY STATEMENTS

**A.**     All acts taken by the Trustee herein are solely in his capacity as Trustee of the Debtors, and not in his individual capacity.

**B.**     The Debtors filed for protection under Chapter 11 of the Bankruptcy Code on March 20, 2008, in the Bankruptcy Court. The Bankruptcy Case was converted to one under Chapter 7 of the Bankruptcy Code on April 29, 2008. The Trustee was appointed as Chapter 7 Trustee for the Debtors on April 30, 2008.

**C.**     The Buyer wishes to purchase from Seller, and Seller is willing to sell and convey to the Buyer, all of Seller's right, title and interest in all of Seller's assets (including intellectual property assets) as further defined herein (the "**Assets**") pursuant to and in accordance with the Bankruptcy Code, including without limitation Section 363 of the Bankruptcy Code, and subject to the terms and conditions contained in this Agreement.

NOW THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all parties, the parties, intending to be legally bound, have agreed as follows:

## AGREEMENT

## ARTICLE 1- DEFINITIONS

In addition to the terms defined elsewhere in this Agreement, for purposes of this Agreement, the following terms shall have the following respective meanings, and such meanings shall be equally applicable to both the singular and plural forms of such terms, unless the context requires otherwise. As used herein:

"**Administrative Fund**" shall mean the fund created by the Order Authorizing (I) Trustee To Operate Air Cargo Business Pursuant to 11 U.S.C. Section 721, (II) Advance of Funds for Trustee's Administration of Estates and for Benefit of Unsecured Creditors, and (III) Postpetition Advances to Maintain Business Operations of Air Cargo Business Through Sale Closing, filed in

the Bankruptcy Case on May 2, 2008, for the payment of the Trustee's fees and expenses and the fees and expenses of the Trustee's professionals and the payment of other chapter 7 and chapter 11 administrative claims.

**"Affiliate"** of a Person shall mean a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common Control with, the first Person.

**"Agreement"** shall mean this Asset Purchase Agreement.

**"Applicable Law"** shall mean any statute, law, rule, regulation, code or ordinance or any Order of any governmental entity to which a specified Person or property is subject.

**"Assets"** or **"Acquired Assets"** shall have the meaning set forth in <u>Section 3.1</u>.

**"Bankruptcy Case"** shall have the meaning set forth in the opening paragraph of this Agreement.

**"Bankruptcy Code"** shall mean the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable.

**"Bankruptcy Court"** shall have the meaning set forth in the opening paragraph of this Agreement.

**"Buyer's Claims"** shall mean those certain secured claims asserted by Buyer pursuant to (i) its Junior Participation in that certain Loan and Security Agreement dated as of February 17, 2006, as amended, (the **"Loan and Security Agreement"**) among one or more of the Debtors and GMAC Commercial Finance, LLC (**"GMAC"**) and (ii) that certain Note Purchase Agreement, dated August 16, 2006, as amended, and related Subordinated Notes in the amount of $111,618,803 as of March 20, 2008, subordinate only to the secured claims of GMAC.

**"Claims"** means all debts arising under, relating to, or in connection with any acts of Seller or its Affiliates, claims (as defined in Section 101 of the Bankruptcy Code), obligations, demands, guaranties, options, rights, judgments, contractual commitments, restrictions, interests and matters of any kind or nature, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise including, without limitation, any claims and encumbrances (i) that purport to give to any party a right or option to effect a forfeiture, modification, right of first refusal or termination of Seller or its Affiliates' or Buyer's interests in the Assets or (ii) in respect of taxes.

**"Control"** means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, whether through the ownership of voting securities, by contract or other arrangement, as trustee or executor, or otherwise.

**"Closing"** shall mean the closing of the purchase and sale of the Assets.

**"Closing Date"** shall have the meaning set forth in <u>Section 5</u>.

"**Conveyance Documents**" shall mean any and all assignment or transfer forms, bills of sale, general instruments of sale, conveyance and delivery, or other documents of assignment, transfer or conveyance, as required by the Buyer to document the transfer of the Assets to the Buyer pursuant to the terms of this Agreement.

"**Final Order**" shall mean an order entered by the Bankruptcy Court or court of competent jurisdiction, the operation or effect of which has not been stayed, reversed or amended and as to which order or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing or leave to appeal has expired and as to which no appeal or petition for review or rehearing was filed, or, if filed, does not remain pending.

"**Intellectual Property**" shall mean all United States, state, foreign and multinational intellectual property (including without limitation, patents, trademarks, common law trademarks, service marks, registered and unregistered copyrights, industrial designs, trade names, logos, trade dress, product names, service names, slogans, domain names, computer software, mask works, publicity rights, trade secrets, proprietary inventions, inventions and know-how, and all registrations and applications therefore, and the goodwill associated with all of the foregoing) owned by Seller, and all rights in and to such intellectual property.

"**Lien**" shall mean, with respect to any property or asset, all liens, liabilities and Claims whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise, charges, pledges, security interests, conditional sales agreements or other title retention agreements, leases, mortgages, options, encumbrances, easements, restrictions, rights of first refusal and charges and interests of any kind or nature (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction or similar statute, as applicable) in respect of such property or asset, whether known or unknown, fixed, liquidated, contingent or otherwise, including any Claims held by any of Seller's or its Affiliates' creditors, vendors, suppliers, employees or lessors, and any other Person.

"**Order**" shall mean any writ, judgment, decree, injunction or similar order, writ, ruling directive or other requirement of any governmental entity (in each such case whether preliminary or final).

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, enterprise, unincorporated organization, governmental entity, or other entity.

"**Purchase Price**" shall have the meaning set forth in Section 4.1 hereof.

"**Registered Intellectual Property**" means all United States, state, foreign and multinational: (a) patents; (b) registered copyrights and applications for copyright registrations; (c) registered trademarks and applications for trademark registrations; (d) domain names (e) any other Intellectual Property that is the subject of an application, certificate, filing, registration or other document issued, filed with, or recorded by any governmental authority, in each case, owned by Seller; provided, however, that, Registered Intellectual Property shall not include (a) the right to the web domain www.alohaaircargo.com and (b) the trade name "Aloha Air Cargo".

"**Sale Motion**" shall have the meaning set forth in Section 6.1.

3

"**Sale Order**" shall have the meaning set forth in Section 6.2.

Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter. Except as expressly stated or shown, the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Agreement as a whole and not to any particular paragraph, subparagraph, or clause contained in this Agreement. The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included.

## ARTICLE 2- PRELIMINARY STATEMENTS

Each party hereto agrees that the Preliminary Statements set forth above are true and correct and are hereby incorporated herein by reference.

## ARTICLE 3 - PURCHASE AND SALE OF ASSETS

**3.1    Assets.**  On the Closing Date, upon the terms and subject to the conditions contained in this Agreement, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase, assume and acquire from Seller, free and clear of all Liens, Claims (as defined in the Bankruptcy Code), interests and indebtedness, whether known or unknown, all as contemplated by section 363 of the Bankruptcy Code, all of Seller's right, title and interest in and to the Assets, wherever located.  Seller shall sell, assign, transfer, convey and deliver the Assets and Seller shall evidence such transaction by executing and delivering to Buyer such Conveyance Documents as the Buyer shall deem necessary or desirable to vest in Buyer good, valid and marketable title to the Assets, wherever located.  The "**Assets**" shall consist of all of the assets, properties, rights, claims, contracts and businesses of every kind, character and description, whether tangible or intangible (including goodwill), whether real, personal or mixed, whether accrued, contingent or otherwise, and wherever located, held by Seller and any of its subsidiaries, including, but not limited to:

(a)    Assets listed on Schedule 3.1(a) attached hereto; and

(b)    All Intellectual Property listed on Schedule 3.1(b).

**3.2    Trademark and Domain Name Assets**.  In furtherance and not in limitation of Section 3.1, with respect to the Assets comprised of state and federal trademarks and domain names, Seller hereby transfers (1) all the property, right, title and interest in and to the trademark and domain name Assets, including all common law rights connected therein, together with the goodwill of the business therein at common law; (2) all the full benefit of the trademarks, domain names, trademark applications and domain name registrations including all of the rights Seller may have at common law to the intent that upon such trademark applications being in order for registration, this Agreement shall operate to vest the same in the Buyer as registered proprietor absolutely together with the benefit of any use of the trademark, and the trademark applications prior to registration; provided, however, that it is distinctly to be understood that Seller neither warrants nor guarantees that such trademark registrations will be granted by the respective Governmental Authorities involved; and (3) all rights, both at law and in equity, to

4

maintain and enforce any rights subsisting in the trademark, domain names, trademark applications and domain name registrations, including but not being limited to, commencing and maintaining legal proceedings for passing off or infringement of trademarks and/or domain names or any such similar proceedings in respect of the trademarks, domain names, the trademark applications and domain name registrations.

In furtherance and not in limitation of <u>Section 3.1</u>, with respect to the Assets comprised of state and federal trademarks Seller agrees to (1) assist Buyer in every legal way to evidence, record and perfect the assignment of the trademark Assets and to apply for and obtain recordation of the assigned rights and (2) transfer the domain names to the domain name servers designated by Buyer and change all contact information and email addresses for the domain names to those designated by Buyer.

If the Buyer is unable for any reason whatsoever to secure the Seller's signature to any document it is entitled to under this <u>Section 3.1</u>, Seller hereby irrevocably designates and appoints the Buyer and its duly authorized officers and agents, as its agents and attorneys-in-fact with full power of substitution to act for and on its behalf and instead of Seller, to execute and file any such document or documents and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by Seller.

**3.3 "As Is" Transaction.** Buyer hereby acknowledges and agrees that, except as otherwise expressly provided in this Agreement, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Assets, or otherwise relating to any of the transactions contemplated hereby. Buyer is acquiring the Assets based solely upon Buyer's independent investigation. Accordingly, Buyer will accept the Assets at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS"; <u>provided</u>, <u>however</u>, Seller hereby acknowledges and agrees that it will use its reasonable best efforts to preserve and maintain the Assets until and after the Closing.

**3.4 Restriction on Use or Further Transfer.** Buyer shall not license, sell, or otherwise transfer any interest in or right to use the Intellectual Property acquired pursuant to this Agreement to Mesa Air Group, Inc. or any subsidiary or affiliate of Mesa Air Group, Inc.

**3.5 Excluded Assets.** "Assets" do not include (i) any avoidance action claims held by the Trustee under Sections 544, 547, and 548 of the Bankruptcy Code; (ii) defenses by right of offset or otherwise that the estate may hold to the extent necessary to object to or defend against an administrative Claim filed against the estate in the Bankruptcy Case, each as identified in Exhibit 3.5(ii); (iii) the cash proceeds of the liquidation of Yucaipa's collateral or other cash collateral of Yucaipa presently held by Seller (the "**Cash Collateral**") (because such cash proceeds, excluding cash held in or due the Administrative Fund, are already owned by Buyer); (iv) cash in the accounts identified on Exhibit 3.5, being trust accounts or accounts holding Administrative Funds, preference recovery funds, or Trustee Carve Out Funds; and (v) any claims the Estate may have against Yucaipa arising from or related to the various agreements between the Trustee/Estate and Yucaipa, including this Agreement, and the various Orders entered in the Chapter 7 proceeding.

**3.6 Excluded Liabilities.** Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer is not assuming any liability or obligation of Seller of

5

whatever nature, whether presently in existence or arising hereafter, including but not limited to any liability for taxes arising out of or relating to Seller's ownership of the Assets prior to the Closing Date, any taxes that will arise as a result of the sale of the Assets pursuant to this Agreement or any deferred taxes of any nature (the "**Excluded Liabilities**"). All such Excluded Liabilities shall be retained by and remain obligations and liabilities of Seller.

    **3.7**    **Post Closing Cash.**  If the Trustee receives cash proceeds from or that constitute Cash Collateral after the Closing Date, the Trustee shall remit such cash proceeds to Yucaipa within ten days of receipt by the Trustee.

## ARTICLE 4– PURCHASE PRICE

    **4.1**    **Purchase Price.**  Upon the terms and subject to the conditions of this Agreement, the parties agree that the consideration for the Assets shall be $1,500,000 consisting of (i) an amount equal to $1,428,571 credited against Buyer's Claims under the Loan and Security Agreement and (ii) $71,429 in immediately available funds from the Cash Collateral (the "**Yucaipa Cash Portion**").  In the event of an overbid at the auction to be conducted in connection with the sale of the Assets, Buyer shall be permitted to increase its Purchase Price in such additional amounts of Buyer's Claims or in immediately available funds as Buyer deems appropriate.  The Yucaipa Cash Portion or such greater amount in the event of further bidding shall be the amount due the estate's Administrative Fund upon Closing.

## ARTICLE 5- THE CLOSING

    Subject to the satisfaction or waiver of the conditions set forth herein, the Closing shall occur on or before January 15, 2011, in the offices of Seller's counsel (or on such other date and at such other time and place as the parties shall agree in writing, whether due to an appeal, stay or otherwise) (the "**Closing Date**").  The timing of the Closing Date is of the essence of this Agreement.  Notwithstanding any conflicting or inconsistent provisions of this Agreement, the representations and warranties of Seller in this Agreement shall terminate and not survive the Closing.

    **5.1**    **Deliveries of the Seller**.  At the Closing, Seller shall deliver to Buyer:

        (a)    the Conveyance Documents; and

        (b)    an Accounting Statement (as defined in <u>Section 9.4</u>) as of the Closing Date.

    **5.2**    **Deliveries of the Buyer**.  At the Closing, Buyer shall deliver to the Seller:

        (a)    the Purchase Price which, in the event of a cash purchase price, shall be by wire transfer according to instructions provided by Seller at Closing, provided that Buyer's obligation to wire transfer the Purchase Price is conditioned upon disbursement of the amount of the cash purchase price from the Buyer's Cash Collateral to Buyer; provided that at the time of Closing, to the extent Seller holds sufficient Cash Collateral the Yucaipa Cash Portion shall be deducted from the Cash Collateral and not paid by wire transfer; and

(b)     a copy of resolutions (in form satisfactory to the Seller) reflecting that Buyer and its designated affiliates have full power and authority to enter into this Agreement and all agreements executed in connection herewith.

**5.3     Additional Acts**.  Subsequent to the Closing, the parties shall execute and deliver any other agreements or instruments and take any actions, which may be reasonably required for the implementation of this Agreement and the transactions contemplated hereby.

**5.4     Closing Costs**.  Except as set forth elsewhere in this Agreement, each of the parties shall bear its own costs and expenses and the expenses of its counsel and other agents in connection with the transactions contemplated hereby.  Notwithstanding the foregoing, Buyer shall be responsible for the cost of filing the Conveyance Documents.

**5.5     Passage of Title at Closing**.  Upon delivery of the Conveyance Documents, and in accordance with and subject to the conditions set forth in this Agreement, title to the Assets shall pass to the Buyer at the Closing, free and clear of all Liens, claims, encumbrances and interests.  At the Closing, Seller will place the Buyer in full, complete and quiet possession and enjoyment of all of the Assets.

**5.6**     To the extent that another buyer offers to purchase the Assets with a cash offer that is approved by the Bankruptcy Court and the Buyer, such cash payment (net of the Yucaipa Cash Portion) shall be paid to Yucaipa directly at Closing.

**5.7**     For purposes of clarity, Buyer will not be responsible for filing or preparing or paying any amounts owing under any tax returns related to the Assets and arising during or related to any period before the Closing Date.

## ARTICLE 6 - BANKRUPTCY COURT APPROVAL

**6.1     Sale Motion**.  Seller shall file a motion with the Bankruptcy Court in form and substance reasonably acceptable to Buyer (the "**Sale Motion**") requesting entry of an order scheduling (a) an auction of the Assets (the "**Auction**"); and (b) a hearing to confirm the results of the Auction.  Seller shall request that the hearing to confirm the results of the Auction be set on or before November 1, 2010.  The terms and conditions of the Auction must be on terms reasonably acceptable to Buyer.

**6.2     Sale Order**.  Seller shall obtain an Order of the Bankruptcy Court (the "**Sale Order**"), in a form reasonably acceptable to Buyer that provides, among other things:

(a)     All of the Assets sold to the Buyer hereunder shall be transferred to the Buyer free and clear of all Liens, Claims, encumbrances and liabilities of any kind whatsoever;

(b)     Buyer has acted in good faith within the meaning of section 363(m) of the Bankruptcy Code;

(c)     This Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arms' length bargaining positions;

Seller shall use commercially reasonable best efforts to obtain entry of the Sale Order on or before December 31, 2010.  Buyer's obligations to consummate the transactions contemplated

in this Agreement shall be conditioned upon the Bankruptcy Court's entry of the Sale Order on or before December 31, 2010.

## ARTICLE 7 – ACCESS AND COOPERATION AFTER CLOSING

After the Closing, Seller shall cooperate with Yucaipa and use its reasonable best efforts to provide Yucaipa with access to former employees of Debtors in connection with Yucaipa's claims for the United States customs bonds issued on behalf of the Debtors. Any cost for the services of Seller's former employees shall be borne by Yucaipa.

## ARTICLE 8 - FURTHER ASSURANCES

Subject to the terms and conditions of this Agreement, Seller and Buyer will promptly, at any time and from time to time, execute and deliver to each other such further instruments and documents and take such further action as may be required by law or as they may each reasonably request to establish, maintain and protect their respective rights and remedies and to carry out the intent of the parties under this Agreement.

## ARTICLE 9- REPRESENTATIONS AND WARRANTIES OF SELLER

In order to induce Buyer to enter into this Agreement and purchase the Assets, Seller makes the following representations and warranties to Buyer with respect to the business of Seller and the Assets, which representations and warranties shall be true and correct as of the Closing Date as well as on the date hereof, except as otherwise disclosed in the applicable Schedule to this Agreement as referenced below:

**9.1     Authorization, Etc.**  Subject to the issuance of the Sale Order, the performance of this Agreement by Seller and the execution, delivery and performance by Seller of each Conveyance Document to which it is or will be a party has been duly authorized by all necessary action.

**9.2     Execution and Binding Effect.**  Subject to the entry of, and the terms of the Sale Order, this Agreement and each of the Conveyance Documents, when delivered, is or will be, duly and validly executed and delivered by Seller and constitutes legal, valid and binding obligations of Seller, enforceable in accordance with the terms thereof.

**9.3     Intellectual Property.**  To the best of Seller's knowledge and information, Schedule 3.1(b) sets forth a complete and accurate list of all Intellectual Property owned by Seller.

**9.4     Cash Balance, Accounts Receivable, and Account Summaries.**  Schedule 9.4 sets forth an accurate list of accounts receivable owed or payable to any of the Debtors and account balance summaries for all bank accounts held by the estate as of October 5, 2010. The Trustee's quarterly report for the period ending September 30, 2010, to be filed in the Bankruptcy Case, contains an accurate statement of all payments into and out of the estate since April 28, 2008 ("**Accounting Statement**"), which Accounting Statement shall be updated as of the Closing Date and delivered to Buyer within 10 business days of Closing. Nothing in this Agreement shall be construed to be a settlement between Buyer or Yucaipa, as applicable, and Seller regarding the Accounting Statement or the amounts which may be due the Administrative Fund.

## ARTICLE 10 - REPRESENTATIONS AND WARRANTIES OF BUYER

In order to induce Seller to enter into this Agreement and sell the Assets, Buyer makes the following representations and warranties to Seller, which representations and warranties shall be true and correct as of the Closing Date, as well as on the date hereof:

**10.1     Organization**.  Buyer is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware and has the power and authority to acquire and own the Assets.

**10.2     Authorization of Agreement, No Violation.**  The Buyer's General Partner has duly authorized the execution and delivery of this Agreement and the purchase and the consummation of the other transactions contemplated hereby.  Neither the execution, delivery or performance of this Agreement by Buyer nor the consummation of any of the transactions contemplated hereby (i) will violate or conflict with any provision of the Certificate of Limited Partnership or Partnership Agreement of Buyer or (ii) will result in any breach of or default under any provision of any contract or agreement of any kind to which Buyer is a party or by which Buyer is bound or to which any of its properties or assets are subject.

**10.3     Consents Required.**     Buyer has obtained all notices to, or consents, authorizations or approvals of, any Person required for Buyer's due execution, delivery and performance of this Agreement and for Buyer's acquisition of the Acquired Assets; and no further action by, or notice to, or filing with, any Person is required of Buyer for such execution, delivery or performance.

**10.4     Sufficient Cash and Cash Equivalents**.  Buyer has sufficient Buyer's Claims or available cash and cash equivalents on hand to close the transactions contemplated by this Agreement and to perform Buyer's obligations under this Agreement.

**10.5     Sophisticated Buyer**.  Buyer is a sophisticated buyer with respect to the Assets, has adequate information to make an informed decision regarding the purchase of the Assets and has independently and without reliance upon the Seller, and based on such information as Buyer has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that Buyer has relied upon the express representations and warranties of the Seller contained in this Agreement.  Buyer acknowledges that Seller has not made and does not make any representation or warranty, whether express or implied, except as expressly set forth in this Agreement.  Except as otherwise specifically set forth herein, Buyer acknowledges that the sale of the Assets by the Seller to Buyer is irrevocable, and that Buyer shall have no recourse to the Seller after the Closing Date.  Buyer acknowledges that the consideration paid pursuant hereto for the purchase of the Assets may differ both in kind and amount from any payments, distributions, revenue or profit, if any, which may ultimately be received with respect thereto. Buyer acknowledges that it is assuming the risk of full or partial loss of Buyer's investment in the Assets. Buyer acknowledges and agrees that its obligation to close the transactions contemplated by this Agreement is not subject to any contingency relating to its due diligence.

## ARTICLE 11 - NON-SURVIVAL

The representations and warranties of the parties set forth in the foregoing Article 9 and Article 10 shall be true and correct as of the Closing, but shall not survive or be enforceable at any time after the Closing.

9

## ARTICLE 12 - CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of the Buyer to consummate the transactions contemplated hereby shall be subject to the satisfaction on or prior to the Closing Date of all of the following conditions, except such conditions as the Buyer may waive in writing:

(a) The Bankruptcy Court shall have entered the Sale Order, in final form reasonably satisfactory to Buyer, approving the sale of the Assets by Seller to Buyer. Such Sale Order shall have become a Final Order.

(b) No order of any court or governmental or regulatory authority or body which restrains or prohibits the transactions contemplated hereby shall be in effect on the Closing Date and no suit or investigation by any government agency to enjoin the transactions contemplated hereby or seek damages or other relief as a result thereof shall be pending as of the Closing Date.

Any of the foregoing conditions may be waived but only in writing by the Buyer.

## ARTICLE 13 - CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of Seller to consummate the transactions contemplated hereby shall be subject to the satisfaction on or prior to the Closing Date of all of the following conditions, except such conditions as the Seller may waive:

(a) The Bankruptcy Court shall have entered the Sale Order approving the sale of the Assets by Seller to Buyer. Such Sale Order shall have become a Final Order.

## ARTICLE 14 - BANKRUPTCY COURT APPROVAL

The parties agree that the Closing shall not occur unless and until the Bankruptcy Court has entered the Sale Order approving this Agreement and authorizing and directing Seller to comply with the terms of this Agreement, including executing and delivering all necessary documents and instruments contemplated hereunder, including pursuant to section 363 of the Bankruptcy Code.

## ARTICLE 15 - TERMINATION

This Agreement may be terminated as follows:

**15.1    Termination by the Buyer**.  The Buyer may, without liability to Seller, terminate this Agreement by notice to the Seller (i) at any time prior to the Closing if material default shall be made by Seller in the observance or in the due and timely performance of any of the terms hereof to be performed by Seller and such material default remains uncured by Seller after the expiration of three days' written notice from Buyer to Seller of the existence of such material default, or (ii) at the Closing if any of the conditions precedent to the performance of Buyer's obligations at the Closing shall not have been fulfilled and such condition remains unfulfilled at the close of business on December 30, 2010, or such later date as shall have been approved by Buyer and Seller.

**15.2   Termination by the Seller.**   The Seller may terminate this Agreement (i) prior to the Closing, upon the occurrence of a material default or breach by Buyer hereunder that Buyer has failed to cure within three days after Seller's notice to Buyer of such breach or default, or (ii) at the Closing, if any conditions to Seller's obligations to close have not been satisfied.   Upon termination of this Agreement by Seller due to Buyer's material default or breach, Seller shall have all remedies provided for herein and/or available at law or in equity.

**15.3   Termination in Event Buyer Not Successful Bidder.** This Agreement shall be terminated in the event the Buyer is not the successful bidder at the Auction in which case all obligations and liabilities of the parties hereunder with respect to the Assets shall be terminated.

## ARTICLE 16 - NOTICES

Any notices, requests, demands and other communications required or permitted to be given hereunder must be in writing and, except as otherwise specified in writing, will be deemed to have been duly given when personally delivered or facsimile transmitted, or upon receipt (or first rejected delivery) if mailed via the United States mail, by certified mail, postage prepaid, return receipt requested, as follows:

If to Seller:      Dane Scott Field, duly appointed Trustee of Aloha Airlines, Inc., Aloha
                   Airgroup, Inc. and Aloha Acquisition Corp.
                   333 Queen Street, Suite 803
                   Honolulu, HI 96813
                   Facsimile: 808-531-1020

    with a copy to:      Wagner Choi & Verbrugge
                   745 Fort Street, Suite 1900
                   Honolulu, HI 96813
                   Attention: James A. Wagner
                   Facsimile: 808-566-6900

If to the Buyer:      Yucaipa Corporate Initiatives Fund I, L.P.
                   9130 West Sunset Boulevard
                   Los Angeles, CA 90069
                   Attention: Robert P. Bermingham
                   Facsimile: 310-789-1791

    with a copy to:      Latham & Watkins LLP
                   355 South Grand Avenue
                   Los Angeles, CA 90071-1560
                   Attention: Robert A. Klyman
                   Facsimile: 213-891-8763

or to such other addresses or facsimile numbers as either party hereto may from time to time give notice of (complying as to delivery with the terms of this Section) to the other.

LA\2047252.9

## ARTICLE 17 - REMEDIES; LIMITATION OF DAMAGES

No party nor any of its respective Affiliates, officers, directors, employees, agents, representatives, successors and assigns shall be liable to any other party or its respective Affiliates, officers, directors, employees, agents, representatives, successors and assigns, whether in contract, tort, negligence, indemnity, strict liability or otherwise, for any punitive, special, indirect, incidental or consequential damages in connection with or arising out of or relating to the performance, non-performance or breach of this Agreement or any other related document or any obligations arising hereunder or thereunder. Accordingly, as the sole and exclusive remedy in connection with or arising out of or relating to the performance, non-performance or breach of this Agreement or any other related document or any obligations arising hereunder or thereunder, Buyer shall be entitled to specific performance of this Agreement.

## ARTICLE 18 - ENTIRE AGREEMENT

This Agreement embodies the entire agreement among the parties and there have been and there are no agreements, representations or warranties, oral or written among the parties other than those set forth or provided for in this Agreement. This Agreement may not be modified or changed, in whole or in part, except by a supplemental agreement signed by each of the parties.

## ARTICLE 19 - BENEFITS; BINDING EFFECT; ASSIGNMENT

This Agreement is for the benefit of and binding upon the parties hereto, their respective successors and, where applicable, assigns. Neither party may assign this Agreement or any of its rights, interests or obligations hereunder without the prior approval of the other party.

## ARTICLE 20 - WAIVER

The parties hereto may by written agreement (i) extend the time for or waive or modify the performance of any of the obligations or other acts of the parties hereto or (ii) waive any inaccuracies in the representations and warranties contained in this Agreement or in any document delivered pursuant to this Agreement. No waiver of any of the provisions of this Agreement will be deemed to constitute or will constitute a waiver of any other provision hereof (whether or not similar), nor shall any such waiver constitute a continuing waiver unless otherwise expressly so provided.

## ARTICLE 21 - NO THIRD-PARTY BENEFICIARY

Nothing expressed or implied in this Agreement is intended, or will be construed, to confer upon or give any Person or entity other than the parties hereto and their respective successors and assigns any rights or remedies under or by reason of this Agreement; provided that Buyer may assign its right to acquire the Assets to one or more wholly owned subsidiaries of Buyer (who thereupon shall become the transferee of the Assets covered by such assigned rights); provided that no such assignment by Buyer shall relieve the Buyer of any of its obligations hereunder.

## ARTICLE 22 - SECTION HEADINGS

The headings of the Sections, paragraphs and subparagraphs of this Agreement are solely for convenience and reference and shall not limit or otherwise affect the meaning of any of the

LA\2047252.9

terms or provisions of this Agreement. The references herein to Sections, Exhibits and Schedules, unless otherwise indicated, are references to sections of and exhibits and schedules to this Agreement, as applicable.

## ARTICLE 23 - COUNTERPARTS

This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which will be deemed to be one and the same instrument.

## ARTICLE 24 - LITIGATION; JURISDICTION

If any legal action is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorney fees, paralegal fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled. THE PARTIES AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO ENFORCE THE TERMS OF THIS AGREEMENT AND OVER ALL DISPUTES AND OTHER MATTERS RELATING HERETO.

## ARTICLE 25 - REMEDIES CUMULATIVE

No remedy made available by any of the provisions of this Agreement is intended to be exclusive of any other remedy, and each and every remedy is cumulative and is in addition to every other remedy given hereunder or now or hereafter existing at law or in equity.

## ARTICLE 26 - GOVERNING LAW

EXCEPT TO THE EXTENT THAT THE BANKRUPTCY CODE AND THE RULES PROMULGATED THEREUNDER OR OTHER FEDERAL LAWS ARE APPLICABLE, AND SUBJECT TO THE PROVISIONS OF ANY CONTRACT, INSTRUMENT, RELEASE, INDENTURE OR OTHER AGREEMENT OR DOCUMENT ENTERED INTO IN CONNECTION WITH THIS AGREEMENT THE CONSTRUCTION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT AND ALL RIGHTS AND OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF HAWAII, WITHOUT GIVING EFFECT TO CONFLICTS OF LAW PRINCIPLES WHICH WOULD APPLY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF HAWAII OR THE UNITED STATES OF AMERICA.

## ARTICLE 27- CONSTRUCTION

The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

LA\2047252.9

IN WITNESS WHEREOF, the parties hereto have each executed and delivered this Agreement as of the day and year first above written.

**<u>SELLER</u>**

_____
Signature

Print Name: Dane S. Field, as Trustee and not individually
Title: Chapter 7 Trustee of Aloha Airlines, Inc., Aloha Airgroup, Inc. and Airgroup Acquisition Corp.

**<u>BUYER</u>**

**YUCAIPA CORPORATE INITIATIVES FUND I, L.P.**

_____
Signature

      Print Name: Robert P. Bermingham
      Title: Vice President

**YUCAIPA CORPORATE INITIATIVES FUND I, LLC**

_____
Signature

      Print Name: Robert P. Bermingham
      Title: Vice President

14

## Schedule 3.1(a)
### Assets

1. All accounts receivable, including, but not limited to, collections in progress, and all documents and records necessary to collect on the foregoing.

2. All estate and trustee claims against third parties, including without limitation the FHB excessive processing fee action (excluding avoidance actions).

3. AMX refund and all documents and records necessary to collect the AMX refund.

4. All collateral used to secure Customs bonds, any other bonds, and all rights to the release of said collateral and all documents and records necessary to pursue the foregoing.

5. Agency commissions.

6. Assignment of the VISA/MasterCard settlement.

7. Any airport deposits.

**Schedule 3.1(b)**

IP ASSETS

## Trade Names, Trademarks and Service Marks Owned By Aloha Airlines, Inc.:

### United States Patent and Trade Mark Office

| Name | Serial No. | Reg. No. | Description | Type |
|------|-----------|----------|-------------|------|
| ALI'I DIAMOND | 76599095 | 3242778 | standard character mark | Service Mark |
| ALI'I GOLD | 76599094 | 3242777 | standard character mark | Service Mark |
| ALI'I LOYALTY PROGRAM | 76599092 | 3233921 | standard character mark | Service Mark |
| ALI'I SILVER | 76599093 | 3242776 | standard character mark | Service Mark |
| ALOHA AIRAWARDS CARD | 74583280 | 1980226 | design plus words (see Annex A) | Service Mark |
| ALOHA AIRAWARDS CARD | 74583279 | 1971927 | typed drawing | Service Mark |
| ALOHA AIRLINES | 75373886 | 2303334 | design plus words (see Annex B) | Service Mark |
| ALOHA AIRLINES | 75363807 | 2347989 | design plus words (see Annex C) | Service Mark |
| ALOHA AIRLINES VACATIONS | 76599828 | 3071580 | standard character mark | Service Mark |
| ALOHA VACATIONS AIRLINES and design | 78782505 | 3215210 | design plus words (see Annex D) | Service Mark |
| ALOHAPASS | 75363806 | 2233646 | typed drawing | Service Mark |
| ALOHAPASS SMARTCREDITS | 75652013 | 2423994 | typed drawing | Service Mark |
| ALOHAPASS SMARTCREDITS | 75652012 | 2419939 | design plus words (see Annex E) | Service Mark |
| EXPECT MORE | 74621210 | 2003643 | typed drawing | Service Mark |
| stylized bird of paradise flower | 76566410 | 2939344 | design only (see Annex F) | Service Mark |
| THE ALI'I CLUB | 76602963 | 3118742 | standard character mark | Service Mark |
| * ALOHAPASS MALL | 78848862 | Pending | standard character mark | Service Mark |
| * IT'S HOW WE FLY | 77252499 | Pending | standard character mark | Service Mark |
| * ALOHA EXECUTIVE PLUS | 77063391 | Pending | design plus words (see Annex G) | Service Mark |
| * ALOHACOMFORT CLASS | 77013266 | Pending | standard character mark | Service Mark |

19

**State of Hawaii Department of Commerce and Consumer Affairs**

| Name | Cert. No. | Description | Registration Date |
|---|---|---|---|
| AIRAWARDS CARD | 183568 | Trade Name Master (domestic) | 09/02/1994 |
| ALOHA AIRAWARDS CARD | 183569 | Trade Name Master (domestic) | 09/02/1994 |
| ALOHA AIRLINES OVERNIGHTERS | 174376 | Trade Name Master (foreign) | 12/10/1993 |
| SUITE 737 | 174377 | Trade name master (foreign) | 01/12/1994 |
| EXECUTIVE PLUS | 250188 | Service Mark Master (foreign) | 05/17/2001 |
| ALOHA PACIFIC AIRLINES | 4021251 | Trade Name Master (foreign) | 04/03/2004 |
| Design of Bird of Paradise Flower | 4020425 | Service Mark Master (foreign) | 01/07/2004 |
| The word "Aloha" in dark orange with abstract design of five petal flower(s) in red, orange and/or yellow | 4042404 | Service Mark | 04/04/2006 |
| "Funbird" | 4046520 | Service Mark | 08/21/2006 |
| ALOHA 5-0 | 4059342 | Trademark | 12/24/2007 |
| ALOHA AIR EXPRESS | 4059340 | Trademark | 12/27/2007 |
| ALOHA CONTRACT SERVICES | 4062287 | Trademark | 04/21/2008 |
| ALOHA50 | 4059341 | Trademark | 12/27/2007 |
| GO ALOHA | 4059343 | Trademark | 12/27/2007 |

**Japanese Trademark Registrations**

| Name | Registration Number Registration Date | Application Number Application Date |
|---|---|---|
| ALOHA AIRLINES | 4777120 06/11/2004 | 2003-087659 10/07/2003 |
| ALOHA AIRLINES | 4763894 | 2003-087665 |

| | | |
|---|---|---|
| | 04/16/2004 | 04/16/2004 |
| ALOHA AIRLINES | 4762173 | 2003-087656 |
| | 04/09/2004 | 04/09/2004 |
| ALOHA AIRLINES | 4763892 | 2003-087657 |
| | 04/16/2004 | 04/16/2004 |
| ALOHA AIRLINES | 4763893 | 2003-087660 |
| | 04/16/2004 | 04/16/2004 |
| ALOHA AIRLINES | 4777122 | 2003-087664 |
| | 06/11/2004 | 06/11/2004 |
| ALOHA AIRLINES | 4777121 | 2003-087663 |
| | 06/11/2004 | 06/11/2004 |

**Web Sites and Domain Names:**

1. Alohaairlines.com
2. Alohaairlines.biz
3. Alohaairlines.net
4. Alohaairlines.aero
5. Alohaair.com
6. Alohaspecials.com
7. Alohaairlines.travel
8. Alohaairlines.jp
9. Aloha-airlines.jp

**Painting Specifications:**

1. For the Boeing 737-700 in the current livery
2. For the Boeing 737-200 in the current livery
3. For the Boeing 737-200 in the "Funbird" livery

✱ EXPIRED

Annex A



22

LA\18937815 U.S. Bankruptcy Court - Hawaii  #08-00337  Dkt # 1347-1  Filed  03/24/09  Page 26 of 32

Annex B



Annex C

LA\1893781.5  U.S. Bankruptcy Court - Hawaii  #08-00337  Dkt # 1347-1   Filed  03/24/09   Page 28 of 32

Annex D



LA\1893781.5

Annex E



LA\1893781.5

Annex F



LA\1893781.5

Annex G



LA\189378L5
U.S. Bankruptcy Court - Hawaii   #08-00337   Dkt # 1347-1   Filed  03/24/09   Page 32 of 32

**Schedule 3.5(ii)**

A.    Any offset rights the estate may have against any Chapter 7 administrative claim asserted by the State of Hawaii.

B.

**Aloha Airlines, Inc.**

**YUCAIPA ASSET PURCHASE AGREEMENT**
**Schedule 9.4**

**Receivables as of October 5, 2010**

| NAME | AMOUNT | COMMENTS |
|------|--------|----------|
| Various Airports (PFC Claims) | 394,158.11 | See attached Schedule 1 |
| Various Travel Agents | 165,725.53 | See attached Schedule 2 |
| American Express | 957,750.31 | |
| First Hawaiian Bank | 2,000,000.00 | Overcharges |
| Diners – Canada | 16,071.19 | |
| AMX – Canada | 32,679.82 | |
| RLI Insurance | 300,000.00 | |
| Reliance Insurance Co. | 1,435,197.00 | |
| FHB Mastercard Deposits | 52,455.63 | See attached Schedule 3 |

**Bank Balance as of October 5, 2010**

| | | | | | |
|---|---|---|---|---|---|
| 08-00338 | ALOHA AIRGROUP, INC. | 2131042182 | Money Market Account | 99,169.96 | 99,169.96 |
| 08-00339 | AIRGROUP ACQUISITION CORP. | 2131042109 | Money Market Account | 261,257.44 | 261,257.44 |
| | | | **REPORT TOTAL** | **261,257.44** | **261,257.44** |

| 08-00337 | Aloha Airlines, Inc. | 2131042026 | MM JET WEST ACCT | 12,157.65 | 12,157.65 |
|----------|---------------------|------------|------------------|-----------|-----------|
| 08-00337 | Aloha Airlines, Inc. | 2131041952 | Money Market Account Only Trustee Comp. | 199,560.61 | 199,560.61 |
| 08-00337 | Aloha Airlines, Inc. | 2131041994 | MM ACCOUNT - carve out 5% | 0.03 | 0.03 |
| 08-00337 | Aloha Airlines, Inc. | 2131042018 | MM PFC TRUST ACCT | 291,652.70 | 291,652.70 |
| 08-00337 | Aloha Airlines, Inc. | 2131042034 | MM Collections Account | 568,559.36 | 568,444.65 |
| 08-00337 | Aloha Airlines, Inc. | 2131042067 | Checking Account | 999.39 | 999.39 |
| 08-00337 | Aloha Airlines, Inc. | 2131043099 | Checking Account Admin Fund Related Items | 593.22 | 593.22 |
| 08-00337 | Aloha Airlines, Inc. | 2131043289 | NO LIEN Money Market Account | 561,695.62 | 561,695.62 |
| | | | **REPORT TOTAL** | **1,635,218.58** | **1,635,103.87** |

**Aloha Airlines, Inc.**

NET PFC'S AS OF Dec. Refunds and Collections through 2/26/2010

| City | Total Due or (Refundable) after 2nd qtr payt | Refund Pmts Rec'd 3rd Qtr | 3rd Qtr Total PFC Refunds Requested | 4th Qtr. PFC Refunds Requested | PFC Payment Made by Dane | Refund Pmts Rec'd 4th Qtr | Net Now Due Airports or (Refundable) |
|---|---|---|---|---|---|---|---|
| ABQ | | | | | | | - |
| ANC | | | (9.00) | | 12/3/2008 | 9.00 | - |
| ATL450 | | | (31.50) | | | | (31.50) |
| AUS450 | | | | | | | - |
| BHM | (0.11) | | | | | | (0.11) |
| BNA | | | | | | | - |
| BOS450 | | | (27.00) | | | | (27.00) |
| BUF450 | | | (4.50) | | | | (4.50) |
| BWI450 | | | (9.00) | | | | (9.00) |
| CAK450 | (0.11) | | | | | | (0.11) |
| CLE450 | (18.11) | | (4.50) | | | | (22.61) |
| CMH450 | (27.00) | | | | | | (27.00) |
| COD450 | | | | | | | - |
| COS | | | | | | | - |
| CRP450 | | | (4.50) | | | | (4.50) |
| CVG450 | (13.61) | | | | | | (13.61) |
| DEN450 | | | (112.50) | | | | (112.50) |
| DFW450 | | | (94.50) | | | | (94.50) |
| DRO450 | | | | | | | - |
| ELP | | | | | | | - |
| EWR450 | (54.33) | | (27.00) | | | | (81.33) |
| FLL450 | | | (13.50) | | | | (13.50) |
| FWA450 | | | | | | | - |
| GFK450 | (13.50) | 7/29/2008  13.50 | | | | | - |
| GRB450 | | | (9.00) | | 11/25/2008 | 8.78 | (0.22) |
| GTF450 | | | | | | | - |
| GUM450 | | | (9.00) | | | | (9.00) |
| HDN450 | (4.50) | | | | | | (4.50) |
| HLN450 | | | | | | | - |
| HNL | (6,114.33) | | (11,823.00) | (567.00) | | | (18,504.33) |
| HSV450 | | | (9.00) | | 11/4/2008 | 9.00 | - |
| IAD450 | | | | (4.50) | | | (4.50) |
| IND450 | | | (4.50) | | 11/25/2008 | 4.50 | - |
| ITO | | | (27.00) | | | | (27.00) |
| JFK450 | (0.44) | | (4.50) | | | | (4.94) |
| KOA | (5,261.64) | | (9,828.00) | (310.00) | | | (15,399.64) |
| LAS400 | 2,218.51 | | (468.00) | (284.00) | 3/19/2009 | (1,013.01) | 453.50 |
| LAS450 | - | | (445.50) | | | | (445.50) |

SCHEDULE 1

| Station | | Date | | | Date | | | | Balance |
|---|---|---|---|---|---|---|---|---|---|
| LAX450 | | | | (1,134.00) | | (117.00) | | | (1,251.00) |
| LGA450 | - | | | - | | - | | | - |
| LIH | (3,461.57) | | | (7,104.00) | | (387.00) | | | (10,952.57) |
| MCI450 | | | | (31.50) | | | | | (31.50) |
| MCO450 | | | | (4.50) | | | | | (4.50) |
| MDT450 | (0.22) | | | | | | | | (0.22) |
| MDW450 | | | | (13.50) | | | | | (13.50) |
| MIA450 | | | | (9.00) | | | | | (9.00) |
| MSN450 | (0.11) | | | | | | | | (0.11) |
| MSP450 | | | | (9.00) | | | | | (9.00) |
| OAK450 | (17,663.86) | | | (19,314.00) | | (805.50) | | | (37,783.36) |
| OGG | (23,156.19) | | | (26,793.00) | | (1,041.00) | | | (50,990.19) |
| ONT450 | | | | (117.00) | | | | | (117.00) |
| ORD450 | | | | (6.00) | | | | | (6.00) |
| ORF | | | | | | | | | - |
| ORF450 | | | | (54.00) | 11/25/2008 | (9.00) | | 31.50 | (31.50) |
| PDX450 | | | | (31.50) | | | | | (31.50) |
| PHL450 | | | | | | | | | |
| PHX450 | | | | (189.00) | 10/5/08 & 10/30/08 | (9.00) | | 189.00 | (9.00) |
| PIT450 | (4.61) | | | | | | | | (4.61) |
| RDM450 | | | | | | | | | |
| RDU450 | | | | | | | | | |
| RNO | | | | (27.00) | | | | | (27.00) |
| RNO450 | 3,274.31 | | | (1,584.00) | 3/19/2009 | (216.00) | (1,475.81) | 201.00 | (219.00) |
| SAN450 | (15,364.81) | 8/19/2008 | 15,364.81 | (18,414.00) | 12/31/2008 | (787.50) | | 18,715.50 | (486.00) |
| SAT450 | (9.00) | | | (4.50) | | | | | (13.50) |
| SEA450 | | | | (76.50) | | | | | (76.50) |
| SFO450 | (1,327.50) | 8/26/2008 | 1,327.50 | (666.00) | 12/22/2008 | (94.50) | | 662.89 | (97.61) |
| SHV450 | (4.50) | | | | | | | | (4.50) |
| SJC450 | | | | (18.00) | | | | 9.00 | (9.00) |
| SLC450 | | | | (22.50) | 10/7/2008 / 1/22/2009 | | | 22.50 | - |
| SMF450 | (6,574.60) | | | (8,064.00) | | (391.50) | | | (15,030.10) |
| SNA450 | (2,688.86) | | | (25,978.50) | | (1,323.00) | | | (29,990.36) |
| STL450 | | | | | | | | | |
| TPA450 | (4.50) | | | (22.50) | | | | | (27.00) |
| TUL | | | | (3.00) | | | | | (3.00) |
| VPS450 | (4.50) | | | | | | | | (4.50) |
| | (76,279.69) | | 16,705.81 | (132,658.50) | | (6,360.00) | (2,488.82) | 19,661.67 | (181,419.53) |

(181,419.53) Balance as of 2/26/2010

| ArcNumber | AgencyName | Address1 | Address2 | City | State | Zip | AgencyTotal |
|---|---|---|---|---|---|---|---|
| 0556324 | Happy Vacations | | 314 Westridge Drive | Watsonville | CA | 95076 | 647.59 |
| 0568624 | Creative Leisure | | 951 Transport Way | Petaluma | CA | 94954-1474 | 239.62 |
| 0571022 | Gogo Tours | | 1111 Howe Avenue | Sacramento | CA | 95825 | 172.10 |
| 0667205 | Gogo Tours | Suite 218 | 3045 S. Parker Road | Aurora | CO | 80014 | 226.93 |
| 0756068 | LowestFare.com | | 800 Connecticut Ave. | Norwalk | CT | 06854 | 399.98 |
| 0788206 | Gogo Tours | 2nd Floor | 31 Washington Ave. | North Haven | CT | 06473-2310 | 160.96 |
| 0880543 | Gogo Tours | Suite 207 | 3202 Kirkwood Hwy | Wilmington | DE | 19808 | 503.68 |
| 1157862 | Travelscape Inc. | Suite 207 | 6 West Druid Hills | Atlanta | GA | 30308 | 30,197.12 |
| 1158309 | WWTE | Suite 207 | 6 West Druid Hills | Atlanta | GA | 30308 | 1,891.63 |
| 1161727 | Expedia Inc. | Suite 707 | 6 West Druid Hills | Atlanta | GA | 30308 | 58,575.63 |
| 1250972 | Regal Travel Inc. | Suite 113 | 420 Waiakamilo Rd. | Honolulu | HI | 96817-5316 | 219.73 |
| 1251318 | Travel Specialist | Suite 2810 | 1188 Bishop St. | Honolulu | HI | 96813-3311 | 169.71 |
| 1255042 | Royal Adventure Travel Inc. | | 3229 Koapaka Street | Honolulu | HI | | 180.04 |
| 1259353 | Military Travel Service | | P. O. Box 1689 | Keaau | HI | 96749-1689 | 180.46 |
| 1283746 | Seawind Tours & Travel | Suite C-301 | 725 Kapiolani Blvd | Honolulu | HI | 96813 | 421.39 |
| 1467267 | Gogo Tours | Suite 102 | 3051 Oak Grove Rd | Downers Grove | IL | 60515-1180 | 196.06 |
| 1752503 | Golden Rule Travel | | 6411 W. Morgan Ave. | Hutchinson | KS | 67501-9024 | 174.16 |
| 2356848 | Gogo Tours | Suite 213 | 42815 Garfield Rd | Clinton Township | MI | 48038 | 527.77 |
| 2971306 | Gogo Tours | | 6145 Spring Mountain Rd. | Las Vegas | NV | 89146 | 392.95 |
| 3053947 | Gogo Tours | Suite 101 | 10 Slayton Hill Rd. | Lebanon | NH | 03766 | 157.69 |
| 3162362 | Gogo Tours | Suite 500/First | 440 Franklin Turnpike | Mahwah | NJ | 07430 | 264.10 |
| 3174029 | Liberty Travel Inc. | | 799 Route 17 North | Paramus | NJ | 07652 | 228.30 |
| 3178951 | Gogo Tours | Suite 222 | 440 Franklin Turnpike | Mahwah | NJ | 07430 | 167.81 |
| 3191578 | Liberty Travel Inc. | Suite 1034 | Route 23 North | Wayne | NJ | 07470 | 187.44 |
| 3350193 | Travel Impressions Ltd | Suite A | 465 Smith St. | Farmingdale | NY | 11735-1106 | 1,965.96 |
| 3383968 | Gogo Tours | C 100 | 1979 Marcus Ave. | Lake Success | NY | 11042 | 533.92 |
| 3393360 | Gogo Tours | Suite 1000 | 5110 Velasko Rd. | Syracuse | NY | 13215 | 306.40 |
| 3453299 | Gogo Tours | Suite 309 | 100 Capitola | Durham | NC | 27713 | 159.58 |
| 3967272 | Gogo Tours | | 7802 Castor Avenue | Philadelphia | PA | 19152-3604 | 160.48 |
| 4452435 | Cheap Tickets Inc. | Suite 110 | 801 Royal Pkwy | Nashville | TN | 37214 | 421.17 |
| 4460761 | Gogo Tours | | 471 Welshwood Drive | Nashville | TN | 37211-4225 | 309.72 |
| 4573510 | TPN Travel | Suite 125 | 11603 Crosswinds Way | San Antonio | TX | 78233 | 6,461.94 |
| 6750311 | THE - TFS | Suite 9 | 15 Kern Road | Toronto | Canad | M3B1S9 | 715.84 |

Total   107,517.86

SCHEDULE 2

65355

**Aloha Airlines, Inc. FHB Prepaid Master Cards - 04/08/09**

| Name | Account | Balance |
|------|---------|---------|
| Dennis Frederick | 5569-3014-0011-7663 | $ 5,483.93 |
| Lori Sakurai | 5569-3014-0011-7655 | $ 2,615.12 |
| Jeffrey G Cummins | 5569-3014-0011-7671 | $ 2,659.20 |
| R P Clark, Jr. | 5569-3014-0015-8188 | $ 15,516.66 |
| Mustansir Malik | 5569-3014-0012-9387 | $ 801.91 |
| Mike Coffman | 5569-3014-0015-1050 | $ 14,506.15 |
| Pat Rosa | 5569-3014-0015-1068 | $ 10,872.66 |
| | | $ 52,455.63 |

SCHEDULE  3

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | Case No. 08-00337 |
| | (Chapter 7 Cases) |
| ALOHA AIRLINES, INC., a Delaware corporation, <u>et al.</u>, | (Jointly Administered) |
| Debtors | |
| This Document relates to: All Cases | |

## DECLARATION OF TRUSTEE IN SUPPORT OF MOTION

I, Dane S. Field, hereby declare under penalty of perjury that:

1.      I am the duly appointed Chapter 7 Trustee of Aloha Airlines, Inc., Aloha Airgroup, Inc., and Airgroup Acquisition Corp. (collectively, the "Debtors").

2.      I make this declaration in support of the *TRUSTEE'S RENEWED MOTION FOR ENTRY OF AN ORDER APPROVING THE SALE OF THE ESTTE'S REMAINING ASSETS INCLUDING INTELLECTUAL PROPERTY ASSETS TO YUCAIPA* (the "Motion").

3.      Terms used herein and not otherwise defined shall have the meanings given them in the Motion.

4.      Except as otherwise indicated, all of the facts set forth in this Declaration are based upon my personal knowledge and my review of relevant

documents of the Debtors and the record in these cases.[1]   I am competent to

testify to the matters herein set forth and if called upon to do so, I could and would

testify to the facts set forth herein.

       5.    I have determined that selling the Debtors' interest in the Assets

to Yucaipa, subject to overbid, and on the terms and conditions set forth in the

Asset Purchase Agreement, attached as Exhibit "A" to the Motion, is in the best

interest of the Debtors' estates.

I declare under penalty of perjury, that the foregoing is true and correct.

Dated: Honolulu, Hawaii, November 18, 2010.

/s/  Dane S. Field
Dane S. Field

---

[1] Certain of the disclosures herein relate to matters within the personal knowledge of other officers and employees of the Debtors and are based on information provided by them and/or are matters of public record.